### In Re ENRON CORPORATION SECURITIES, DERIVATIVE & "ERISA LITIGATION"

**This Document Relates to: All Cases**

**Mark Newby, et al., Plaintiffs**

**v.**

**Enron Corporation, et al., Defendants**

**The Regents of The University of California, et al., Individually and On Behalf of All Others Similarly Situated, Plaintiffs,**

**v.**

**Kenneth L. Lay, et al., Defendants.**

**No. MD–1446, CIV.A.H–01–3624.**

United States District Court,
S.D. Texas,
Houston Division.

March 12, 2003.

Eric D. Green, pro se, Resolutions LLC, Boston, MA, for Mediator.

Richard J. Zook, Cunningham Darlow et al, Roger B. Greenberg, Schwartz Junell et al, Houston, TX, William S. Lerach, Milberg Weiss et al, San Diego, CA, Earnest W. Wotring, Connelly Baker et al, Houston, TX, Ira Press, Kirby McInerney et al, New York, NY, Michael I. Behn, Futterman & Howard Chtd, Chicago, IL, Charles R. Parker, Hill and Parker, Houston, TX, James M. Finberg, Richard M. Heimann, Melanie M. Piech, Lieff Cabraser et al, San Francisco, CA, Stephen Lowey, Neil L. Selinger, Lowey Dannenberg et al, White Plains, NY, Elizabeth Cabraser, Lieff Cabraser et al, San Francisco, CA, Sherrie Savett, Arthur Stock, Berger & Montague PC, Philadelphia, PA, Thomas W. Sankey, Sankey & Luck, Houston, TX, Paul F. Bennett, Gold Bennett et al, San Francisco, CA, Thomas E. Bilek, Hoeffner Bilek & Eidman, Houston, TX, Helen J. Hodges, Milberg Weiss et al, San Diego, CA, William B. Federman, Federman & Sherwood, Oklahoma City, OK, Richard A. Speirs, Jeffrey C. Zwerling, Zwerling Schachter et al, New York, NY, Jack Edward McGehee, McGehee & Pianelli, Houston, TX, Robert B. Weintraub, Daniel W. Krasner, Wolf Haldenstein et al, New York, NY, Tom Alan Cunningham, Cunningham Darlow et al, Houston, TX, Martin D. Chitwood, Jeffrey H. Konis, Chitwood & Harley, Atlanta, GA, Sidney S. Liebesman, Grant & Eisenhofer PA, Wilmington, DE, Jay W. Eisenhofer, Grant & Eisenhofer, Wilmington, DC, Edward H. Nicholson, Jr., Chitwood & Harley, Atlanta, GA, Ronald Joseph Kormanik, Sydow Kormanik Carrigan & Eckerson, Gregory Sean Jez, Fleming & Associates, Houston, TX, David C. Mattax, Office of Attorney General, Rose Ann Reeser, Texas Attorney General, Austin, TX, Stephen D. Oestreich, Entwistle & Cappuci LLP, New York, NY, Deborah R. Gross, Law Offices Bernard M. Bross PC, Philadelphia, PA, James F. Marshall, Attorney at Law, San Marino, CA, Meredith Cavallo, Larry E. Klayman, Judicial Watch Inc, Steven J. Toll, Cohen Milstein et al, Washington, DC, Theodore C. Anderson, Kilgore & Kilgore PLLC, Dallas, TX, David R. Scott, Attorney at Law, Neil Rothstein, James E. Miller, Scott & Scott LLC, Colchester, CT, John A. Lowther, James I. Jaconette, Alexandra S. Bernay, Milberg Weiss et al, San Diego, CA, Hector G. Gancedo, Gancedo & Nieves LLP, Pasadena, CA, Herbert Blake Tartt, Jr., Beirne Maynard et al, Houston, TX, Robert M. Kornreich, Wolf Popper LLP, New York, NY, Allyson L. Mihalick, Beirne Maynard et al, Houston, TX, Robert C. Finkel, Wolf Popper LLP, New York, NY, Thomas G. Shapiro, Shapiro Haber et al, Boston, MA, Joseph Albert McDermott, III, Attorney at Law, Houston, TX, Jonathan M. Plasse, Goodkind Labaton et al, New York, NY, David B. Kahn, Attorney at Law, Northfield, IL, Saul Roffe, Sirota & Sirota LLP, New York, NY, Sean F. Greenwood, Robins Cloud et al, John G. Emerson, Jr., The Emerson Firm, Richard Frankel, Hackerman Peterson et al, Houston, TX, Aaron Brody, Stull Stull et al, New York, NY, James D. Baskin, III, The Baskin Law Firm, Austin, TX, Klari Neuwelt, Attorney

at Law, New York, NY, Michael D. Donovan, Donovan Searles LLC, Philadelphia, PA, Steven E. Cauley, Cauley Geller et al, Little Rock, AR, George M. Fleming, Fleming & Associates, Jeffery B. Kaiser, Sydow, Kormanik, Carrigan & Eckerson, LLP, Houston, TX, Andrew J. Mytelka, Greer Herz & Adams, Galveston, TX, Debra Brewer Hayes, Paul Thomas Warner, Reich & Binstock, Houston, TX, Harvey Greenfield, Attorney at Law, Laura M. Perrone, Law Firm of Harvey Greenfield, New York, NY, Edward Morgan Carstarphen, III, Ellis Carstarphen et al, Houston, TX, Fredrick F. Neid, Ass't Atty Gen, Lincoln, NE, Daniel Dean Gartner, Gartner Law Firm, PC, Robin L. Harrison, Campbell Harrison et al, Houston, TX, Lynn Lincoln Sarko, Derek W Loeser, Britt L. Tinglum, Keller Rohrback LLP, Seattle, WA, Steve W. Berman, Hagens Berman LLP, Erin M. Riley, Keller Rohrback LLP, Seattle, WA, Baxter Ward Banowsky, Banowsky Betz & Levine, Dallas, TX, Gary Benjamin Pitts, Pitts & Asoc, Houston, TX, Kenneth F. McCallion, McCallion & Associates, New York, NY, Damon Michael Young, Young Pickett et al, Texarkana, TX, Jeffrey R. Krinsk, Attorney at Law, San Diego, CA, Curtis L. Bowman, Cauley Geller et al, Little Rock, AR, Keith Alan Ward, Porter Rogers et al, Austin, TX, Mike Lange, Reinhardt Lange, Fairfield, CT, John Lee Ringgenberg, Attorney at Law, Englewood, CO, John A. Huettner, Attorney at Law, Cleveland, OH, Richard A. Lockridge, Lockridge Grindal et al, Minneapolis, MN, Stanley M. Grossman, Pomerantz Haudek et al, New York, NY, Steven N. Williams, Joseph W. Cotchett, Bruce L. Simon, Mark C. Molumphy, Cotchett Pitre et al, Burlingame, CA, Lynn W. Jinks, III, Jinks Daniel et al, Union Springs, AL, Ted L. Mann, Mann Cowan et al, Birmingham, AL, L. Shane Seaborn, Penn & Seaborn LLC, Clayton, AL, R. Paul Yetter, Yetter and Warden, Houston, TX, Philip T. Reinstein, Reinstein & Sherman, Howard C. Goode, Attorney at Law, Northbrook, IL, John H. Boone, Attorney at Law, Joseph M. Alioto, Alioto Law Firm, San Francisco, CA, Autry W. Ross, Yetter & Warden LLP, Houston, TX, Thomas Walter Umphrey, Provost & Umphrey, Beaumont, TX, Bonnie E. Spencer, Spencer and Associates, Houston, TX, Andy Wade Tindel, Provost & Umphrey Law Firm, Tyler, TX, for Plaintiffs/Consolidated Plaintiffs.

Stephen D. Susman, Susman Godfrey, Scott David Lassetter, John B. Strasburger, Weil Gotshal and Manges, Kenneth S. Marks, Susman Godfrey LLP, Craig Smyser, Jr., Smyser Kaplan & Veselka, Richard Bruce Drubel, Jr., Boies Schiller et al, Hanover, NH, John W. Keker, Jan Nielsen Little, Christa M. Anderson, Keker & Van Nest LLP, San Francisco, CA, James E. Coleman, Jr., Carrington Coleman et al, Dallas, TX, Robin C. Gibbs, Gibbs & Bruns, Houston, TX, Charles F. Richards, Jr., Richards Layton et al, Wilmington, DE, David Clarke, Jr., Keara M. Gordon, Piper Marbury et al, Washington, DC, Glenn E. Coe, Brenda M. Hamilton, Rome McGuigan et al, Hartford, CT, Ronald Gene Woods, Attorney at Law, Houston, TX, Bruce A. Hiler, O'Melveny & Myers, Washington, DC, Jeffrey Kilduff, O'Melveny & Myers, McLean, VA, Robert M. Stern, Attorney at Law, Washington, DC, Russell "Rusty" Hardin, Jr., Rusty Hardin and Associates, Houston, TX, Daniel F. Kolb, Sharon Katz, Davis Polk et al, New York, NY, Theresa Ann Foudy, Benard V. Preziosi, Eliot Lauer, Curtis Mallet-Prevost et al, New York, NY, Warren B. Lightfoot, Lightfoot Franklin et al, Birmingham, AL, Catherine E. Palmer, Latham & Watkins, New York, NY, Miles N. Ruthberg, Latham & Watkins, Los Angeles, CA, Peter Wald, Latham & Watkins, Stan G. Roman, Krieg Keller et al, San Francisco, CA, Turner P. Smith, Samuel Rosenthal, Curtis Mallet–Prevost et al,

New York, NY, Barry G. Flynn, Attorney at Law, George W. Billy Shepherd, III, Cruse Scott et al, Houston, TX, Michael D. Warden, Luisa Caro, Sidley Austin et al, Washington, DC, Eric J.R. Nichols, Beck Redden & Secrest, Clayton C. Cannon, Stumpf Craddock et al, Houston, TX, Scott B. Schreiber, John C. Massaro, Justin S. Antonipillai, Arnold & Potter, Washington, DC, Mark K. Glasser, King & Spalding, Charles G. King, III, King & Pennington, Houston, TX, Gregory A. Markel, Cadwalader Wickersham et al, New York, NY, Paul R. Bessette, Brobeck Phleger et al, Austin, TX, Ronit Setton, Nancy I. Ruskin, Cadwalader Wickersham et al, New York, NY, Lawrence David Finder, Haynes & Boone LLP, Houston, TX, Richard W. Clary, Karin A. DeMasi, Margaret K. Dooley, Rachel G. Skaistis, Julie Ann North, Melissa J. Baily, Joseph R. Wallin, Cravath Swaine et al, New York, NY, Barry Abrams, Abrams Scott et al, Houston, TX, David H. Braff, Sullivan & Cromwell, New York, NY, William H. Knull, III, Mayer Brown et al, Houston, TX, Alan N. Salpeter, Mark McLaughlin, Andrew D. Campbell, Michele L. Odorizzi, Mayer Brown et al, Chicago, IL, Mark F. Pomerantz, Paul Weiss et al, New York, NY, Jacalyn D. Scott, Wilshire Scott et al, Houston, TX, Richard A. Rosen, Claudia Hammerman, Robyn F. Tarnofsky, Jonathan Hurwitz, Michael E. Gertzman, Brad S. Karp, Alyssa A. Qualls, Robert C. Weisz, Margaret E. McGuinness, Todd A. Kipnes, Paul Weiss et al, New York, NY, Joel M. Androphy, Berg & Androphy, Houston, TX, Lawrence Byrne, Owen Pell, Lance Crofoot–Suede, Timothy Pfeifer, White & Case LLP, New York, NY, Taylor M. Hicks, Jr., Hicks Thomas et al, Houston, TX, Robert F. Serio, Gibson Dunn & Crutcher, Christopher M. Joralemon, Clifford Chance et al, Marshall R. King, Gibson Dunn et al, Herbert S. Washer, James B. Weidner, James D. Miller, Ignatius Grande, Clifford Chance et al, New York, NY, Charles A. Gall, Jenkens & Gilchrist, Dallas, TX, Richard Warren Mithoff, Jr., Mithoff and Jacks, Houston, TX, John D. Roesser, David J. Woll, Thomas C. Rice, Jonathan K. Youngwood, Bruce D. Angiolillo, Christopher M. Caparelli, Jill M. O'Toole, George S. Wang, William M. Tong, Nihara K. Choudhri, Pieter H.B. Van Tol, Simpson Thacher et al, New York, NY, Keith Carter Hannigan, Jenkins & Gilchrist, Chicago, IL, Ronald Earl Cook, Cook Roach et al, Houston, TX, James F. Moyle, James N. Benedict, Rogers & Wells, Mark A. Kirsch, Clifford Chance et al, New York, NY, Kelly M. Klaus, Ronald L. Olson, Dennis C. Brown, John W. Spiegel, Kevin S. Allred, Kristin L. Myles, Munger, Tolles, & Olson, LLP, San Francisco, CA, Jack C. Nickens, Nickens Keeton et al, Houston, TX, Elizabeth T. Parker, Pepper Hamilton LLP, Philadelphia, PA, Stephen J. Crimmins, Pepper Hamilton LLP, Washington, DC, Robert C. Micheletto, Jones Day et al, Chicago, IL, David L. Carden, Jones Day et al, New York, NY, Brian A. Troyer, Jones Day et al, Cleveland, OH, David Elliott Miller, Hugh R. Whiting, Jones Day et al, Houston, TX, William Edward Matthews, Gardere Wynne et al, Harvey G. Brown, Jr., Orgain Bell et al, Matthew D. Shaffer, Schechter McElwee et al, Houston, TX, Michael G. Davies, Hoguet Newman et al, New York, NY, James P. Pennington, King & Pennington LLP, Houston, TX, Paul Vizcarrondo, Jr., Jonathan E. Pickhardt, Wachtell Lipton et al, Max Gitter., Cleary Gottlieb et al, New York, NY, Murray J. Fogler, McDade Fogler et al, Houston, TX, Roger E. Zuckerman, Steven M. Salky, Deborah J. Jeffrey, Amy M. McNamer, Norman L. Eisen, Zuckerman Spaeder LLP, Washington, DC, Barnes H. Ellis, David H. Angeli, Stoel Rives LLP, Portland, OR, Amy Joseph Pedersen, William F. Martson, Zachary W.L. Wright, Tonkon Torp LLP, Portland, OR, Edward

John O'Neill, Jr., Jason Carrington Norwood, Clements O'Neill et al, Houston, TX, Jennifer Piskun, John J. McKetta, III, Graves Dougherty et al, Austin, TX, Mark J. Rochon, Emmett B. Lewis, Miller & Chevalier Chartered, Washington, DC, H. Bruce Golden, Golden & Owens LLP, Houston, TX, Dennis H. Tracey, Brad M. Johnston, David Wertheimer, Hogan & Hartson LLP, New York, NY, Amelia Rudolph, Sutherland Asbill et al, Atlanta, GA, Kathryn Schaefer Zecca, Gary A. Orseck, Robbins Russell Englert Orseck & Untereiner, LLP, Lawrence S. Robbins, Robbins Russell et al, Washington, DC, Billy Jack Shepherd, Cruse Scott et al, Houston, TX, Peter Fleming, Jr., Michael J. Moscato, Curtis Mallet–Prevost et al, New York, NY, David E. Ross, Mark C. Hansen, Kellogg Huber et al, Washington, DC, Henry F. Schuelke, III, Janice Schuelke et al, Washington, DC, Robert Hayden Burns, Burns Wooley et al, Houston, TX, J. Clifford Gunter, III, Abigail K. Sullivan, Bracewell & Patterson LLP, Houston, TX, Damon Michael Young, Young Pickett et al, Texarkana, TX, Walter J. Cicack, Adams & Reese, Houston, TX, Paul D. Clote, Attorney at Law, Rodney Acker, Jenkens & Gilchrist, Dallas, TX, for Defendants/Consolidated Defendants.

William S. Lerach, Milberg Weiss et al, San Diego, CA, Thomas E. Bilek, Hoeffner Bilek & Eidman, Houston, TX, Steven G. Schulman, Milberg Weiss Bershad Hynes and Lerach, New York, NY, R. Paul Yetter, Yetter and Warden, Houston, TX, Michael J. Pucillo, Burt & Pucillo, West Palm Beach, FL, Glen DeValerio, Jeffrey C. Block, Berman DeValerio et al, Boston, MA, Vincent R. Cappucci, Entwistle & Cappucci, New York, NY, James M. Finberg, Richard M. Heimann, Melanie M. Piech, Lieff Cabraser et al, San Francisco, CA, Stephen Lowey, Lowey Dannenberg et al, White Plains, NY, Wendy Hope Zoberman, Berman DeValerio et al, West Palm Beach, FL, Johnston de Forest Whitman, Jr., Andrew J. Entwistle, Entwistle & Cappucci LLP, New York, NY, Neil L. Selinger, Lowey Dannenberg et al, White Plains, NY, Roger B. Greenberg, Schwartz Junell et al, Houston, TX, Bonnee Linden, Dr, Hewlett, NY, Don R. Sampen, Illinois Ass't Atty Gen, Chicago, IL, Joseph D. Jamail, II, Jamail and Kolius, Houston, TX, John K. Villa, Mary G. Clark, George A. Borden, Williams & Connolly LLP, Washington, DC, Mark D. Starr, Fredrick F. Neid, Don Stenberg, Ass't Atty Gen, L. Steven Grasz, Deputy Atty Gen, Lincoln, NE, Daniel J. Doyle, Office of Atty Gen, Harrisburg, PA, Thomas J. Blessington, Office of Atty Gen, Philadelphia, PA, G. William Scott, Timothy Hauser, Robin Springberg Parry, Michael Schloss, U.S. Dept of Labor, Washington, DC, Damon Michael Young, Young Pickett et al, Texarkana, TX, Jeffrey S. Boyd, Deputy Atty Gen for Litigation, Austin, TX, Brian D. Salwowski, Deputy Atty Gen, Indianapolis, IN, Linda L. Addison, Fulbright and Jaworski, Houston, TX, David H. Donaldson, Jr., George & Donaldson, Austin, TX, James L. Petersen, Ice Miller, Indianapolis, IN, Mike McKool, Jr., McKool Smith, Dallas, TX, George David Gordon, Baggett Gordon & Deison, Conroe, TX, Brian D. Hail, Milbank Tweed et al, New York, NY, for Movants.

Joseph A. Grundfest, Stanford Law School, Stanford, CA, Stephen Webster, SEC, Legal Counsel, Fort Worth, TX, for Amicus.

Carolyn S. Schwartz, pro se, New York, NY, for Trustee.

## MEMORANDUM AND ORDER REGARDING ENRON OUTSIDE DIRECTOR DEFENDANTS' MOTIONS

HARMON, District Judge.

Lead Plaintiff the Regents of the University of California's consolidated com-

plaint in the above referenced putative class action, brought on behalf of purchasers of Enron Corporation's publicly traded equity and debt securities during a proposed federal Class Period from October 19, 1998 through November 27, 2001, alleges violations of (1) Sections 11 and 15 of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. §§ 77k and 77o; (2) Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act" or "the 1934 Act"), 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b–5; and (3) the Texas Securities Act, Texas Rev. Civ. Stat. Ann. art. 581–33 (Vernon's 1964 & 2002 Supp.).

Pending before the Court *inter alia* are motions to dismiss pursuant to Rules 8, 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure, section 21D(b)(3) of the Exchange Act, as amended, the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), codified at 15 U.S.C. § 78u–4(b)(3)(A), and *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), filed by the following Enron Outside Director Defendants:

(1) Certain Current and Former Directors (Robert A. Belfer, Norman P. Blake, Jr., Ronnie C. Chan, John H. Duncan,[1] Joe H. Foy, Wendy L. Gramm, Ken L. Harrison, Robert K. Jaedicke, Charles A. LeMaistre, Rebecca Mark–Jusbasche,[2] John Mendelsohn, Jerome J. Meyer, Paulo V. Ferraz Pereira, Frank Savage, John A. Urquhart, John Wakeham, Charles Walker, and Herbert S. Winokur, Jr.)(# 661);

(2) [Present and Former Outside Directors] Robert A. Belfer, Norman P. Blake, Jr., Ronnie C. Chan, John H. Duncan, Joe H. Foy, Wendy L. Gramm, Robert K. Jaedicke, Charles A. LeMaistre, John Mendelsohn, Jerome J. Meyer, Paulo V. Ferraz Pereira, Frank Savage, John Wakeham, Charles E. Walker, and Herbert S. Winokur (# 662);

(3) John A. Urquhart (# 647); and

(4) Alliance Capital Management L.P. ("Alliance"), for failure to state a § 15 claim[3] for which relief can be granted (# 618).

Also pending are a Joint Motion of Certain Defendants (Belfer, Blake, Chan, Duncan, Foy, Gramm, Jaedicke, LeMaistre, Mendelsohn, Meyer, Ferraz Pereira, Savage, Wakeham, Walker, Winokur, Urquhart, and Mark–Jusbasche) to Strike the Pulsifer Class Action Complaint (# 1042), joined by Enron executives Kenneth L. Lay (# 1047), Richard A. Causey (# 1052), and Ken L. Harrison (# 1053), and Lead Plaintiff's request for leave to amend (# 839) should the Court determine that any part of the complaint should be dismissed.

The Court hereby incorporates its summaries of the alleged facts and applicable law in its memorandum and order of December 20, 2002 (# 1194),[4] regarding the

---

**1.** Outside Director John Duncan will be identified as "Duncan," while Arthur Andersen's David Duncan will be referred to by his full name.

**2.** During the Class Period Harrison and Mark–Jusbasche were Enron executives, not Outside Director Defendants.

**3.** The complaint alleges that Alliance was a controlling-person of controlled-person Frank Savage, who, during the Class Period, was concurrently Chairman of Alliance Capital Management International, a division of Defendant Alliance, and a director (and thus an employee) of Alliance, as well as an Outside Director of Enron Corporation.

**4.** Also available as *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 235 F.Supp.2d 549, Fed. Sec. L. Rep. ¶ 92,239 (S.D.Tex. Dec.19, 2002).

secondary actors' motions to dismiss, and its memorandum and order of January 28, 2003 (# 1241),[5] addressing the Individual Andersen Defendants' motions to dismiss, in particular its conclusions about the group pleading doctrine and controlling person liability.

## SUPPLEMENTAL APPLICABLE LAW

### A. Section 10(b) and Rule 10b–5 Violations

### 1. Signing false or misleading documents to be filed with the SEC

■ A corporate official, acting with scienter, who on behalf of the corporation signs a document that is filed with the SEC that contains material misrepresentations, such as a fraudulent Form 10–K, regardless of whether he participated in the drafting of the document, "makes" a statement and may be liable as a primary violator under § 10(b) for making a false statement. *Howard v. Everex Systems, Inc.,* 228 F.3d 1057, 1061 (9th Cir.2000), *citing AUSA Life Ins. Co. v. Dwyer (In re JWP Inc., Sec. Litig.),* 928 F.Supp. 1239, 1255–56 (S.D.N.Y.1996)(holding that a director who signs a fraudulent Form 10–K with scienter can be liable as a primary violator for making a false statement under § 10(b)), and *F.N. Wolf & Co., Inc. v. Estate of Neal,* No. 89 Civ. 1223(CSH), 1991 WL 34186, at *8 (S.D.N.Y. Feb.25, 1991)(holding that a "director signing a document filed with the SEC ... 'makes or causes to be made' the statements contained therein" under § 18(a) of the 1934 Act). *See also In re Cabletron Systems, Inc.,* 311 F.3d 11, 40 (1st Cir.2002); *In re*

*Reliance Sec. Litig.,* 135 F.Supp.2d 480, 503 (D.Del.2001); *In re Indep. Energy Holdings PLC Sec. Litig.,* 154 F.Supp.2d 741, 767 (S.D.N.Y.2001), *abrogated on other grounds, In re Initial Public Offering Sec. Litig.,* 241 F.Supp.2d 281 (S.D.N.Y. 2003); *In re Lernout & Hauspie Sec. Litig.,* 286 B.R. 33, 37 (D.Mass.2002)(signatures of three members of the Audit Committee on statements filed with the SEC "satisfy the requirement that defendants make a fraudulent statement" for liability under § 10(b)); *In re Lernout & Hauspie Sec. Litig.,* 230 F.Supp.2d 152, 163 (D.Mass.2002)("It is well established in this Circuit that each defendant may be held responsible for the false and misleading statements contained in the financial statements he signed [under § 10(b) ]," *citing Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 367–68 (1st Cir.1994)). The Ninth Circuit explained that "by placing responsibility on corporate officers to ensure the validity of corporate filings, investors are further protected from misleading information." *Howard,* 228 F.3d at 1061. Furthermore, "[k]ey corporate officers should not be allowed to make important false financial statements knowingly or recklessly, yet still shield themselves from liability to investors simply by failing to be involved in the preparation of those statements. Otherwise the securities laws would be significantly weakened ...." *Id.* at 1062.

The SEC has attempted to make signatures on corporate documents that are filed with the SEC carry significant weight. Noting that the signature requirements for Form 10–K [in General Instruction D of Form 10–K [6] and General

---

**5.** Also available as *In re Enron Corp. Sec., Derivative & "ERISA" Litig.,* No. MDL–1446, CIV. A. H–01–3624, 2003 WL ·230688 (S.D.Tex. Jan.28, 2003).

**6.** Instruction D to Form 10–K requires that a report be signed by the registrant and on

the registrant's behalf by its principal executive officer or officers, its principal financial officer, its controller or principal accounting officer, and at least the majority of the registrant's board of directors or persons performing similar functions.

Instruction C of Form 10–KSB] were amended in 1980 to "'enhance director awareness of and participation in the preparation of the Form 10–K information,'" the SEC has explained that "by signing documents filed with the Commission, board members implicitly indicate that they believe that the filing is accurate and complete." "Audit Committee Disclosure" (S.E.C. Release No. 41987), 1999 WL 955908 at *29 n. 57, *9 (Oct. 7, 1999). Similarly, in a brief submitted to the Ninth Circuit during the litigation of *Howard*, the SEC stated, "'When the public sees a corporate official's signature on a document, it understands that the official is thereby stating that he believes that the statements in the document are true.'"

*Id.* at *9, citing Brief for SEC, Amicus Curiae, at 7, *Howard v. Everex Systems, Inc.*, 228 F.3d 1057 (9th Cir.1999).[7]

## 2. Insider Trading as a Primary Violation

Allegations of insider trading may serve different purposes under the federal securities laws, including the following: as a primary violation of § 10(b) of the 1934 Act and Rule 10b–5; as a means to raise a strong inference of scienter for a § 10(b) violation; and as the basis for an independent, but derivative, claim under § 20A of the Exchange Act.[8]

■ To plead a violation of § 10(b), a plaintiff must allege both (1) a breach of a

---

7. As evidence of the growing import placed by the SEC on corporate officers' and directors' signatures on documents to be filed with the SEC, in its post-Enron efforts to protect investors, the SEC in a June 27, 2002 investigative order required the chief financial officer and the chief executive officer of the 947 largest public companies to certify the accuracy of their companies' financial statements with their signatures on all annual and quarterly Form 10–K and Form 10–Q reports by August 14, 2002. File No. 4–460: Order Requiring the Filing of Sworn Statements Pursuant to Section 21(a)(1) of the Securities and Exchange Act of 1934 (June 27, 2002).

In addition, certification by the CEO and CFO is also required under two different provisions, Section 302 and Section 906, of the Sarbanes–Oxley Act of 2002. Under Section 302, which amends the Exchange Act and became effective August 29, 2002, the signing officer must certify that he has reviewed the Form 10–K or 10–Q report, that based on his knowledge that report does not omit or misstate a material fact and the financial information fairly presents in all material respects the financial condition and results of operations of the company and complies with new Exchange Act Rules requiring an issuer to establish and maintain a system of disclosure controls and procedures. Under Section 906, which amends the federal criminal code (Title 18 of the U.S.Code) and became effective July 30, 2002, similar certification is required on the same periodic reports, and criminal pen-

alties may be imposed for knowing and willfully false certifications by the CEO and CFO.

In the its "Proposed Rule": Certification of Disclosure in Companies' Quarterly and Annual Reports, Release No. 34–46300 (Aug. 2, 2002), the SEC indicated that under Section 302 complying with GAAP alone was not sufficient and that Congress "intended this statement to provide assurances that the financial information disclosed in a report, viewed in its entirety, meets a standard of overall material accuracy and completeness that is broader than financial reporting requirements under generally accepted accounting principles." Moreover, according to the SEC, "fair presentation" includes "the selection of appropriate accounting policies, proper application of appropriate accounting policies, disclosure of financial information that is informative and reasonably reflects the underlying transactions and events and the inclusion of any additional disclosure necessary to provide investors with a materially accurate and complete picture of an issuer's financial condition, results of operations and cash flows." *Id.*

8. The Court reminds the parties because of arguments in their briefs that the Court has previously ruled that the declaration of Lead Plaintiff's expert Scott Hakala would not be considered in determining the adequacy of Lead Plaintiff's pleading of insider trading. # 996, entered on 8/9/02.

fiduciary duty, such as the duty to disclose, and "manipulation or deception," *Santa Fe Industries v. Green*, 430 U.S. 462, 472, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); and (2) scienter, or "intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

### Duty to Disclose

■ Rule 10b–5 does not impose on a corporation an affirmative duty to disclose all nonpublic material information that it has about the corporation, and where a material omission is alleged, there is no liability under the federal securities laws unless that corporation has a duty to disclose such information. *Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)("a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information"); *Dirks v. SEC*, 463 U.S. 646, 654, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983); *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."); *Gross v. Summa Four, Inc.*, 93 F.3d 987, 992 (1st Cir.1996); *Starkman v. Marathon Oil Co.*, 772 F.2d 231, 238 (6th Cir. 1985)("[T]he established view is that a 'duty to speak' must exist before the disclosure of material facts is required under Rule 10b–5."), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986); *Glazer v. Formica Corp.*, 964 F.2d 149, 156–57 (2d Cir.1992).

■ Courts have imposed a duty to disclose on corporations and/or its officers [9] in certain circumstances. "The duty to disclose only arises if the person is in a position of trust." *SEC v. Fox*, 855 F.2d 247, 252 (5th Cir.1988), *citing Chiarella*, 445 U.S. at 235, 100 S.Ct. 1108; *see also United States v. Ruggiero*, 56 F.3d 647, 654–55 (5th Cir.1995), *cert. denied*, 516 U.S. 979, 116 S.Ct. 486, 133 L.Ed.2d 413 (1995). One such situation is when a corporate insider trades on confidential information ("intended to be available only for a corporate purpose and not for the personal benefit of anyone") and makes "secret profits." *Chiarella*, 445 U.S. at 228–29, 100 S.Ct. 1108; *Dirks*, 463 U.S. at 654, 103 S.Ct. 3255; *United States v. O'Hagan*, 521 U.S. 642, 652, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997); *United States v. Ruggiero*, 56 F.3d at 654–55. Thus Section 10(b) may be violated where the trading in the corporation's securities arises "in connection with" a breach of a fiduciary duty and where there is also manipulation or deception. *Dirks*, 463 U.S. at 654, 103 S.Ct. 3255; *Chiarella*, 445 U.S. at 232–36, 100 S.Ct. 1108. The fiduciary duty is not imposed because of the nonpublic nature of the information; rather "liability under § [*sic*] 10b–5 attaches by virtue of the relationship between the shareholders and the individual trading on the inside information" in whom those shareholders "'had placed their trust and confidence.'" *Ruggiero*, 56 F.3d at 654–55. The SEC long ago concluded that an "affirmative duty to disclose ... material facts which are known to [the insider] by virtue of [his] position but which are not known to persons with whom [the insider] deal[s] and which, if known, would affect their investment judgment," arises "from (i) the existence of a relationship affording access to inside information intended to be available only for a corporate purpose, and (ii) the unfairness of allowing a corporate insider to take advantage of that information by trading without disclosure." *Chiarella*,

---

**9.** The duty to disclose or abstain from trading applies to a corporate issuer that trades in its own securities as well as to the corporation's insiders, individually. *Kohler v. Kohler Co.*, 319 F.2d 634, 638 (7th Cir.1963); *McCormick v. Fund American Cos., Inc.*, 26 F.3d 869, 876 (9th Cir.1994); *Shaw v. Digital Equipment*, 82 F.3d 1194, 1203–04 (1st Cir.1996)(*en banc*).

445 U.S. at 227, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), *citing In re Cady, Roberts & Co.,* 40 S.E.C. 907, 911, 912, 1961 WL 60638 (1961)(holding that a corporate insider must either disclose all material inside information known to him because of his corporate position or abstain from trading the securities of his corporation). *See also SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 848 (2d Cir.1968)(*en banc* ), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *SEC v. MacDonald,* 699 F.2d 47, 50 (1st Cir.1983)(*en banc* ); *Shaw v. Digital Equipment,* 82 F.3d 1194, 1203 (1st Cir.1996)(*en banc* ).

As another instance where a duty to disclose is imposed by law on corporations, when a corporation makes a disclosure of material fact, voluntarily or involuntarily, the courts have recognized that "there is a duty to make it complete and accurate." *Roeder v. Alpha Industries, Inc.,* 814 F.2d 22, 26 (1st Cir.1987), *citing Texas Gulf Sulphur,* 401 F.2d at 860–61; *Gross v. Summa Four, Inc.,* 93 F.3d at 992; *Glazer v. Formica Corp.,* 964 F.2d 149, 156–57 (2d Cir.1992); *Sailors v. Northern States Power Co.,* 4 F.3d 610, 611 (8th Cir.1993). The Fifth Circuit has held that "under Rule 10b–5, 'a duty to speak the full truth arises when a defendant undertakes a duty to say anything.'" *Rubinstein v. Collins,* 20 F.3d 160, 170 (5th Cir.1994), *citing First Virginia Bankshares v. Benson,* 559 F.2d 1307, 1317 (5th Cir.1977), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978). It furthermore noted that defendants "have a duty under Rule 10b–5 to correct statements if those statements become materially misleading in light of subsequent events." *Id.* at 170 n. 41, *citing Backman v. Polaroid Corp.,* 910 F.2d 10, 17 (1st Cir.1990); *In re Phillips Petroleum Sec. Litig.,* 881 F.2d 1236, 1245 (3d Cir. 1989); *Hanon v. Dataproducts Corp.,* 976

F.2d 497, 503–04 (9th Cir.1992); *Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040, 1043 (11th Cir.1986), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987).

## Manipulation or Deception

Section 10(b) does not use the term, "insider trading," but because of the special relationship of trust and confidence between shareholders and corporate insiders, courts have concluded that "insider trading by a corporate insider based on material, nonpublic information, qualifies as a 'deceptive device' under § 10(b) and violates the insiders's duty to disclose or abstain from trading and therefore constitutes a manipulative act." *In re Sec. Litig. BMC Software, Inc.,* 183 F.Supp.2d 860, 869 n. 18 (S.D.Tex.2001), *citing O'Hagan,* 521 U.S. at 652, 117 S.Ct. 2199; *Dirks,* 463 U.S. at 654, 103 S.Ct. 3255; *Shaw,* 82 F.3d at 1203. Moreover in a new rule, 17 C.F.R. § 240.10b5–1(a), effective August 24, 2000, the SEC made explicit,

> The "manipulative and deceptive devices" prohibited by Section 10(b) of the Act (15 U.S.C. § 78j) and § 240.20b–5 thereunder include, among other things, the purchase or sale of a security of any issuer, on the basis of material nonpublic information about that security, in breach of a duty of trust or confidence that is owed directly, indirectly, or derivatively, to the issuer of that security or the shareholders of that issuer, or to any other person who is the source of the material nonpublic information.

 Under the traditional or "classical" theory of insider trading, insider trading may constitute a violation of § 10(b) and Rule 10b–5 "when a corporate insider trades in the securities of his corporation on the basis of material nonpublic information." *United States v. O'Hagan,* 521 U.S. at 651–52, 117 S.Ct. 2199, *citing Chiarella,* 445 U.S. at 228–29, 100 S.Ct. 1108.[10] As

---

**10.** In comparison to the classical theory, the "misappropriation" theory of insider trading also originates in § 10(b) and Rule 10b–5.

noted, such trading constitutes a "deceptive device" under § 10(b) because of "a relationship of trust and confidence between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position in the corporation" that "gives rise to a duty to disclose [or to abstain from trading] because of the necessity of preventing a corporate insider from ... taking unfair advantage of ... uninformed stockholders." *Id.* at 652, 117 S.Ct. 2199. The classical theory of insider trading applies not only to officers, directors, and other permanent insiders of a corporation, but also to attorneys, accountants, lawyers, and other consultants who become only temporary fiduciaries of a corporation by entering into a confidential relationship in the conducting of the corporation's business and are given access to nonpublic corporate information solely for corporate purposes. *Id.* at 652, 117 S.Ct. 2199, *citing Dirks v. SEC,* 463 U.S. 646, 655 n. 14, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). "Directors, officers and principal shareholders all qualify as corporate insiders under section 10(b), as long as they have 'obtained confidential information by reason of their position with that corpora-

tion.'" *In re Compaq Sec. Litig.,* 848 F.Supp. 1307, 1310 n. 7 (S.D.Tex.1993), *citing In re Cady Roberts & Co.,* 40 S.E.C. 907, 1961 WL 60638 (1961).

There has been a division among the Circuit Courts of Appeals regarding whether the language, "on the basis of material nonpublic information," employed in *O'Hagan, Chiarella, and Dirks,* in insider trading cases brought under § 10(b) and Rule 10b–5, requires a plaintiff to demonstrate that the insider defendant actually used the nonpublic information that he obtained through his position in the corporation in deciding whether to trade the securities, or whether the plaintiff need only show that the insider defendant merely possessed the nonpublic information at the time he traded the securities. The Ninth Circuit in a classic-theory, insider-trading criminal action held that the government had to show that the defendant not only had "knowing possession" of material inside information, but also that the defendant used that information in deciding to buy or sell securities, i.e., a causal connection. *United States v. Smith,* 155 F.3d 1051, 1066–69 (9th Cir.1998), *cert. denied,* 525 U.S. 1071, 119 S.Ct. 804, 142 L.Ed.2d 664 (1999). Nevertheless the ap-

Under the misappropriation theory, a person commits fraud "in connection with" a securities transaction in violation of § 10(b) "when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information" rather than to the corporation or its shareholders. *O'Hagan,* 521 U.S. at 652, 117 S.Ct. 2199. Thus under the misappropriation the misappropriator/defendant is not a corporate insider, but a corporate outsider that has no special relationship to the corporation's shareholders, and the fraud is not on the person or entity to whom the securities trade is made, but on the supplier of the nonpublic information. Such misappropriation constitutes a "deceptive device or contrivance" because those who misappropriate "deal in deception. A fiduciary who [pretends] loyalty to the principal while *secretly* coveting the prin-

cipal's information for *personal* gain ... defrauds the principal" and thereby defrauds that principal of exclusive use of that information while benefitting himself by trading on it. *Id.* Morever, the misappropriation is "in connection with" the purchase or sale of securities

because the fiduciary's fraud is consummated not when the fiduciary gains the confidential information, but when, without disclosure to his principal, he uses the information to purchase or sell securities. The securities transaction and the breach of duty thus coincided. This is so even though the person or entity defrauded is not the other party to the trade, but is, instead, the source of the nonpublic information.

*O'Hagan,* 521 U.S. at 643–44, 117 S.Ct. 2199; *id.* at 656, 117 S.Ct. 2199.

pellate court expressly did not decide whether that "use" standard would apply in a civil case. *Id.* at 1069 n. 27. The Eleventh Circuit, in a civil enforcement action, held that while "use" of material, nonpublic information was the ultimate issue, evidence of "knowing possession" of such information raises a "strong inference" that the defendant did use it in trading, sufficient to make a *prima facie* case of liability, which the defendant would then have to rebut. *SEC v. Adler,* 137 F.3d 1325, 1337–39 (11th Cir.1998). The Second Circuit had previously suggested that a plaintiff need only show that the insider defendant traded the securities while in "knowing possession" of material nonpublic information. *United States v. Teicher* 987 F.2d 112, 120–21 (2d Cir.1993), *cert. denied,* 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993).

To resolve this conflict, the SEC recently adopted a new rule, Rule 10b5–1 under the Exchange Act, effective October 23, 2000, 17 C.F.R. § 240.10b5–1(b), to address the question "what, if any, causal connection must be shown between the trader's possession of inside information and his or her trading." S.E.C. Release Nos. 7881, 43154, 33–7881, 34–43154, and IC–24599, 2000 WL 1201556, *21 (August 15, 2000). The rule largely adopts the Second Circuit's "knowing possession" test in *Teicher* but, as in *Adler,* employs it to create a rebuttable presumption: a plaintiff makes a *prima facie* case that the defendant is liable for insider trading merely by showing that the defendant was "*aware* of the material nonpublic information" when he made the purchase or sale of the securities. 17 C.F.R. § 240.10b5–1(b)(emphasis added). The rule estab-

lishes several affirmative defenses available to a defendant to rebut the presumption by showing that, in good faith and not as a part of a scheme to evade liability, he did not use material nonpublic information in entering into his trading decision. Specifically, the defendant may provide evidence that before he became aware of the material nonpublic information, he had structured his securities trading plans and strategies in one of the following ways: (1) that the defendant had entered into a binding contract for the trade before he obtained the inside information; (2) that the defendant had instructed another person to execute the trade for him before the defendant obtained the inside information; or (3) the defendant had established a written plan for specific purchases or sales of the securities before he obtained the insider information. 17 C.F.R. § 240.10b5–1(c)(1)(i)(A)(1–3) and (ii); Release, 2000 WL 1201556, at *22–23. Moreover the contract, instruction or plan had to meet specific requirements that did not allow the defendant to exercise any subsequent control over or alteration of that contract, instruction or plan with respect to the purchases or sales of the securities: it (1) must have expressly specified the amount, price and date; (2) must have provided a written formula or algorithm or computer program for determining amounts, prices, and dates; or (3) did not permit the defendant to exercise any subsequent influence over how, when or whether to execute the purchases or sales, and that any other person who did exercise such influence was not aware of the material nonpublic information when he did so. 17 C.F.R. § 240.10b5–1(c)(1)(i)(B) & (C); SEC Release, 2000 WL 1201556, at *23.[11]

---

11. The SEC explained the rationale behind its rule:

> [I]n our view, the goals of insider trading prohibitions—protecting investors and the integrity of the securities markets—are best accomplished by a standard closer to the

"knowing possession" standard than to the "use" standard. At the same time, we recognize that an absolute standard based on knowing possession, or awareness, could be overbroad in some respects. The new rule attempts to balance these consider-

Accordingly, this Court defers to the SEC and adopts Rule 10b5–1's "awareness" standard.

### Insider Trading as Source of Scienter under § 10(b)

 Alternatively, instead of constituting a primary violation of § 10(b) and Rule 10b–5, under different pleading requirements allegations of insider trading may assert circumstantial evidence of, and thus give rise to a strong inference of, bad faith and scienter for § 10(b) and Rule 10b–5 purposes. Specifically a complaint may allege facts demonstrating a corporate-insider defendant's normal trading history before, and then dramatic change during, the class period, with trades at times calculated to provide the defendant with the maximum personal benefit, to show that the class period sales are "unusual" or "suspicious." [12] *See, e.g., Rothman v. Gregor,* 220 F.3d 81, 94–95 (2d Cir.2000); *Florida State Bd. of Admin. v. Green Tree Financial Corp.,* 270 F.3d 645, 656 (9th Cir.2001)("[I]n the insider trading case, trading at a particular time is circumstantial evidence that the insider knew the best time to trade because he or she had inside information not shared by the public. This in turn is circumstantial evidence that he or she kept information from the public in order to trade on the unfair advantage.") *See also Ronconi v. Larkin,* 253 F.3d 423, 434–35 (9th Cir.2001)("If insiders owning much of a company's stock make rosy characterizations of company performance to the market while simultaneously selling off all their stock for no apparent reason, their sales may support inferences both that their rosy characterizations are false and that they knew it. We have considered insider trading as circumstantial evidence that a statement was false when made."). Insider stock sales are suspicious "when they are 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp., No. 01–16725,* 320 F.3d 920, 937 (9th Cir.2003), *citing In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117 (9th Cir.1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990).

Whether there is an unusual or suspicious pattern of insider trading may be gauged by such factors as timing of the sales (how close to the class period's high price), the amount and percentage of the seller's holdings sold, the amount of profit

ations by means of a general rule based on "awareness" of the material nonpublic information, with several carefully enumerated affirmative defenses. This approach will better enable insiders and issuers to conduct themselves in accordance with the law.

2000 WL 1201556, at *21. Furthermore, in response to concerns that "the awareness standard might eliminate the element of scienter from insider trading cases, contrary to the requirements of Section 10(b) of the Exchange Act," the SEC stated,

Rule 10b5–1 is designed to address only the use/possession issue in insider cases under Rule 10b–5. The rule does not modify or address any other aspect of insider trading law, which has been established by case law. Scienter remains a necessary element for liability under Section 10(b) of the Exchange Act and Rule 10b–5 thereunder, and Rule 10b5–1 does not change this.

*Id.* at *22.

12. Because insider corporate executives must document their stock transactions (on a Form 4, Statement of Changes in Beneficial Ownership) and file the documents with the SEC, these documents are public records that may appropriately be reviewed on a motion to dismiss. *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1017–18 (5th Cir.1996); *Florida State Bd. of Admin. v. Green Tree Financial Corp.,* 270 F.3d 645, 663 (8th Cir.2001); *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir. 2000); *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1275–81 (11th Cir.1999).

the insider received, the number of other insiders selling, or a substantial change in the volume of insider sales. *Rothman*, 220 F.3d at 94; *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 420–21 (5th Cir.2001); *Florida State*, 270 F.3d at 659; *In re Advanta Sec. Litig.*, 180 F.3d 525, 540–41 (3d Cir. 1999); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197–98 (1st Cir.1999); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 551–52 (6th Cir.2001)(*en banc*), *cert. dismissed*, 536 U.S. 935, 122 S.Ct. 2616, 153 L.Ed.2d 800 (2002). There is no *per se* rule for what constitutes illicit insider trading, and each case must be decided on its own facts. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir.2001), *cert. denied*, 534 U.S. 1071, 122 S.Ct. 678, 151 L.Ed.2d 590 (2001). *See also Greebel*, 194 F.3d at 198 (Cautioning that "mere pleading of insider trading, without regard to either context or the strength of the inferences to be drawn, is not enough").

██ Context is critical to the analysis. For example, sudden and substantial trading may not be suspicious where the seller was legally prohibited from trading during the period before the alleged insider trading. *See, e.g., No. 84*, 320 F.3d 920, 940, *Ronconi*, 253 F.3d at 436. Readily available, plausible explanations for a sale, such as that the insider is leaving the company or retiring in a few months might make a sale nonsuspicious. *Greebel*, 194 F.3d at 206 ("It is not unusual for individuals leaving a company . . . to sell shares. Indeed they often have a limited period of time to exercise their company stock options."). If an insider sells when the stock price is not at a high point or *after*, rather than before, he has delivered negative news about the corporation that causes the stock price to decline, the sale may not be suspicious. *Id.* at 206–07; *see also Ronconi*, 253 F.3d at 435 (when an insider dramatically "misses the boat," e.g., sells the majority of his stock in October at prices between $52 7/8 and $56 1/4 per share and

the share price rises to $73 the next March, the sale does not support an inference of scienter); *In re The Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093–94 (9th Cir.2002)(doubtful that defendant "was operating on 'inside knowledge' " because "he sold the overwhelming majority of shares for between $20 and $24 per share, when the price of the stock continued to increase in the several months following these sales, and ultimately peaked at $39"). Similarly, an insider's "sales do not support the 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made." *Ronconi*, 253 F.3d at 436. Moreover, a long class period may inflate the number of sales if the number of its months are not carefully considered. *Vantive*, 283 F.3d at 1094–95. If an insider is in a significant position "to know the 'true' facts" and sells only 13% of his shares over a fifteen-month period, "his trading percentage belies any intent to rid himself of a substantial portion of his holdings." *Id.* at 1094. A newcomer to a corporation may have no relevant trading history. *Id.* at 1095. The Ninth Circuit has proclaimed, "When a complaint fails to provide us with a meaningful trading history for purposes of comparison, we have been reluctant to attribute significance to the defendant's stock sales, even when the percentages of stock sold by an insider were far more suspicious" than a sale of 48% of holdings. *Id., citing Ronconi*, 253 F.3d at 435–36 (refusing to conclude that an insider that sold 98% of her shares over the class period had engaged in suspicious trading because plaintiff provided no trading history).

**B. Section 11 Under the 1933 Act**

██ A plaintiff states a claim under Section 11 if he alleges that he purchased

a security and that the registration statement contained a false or misleading statement regarding a material fact. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)("Section 11 of the 1933 Act allows purchasers of a registered security to sue certain enumerated parties [the issuer, its directors or partners, underwriters and accountants who are named as having prepared or certified the registration statement] in a registered offering when false or misleading information is included in a registration statement."). Unlike under § 10(b), under § 11 the plaintiff generally does not have to establish scienter,[13] causation (materiality) or reliance. *Id.* at 382, 103 S.Ct. 683; *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1222 (1st Cir.1996); *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1541 (8th Cir.1996).

A statutory exception to the no-reliance-requirement rule is found in the last paragraph of § 11, 15 U.S.C. § 77k(a), which reads,

> If such person acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that such person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement by such person.

Under 17 C.F.R. § 230.158, the term "effective date" in this final paragraph is defined as follows:

> For purposes of the last paragraph of section 11(a) only, the "effective date of the last registration statement" is deemed to be the date of the latest to occur of (1) the effective date of the registration statement: (2) the effective date of the last post-effective amendment to the registration statement, next preceding a particular sale by the registrant of registered securities to the public filed for purposes of (i) including any prospectus required by section 10(a)(3) of the Act, (ii) reflecting in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement, or (iii) including any material information with respect to the plan or distribution not previously disclosed in this registration statement or any material change to such information in the registration statement, or (3) the date of filing of the last report of the registrant incorporated by reference into the prospectus, and relied upon in lieu of filing a post-effective amendment for purposes of paragraphs (c)(2)(i) and (ii) of this rule, next preceding a particular sale by the registrant of registered securities to the public.

Among the statutory defenses available under Section 11 of the 1933 Act to any defendant, except an issuer, that signs a registration statement containing an allegedly materially false or misleading state-

---

**13.** The sole exception to the no-scienter-requirement is that under § 27A(c) of the PSLRA, to impose liability on a defendant for "forward-looking" statements, a plaintiff must demonstrate that the speaker or approving officer had actual knowledge of the false and misleading statement made on behalf of the corporation. 15 U.S.C. § 77z–2(c)(1)(B)(i).

ment, are that (1) the person conducted a "reasonable investigation" under § 11(b)(3)(A)(the "due diligence" defense); and (2) the person "had no reasonable ground to believe and did not believe ... that the statements [made or certified by an expert] were untrue" and thus relied on the opinion of the expert under § 11(b)(3)(C).[14]

The defendant bears the burden of proof for his affirmative defense according to the express language of § 11(b)("[N]o person, other than the issuer, shall be liable ... who shall sustain the burden of proof ....."). 15 U.S.C. § 77k(b)(1)(3).

The standard for determining "reasonableness" in a "reasonable investigation" and "reasonable ground for belief" in the two affirmative defenses is a negligence standard, i.e., "that required of a prudent man in the management of his own property." 15 U.S.C. § 77k(c); *In re Software Toolworks, Inc.*, 50 F.3d 615, 621 (9th Cir.1994)(*citing Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208, 96 S.Ct. 1375, 47

L.Ed.2d 668 (1976)), *cert. denied sub nom. Montgomery Securities v. Dannenberg*, 516 U.S. 907, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995); *In re Gap Stores Sec. Litig.*, 79 F.R.D. 283, 297–98 (N.D.Cal.1978). Adequate due diligence "is a question of degree, a matter of judgment in each case." *Escott v. BarChris Const. Corp.*, 283 F.Supp. 643, 697 (S.D.N.Y.1971); *Feit v. Leasco Data Processing Equipment Corp.*, 332 F.Supp. 544, 577 (E.D.N.Y.1971)(defendants "must make an investigation reasonably calculated to reveal all of those facts which would be of interest to a reasonably prudent man.").

The SEC has identified the following as "[c]ircumstances affecting the determination of what constitutes reasonable investigation for the due diligence affirmative defense under section 11 of the Securities Act":

(a) The type of issuer;

(b) The type of security;

(c) The type of person;

---

**14.** Title 15 U.S.C. § 77k(b)(3) in relevant part provides affirmative statutory defenses to liability for a defendant sued under § 11:

(A) as regards any part of the registration statement not purporting to be made on the authority of an expert and not purporting to be a copy of or extract from a report or valuation of an expert, and not purporting to be made on the authority of a public official document or statement, he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not *misleading*; and (B) as regards any part of the registration statement purporting to be made upon his authority as an expert or purporting to be a copy of or extract from a report or valuation of himself as an expert, (i) he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effec-

tive, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading or (ii) that such part of the registration statement did not fairly represent his statement as an expert or was not a fair copy of or extract from his report or valuation as an expert; and (C) as regards any part of the registration statement purporting to be made on the authority of an expert (other than himself) or purporting to be a copy of or extract from a report or valuation of an expert (other than himself), he had no reasonable ground to believe and did not believe, at the time such part of the registration statement became effective, *that the statements therein were untrue* or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading or that such part of the registration statement did not fairly represent the statement of the expert or was not a fair copy of or extract from his report or valuation as an expert ....

(d) The office held when the person is an officer;

(e) The presence or absence of another relationship to the issuer when the person is a director or proposed director;

(f) Reasonable reliance on officers, employees, and others whose duties should have given them knowledge of the particular facts (in light of the functions and responsibilities of the particular person with respect to the issuer and the filing);

(g) When the person is an underwriter, the type of underwriting arrangement, the role of the particular person as an underwriter and the availability of information with respect to the registrant; and

(h) Whether, with respect to a fact or document incorporated by reference, the particular person had any responsibility for the fact or document at the time of the filing from which it was incorporated.

17 C.F.R. § 230.176.

■ Although the reasonableness of a defendant's investigation or reasonable ground for his belief in and reliance on an expertised financial statement or expert report is usually a question for the jury, it may become a question of law on summary judgment where "only one conclusion about the conduct's reasonableness is possible," in other words, where "undisputed facts leave no room for a reasonable difference of opinion" and "no rational jury

could conclude that the defendant had not acted reasonably." *In re Software*, 50 F.3d at 621–22, *citing TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 450 & n. 12, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Nevertheless, reasonableness in this context is "not a question properly resolved on a motion to dismiss." *Griffin v. Paine-Webber Inc.*, 84 F.Supp.2d 508, 513 (S.D.N.Y.2000). *See also Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 369 (5th Cir.2001)(Due diligence in response to a § 11 claim "is an affirmative defense that must be pleaded and proved."); *In re Cendant Litig.*, 60 F.Supp.2d 354, 365 (D.N.J.1999)(inappropriate to dismiss claims based on affirmative defense before summary judgment stage because contents of documentary evidence cannot be considered for truth of content beforehand); *In re International Rectifier Sec. Litig.*, No. CV91–3357–RMT(BQRX), 1997 WL 529600, *7 (C.D.Cal. Mar.31, 1997)("To the extent that the underlying facts are undisputed, the adequacy of the diligence may be appropriately decided on summary judgment.").

## C. Controlling Person Liability Under the 1933 and 1934 Acts

■ The language establishing the statutory defense to controlling person liability under § 15 of the 1933 Act, 15 U.S.C. § 77o (2002),[15] differs from that describing the defense to controlling person liability under § 20(a) of the 1934 Act, 15 U.S.C. § 78t(a)(2002).[16] Specifi-

---

**15.** Section 15 of the 1933 Act, 15 U.S.C. § 77o states,

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to

whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

**16.** Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a) provides,

Every person who, directly or indirectly, controls any person liable under any provi-

cally § 15 provides that controlling persons are liable if they fail to prevent a violation of § 11 or § 12 of the 1933 Act unless "the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist," while a defendant to a § 20(a) claim must show that he "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." Because the Fifth Circuit views § 15 and § 20(a) as analogues, however, it gives them the same interpretation. *Pharo v. Smith*, 621 F.2d 656, 673 (5th Cir.1980); *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 & n. 22 (1981). Furthermore, under Fifth Circuit precedent, while lack of participation and good faith constitute an affirmative defense to one charged with controlling person liability under either federal Act, the plaintiff has the burden of establishing control, while the defendant must prove good faith. *Partridge*, 636 F.2d at 958 & n. 23. Thus for a *prima facie* case of controlling person liability, a plaintiff is not required to plead facts showing that the defendant acted in bad faith.

A number of courts have held that a corporation's Audit Committee members, who are authorized to sign and do sign the corporation's financial documents and registration statements, are controlling persons for liability under § 20(a) in the 1934 Act. *In re Lernout*, 286 B.R. at 39–40, *citing and quoting In re Livent, Inc. Noteholders Sec. Litig.*, 151 F.Supp.2d 371, 437 (S.D.N.Y.2001)("An outside director and audit committee member who is in a position to approve a corporation's financial statements can be presumed to have 'the power to direct or cause the direction of the management and policies of' the corporation, at least insofar as the 'management and policies' referred to relate to ensuring a measure of accuracy in the contents of the company reports and SEC registrations that they actually sign."); *In re Reliance*, 135 F.Supp.2d at 518 (finding a "genuine issue of material fact" when an outside director "served on subcommittees relating to the oversight of [the corporation's] accounting and reporting practices"); *Jacobs v. Coopers & Lybrand, LLP*, 1999 WL 101772, *18 (S.D.N.Y. Mar.1, 1999)("[T]hough his status as a director who allegedly served on the audit committee alone would not raise the inference that Hirsch was a § 20(a) controlling person, the allegations that he signed a fraudulent 10–K form does raise this inference ....").

## D. Section 20A of the 1934 Act

As an alternative to constituting a primary violation of § 10(b) as a "deceptive device" in connection with the sale or purchase of securities or a basis for raising a strong inference of scienter for a § 10(b) claim, insider trading can also constitute a derivative violation under § 20A of the 1934 Act. The Insider Trading and Securities Fraud Enforcement Act of 1988, Pub.L. No. 100–704, 102 Stat. 4677 (1988), added § 20A to the Exchange Act, as amended, 15 U.S.C. § 78t–1. Section 78t–1(a) provides in relevant part:

> Any person who violates any provision of this chapter or the rules and regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable ...

sion of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, un-

less the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased ... or sold ... securities of the same class.

Section 20A, unlike § 10(b), targets only insider trading and provides an express private cause of action against "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material nonpublic information ...."

To plead a § 20A cause of action, the plaintiff must (1) allege a requisite independent, predicate violation of the Exchange Act (or its rules and regulations), e.g., § 10(b),[17] and (2) show that he has standing to sue under § 20A because he "contemporaneously with the purchase or sale of securities that is the subject of such violation has purchased ... or sold ... securities of the same class" as the insider defendant. 15 U.S.C. § 78t–1(a).

Arising "from a recognition that '[s]ince identifying the party in actual privity with the insider is virtually impossible in trades occurring on an anonymous public market, the contemporaneous standard was developed as a more feasible avenue by which to sue insiders.' " *In re MicroStrategy, Inc.,*

115 F.Supp.2d 620, 662 (E.D.Va. 2000)("Thus, by requiring a showing of contemporaneity in the trades by the insider and the suing investor, Section 20A seeks to ensure that, where contractual privity would otherwise be impractical if not impossible to show, there nonetheless was a sufficiently close temporal relationship between the trades that the investor's interests were implicated by trades made by the insider while in possession of material, nonpublic information.").

Nevertheless, § 20A does not define the word, "contemporaneous," and there is no clear agreement about how long a period between the trade by the defendant and the purchase by the plaintiff is permissible. Different courts have found that "contemporaneity" requires the insider and the investor/plaintiff to have traded anywhere from on the same day, to less than a week, to within a month, to "the entire period while relevant and nonpublic information remained undisclosed." *In re MicroStrategy,* 115 F.Supp.2d at 662–63 & nn. 83–85, *citing* cases (1) requiring trading on the same day: *Copland v. Grumet,* 88 F.Supp.2d 326, 338 (D.N.J.1999) [18]; *In re AST Research Sec. Litig.,* 887 F.Supp. 231, 234 (C.D.Cal.1995); *In re Aldus,* No, C92–885C, 1993 WL 121478, at *7 (W.D.Wash. Mar.1, 1993); and *In re Stra-*

---

**17.** Although this requirement is not expressed in the statute, courts have interpreted § 20A as mandating this independent, predicate violation of the 1934 Act or of its rules and regulations. *See, e.g., In re VeriFone Sec. Litig.,* 784 F.Supp. 1471, 1488–89 (N.D.Cal. 1992)("A careful parsing of the somewhat tangled initial sentence of 20A discloses that an insider ... is liable only where an independent violation of another provision of the securities laws has occurred."), *aff'd,* 11 F.3d 865, 872 (9th Cir.1993); *Jackson National Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 703 (2d Cir.1994)("The reference [in 20A] to 'this chapter' is to the '34 Act, and the language of the statute is thus quite plain that to state a claim under § 20A, a plaintiff must plead a predicate violation of the '34 Act or its

rules and regulations," so a violation of the '33 Act will not suffice; § 20A was "added ... to remedy the very specific problems inherent in prosecuting insider trading cases."); *Sterlin v. Biomune Systems,* 154 F.3d 1191, 1194 n. 5 (10th Cir.1998).

**18.** *See also In re Cendant Corp. Litig.,* No. 98–1664, 1999 WL 549015, at *23 (D.N.J. July 27, 1999)(allegation that one class representative traded on at least one of the days that the defendant traded satisfied contemporaneous requirement); *Backman v. Polaroid Corp.,* 540 F.Supp. 667, 670 (D.Mass.1982)(gap of two trading days between plaintiff's purchase and defendant's sale too long to meet contemporaneous requirement).

*tus Computer, Inc. Sec. Litig.*, No. Civ. A 89–2075–7, 1992 WL 73555, at *5 (D.Mass. Mar.27, 1992); (2) requiring trading within a few days of each other: *In re Oxford Health Plans, Inc., Sec. Litig.*, 187 F.R.D. 133, 138 (S.D.N.Y.1999)(five-day gap); *In re Cypress Semiconductor Litig.*, 836 F.Supp. 711 (N.D.Cal.1993)(same); and *In re Engineering Animation Sec. Litig.*, 110 F.Supp.2d 1183 (S.D.Iowa 2000)(three-day gap); and (3) allowing trading during the entire period of nondisclosure of material nonpublic information: *In re Am. Bus. Computers Corp. Sec. Litig.*, [1995 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 98,-839, at 93,055 (S.D.N.Y. Dec. 9, 1995). In *In re Musicmaker.com Sec. Litig.*, No. CV00–2018 CAS (MANX), 2001 WL 34062431, at *27 (C.D.Cal. June 4, 2001), the district court pointed out that cases cited in the Report of the House of Representatives (H.R.Rep. No. 910, 100th Cong., 2d Sess. 27 (1988), *reprinted in* 1998 U.S.C.C.A.N. 6043, 6064) regarding § 20A suggest that an appropriate time period might be less than a week: *Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 94–95 (2d Cir.1981)(trades one month apart were not contemporaneous) [19]; *Shapiro v. Merrill Lynch, Pierce Fenner & Smith, Inc.*, 495 F.2d 228, 241 (2d Cir. 1974)(trades less than a week apart were contemporaneous); and *O'Connor & Associates v. Dean Witter Reynolds, Inc.*, 559 F.Supp. 800, 803 (S.D.N.Y.1983)(same). Furthermore, given the realities of modern securities markets, some courts have recognized a growing trend among federal district courts to read "contemporaneous" narrowly, at least regarding securities traded in large amounts on the biggest national exchanges. *In re MicroStrategy*, 115 F.Supp.2d at 662 & n. 87 ("as the securities markets become more effective at tracking insider sales and thereby assimilating and dissipating the unfair advantage possessed by insiders, the less likely it becomes that a temporally remote purchaser would have been harmed by the insider sales")(and cases cited therein); *In re AST Research Sec. Litig.*, 887 F.Supp. 231, 233 (C.D.Cal.1995). Moreover, a restrictive reading of the term serves the "privity-substitute function" of the provision while simultaneously "guard[ing] against 'mak[ing] the insider liable to the world.'" *In re MicroStrategy*, 115 F.Supp.2d at 663. Persuaded by such reasoning, this Court finds that two or three days, certainly less than a week, constitute a reasonable period to measure the contemporaneity of a defendant's and a plaintiff's trades under § 20A. Moreover, the plaintiff's trades must have taken place after the challenged insider trading transaction. *Alfus v. Pyramid Technology Corp.*, 745 F.Supp. 1511, 1522 (N.D.Cal. 1990)(and cases cited therein).

Section 20A does not bar a plaintiff from simultaneously suing under any pre-existing implied cause of action under other provisions of the securities laws (such as § 10(b)). 15 U.S.C. § 78t–1(d)("Nothing in this section shall be construed to limit or condition the right of any person to bring an action to enforce a requirement of this chapter or the availability of any cause of action implied from a provision of this chapter [the 1934 Act]."). Indeed, the remedies established by the federal securities laws are intended to be cumulative. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 386–87, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Nevertheless, in *O'Hagan*, where a party was liable for insider trading as a primary violation under § 10(b), the Supreme Court found there was no reason to address liability under § 20A.

---

**19.** *See also Neubronner v. Milken,* 6 F.3d 666, 669–70 (9th Cir.1993)(trades one month apart are not contemporaneous).

*O'Hagan,* 521 U.S. at 666 n. 11, 117 S.Ct. 2199.

Aside from the requirements of a predicate violation of § 10(b) and of contemporaneity, up until recently statute-of-limitations differences between § 10(b) and § 20A may have affected a plaintiff's decision whether to assert a cause of action for insider trading under § 10(b) or under § 20A. Because the implied right of action under § 10(b) was judicially created and lacked a statute of limitations, the Supreme Court for purposes of uniformity applied the one-year-after-discovery /no-later-than-three-years-after-violation limitations and repose period derived from other, express causes of action under the 1934 Act. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 359–60, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991).[20] In contrast, Congress, concerned with the obstacles to discovering evidence of insider trading, enacted § 20A as an express private right of action and as one of "a variety of measures designed to provide greater deterrence, detection and punishment of violations of insider trading," and provided it with a longer, five-year statute of limitations. 15 U.S.C. § 78t–1(b)(4) ("No action may be brought under this section more than 5 years after the date of the last transaction that is the subject of the violation.") than § 10(b); *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 361, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991)("20A is 'one of a variety of measures designed to provide greater deterrence, detection and punishment of violations of insider trading' "), *citing* H.R.Rep. No. 100–910 at p. 7 (1988); *Ceres Partners v. GEL Assocs.,* 918 F.2d 349, 363 (2d Cir.1990).

Other factors may also influence a plaintiff in deciding which of the two statutes to use. Under section 20A(a), damages are limited to "the profit gained or loss avoided in the transaction or transactions that are the subject of the violation." Moreover, any recovery must be offset by any sum the violator is required to disgorge in a parallel action brought by the SEC. 15 U.S.C. § 78t–1(b)(2).

### E. The Texas Securities Act ("TSA")

Many Defendants in this litigation have objected to the fact that Plaintiff failed to specify under which provision(s) of the TSA its claims were brought. In this Court's first memorandum and order (# 1194), the Court quoted what it determined were the potentially applicable sections[21] of Article 581–33 of the Texas Se-

---

**20.** Under the new Public Company Accounting Reform and Investor Protection Act of 2002 (a/k/a the "Sarbanes Oxley Act"), Pub.L. No. 107–204 § 804(b), 116 Stat. 745 (2002), the limitations period for such causes of action for securities laws has been amended and increased to the earlier of two years after discovery of the violation or five years after the violation occurred, for suits commenced on ˙or after July 30, 2002. This amended limitations period does not apply to *Newby.*

**21.** Article 581–33 of the Texas Securities Act, Tex.Rev.Civ. Stat. (Vernon's Supp.2002), provides in relevant portion,

> **Civil Liabilities**
> A. Liability of Sellers.
> . . . .

(2) Untruth or Omission. A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security. However, a person is not liable if he sustains the burden of proof that either (a) the buyer knew of the untruth or omission or (b) he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known of

curities Act, Tex.Rev.Civ. Stat. (Vernon's Supp.2002), and discussed some of the legal requirements under them to determine whether Lead Plaintiff had stated a claim against some of the underwriters and Arthur Andersen or demonstrated that it potentially could state one, and should be permitted to amend to do so, under the TSA. The Court found that it had stated a claim for seller liability under article 581–33A(2), but deferred ruling on controlling person liability until it reviewed the individual defendants' motions to dismiss. While reviewing the challenges raised by the Outside Directors, it has become apparent to this Court during its research into the legislative history and modifications to the statute and limited Texas and federal case law addressing the relationship among the various provisions, that this Court must (1) refine its conclusions of law regarding the statute and (2) order Lead Plaintiff to clarify which section(s) of the statute it sues each defendant under and to amend/supplement its complaint to meet the pleading requirements for each section applicable to that defendant.

A restricted version of what is now article 581–33,[22] addressing only seller liability, was first added to the TSA in 1941; subsequently it was amended in 1955, 1963, and 1977. Hal M. Bateman, *Securities Litigation: The 1977 Modernization of Section 33 of the Texas Securities Act,* 15 Houston L.Rev. 839, 840–63 (1978). of special import are the 1977 amendments, which gave rise to the current law. The structure of the revised statute, while reaching more parties than merely sellers, simultaneously indicates that a more particularized analysis and pleading are required than the Court has previously discussed to state a claim under one or more of its provisions.

The Court in its first memorandum and order (# 1194) discussed the broad definition of "seller" in the TSA established by the Texas Supreme Court in *Brown v. Cole,* 155 Tex. 624, 629, 291 S.W.2d 704, 708 (1956), i.e., "the seller may be any link in the chain of the selling process. He is the one who performs 'any act by which a sale is made.'" That definition has been cited and applied in a number of cases since. *See, e.g., Rio Grande Oil Co. v. State,* 539 S.W.2d 917, 922 (Tex.Civ.App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.); *Texas Capital Securities, Inc. v. Sandefer,* 58 S.W.3d 760, 775–76 (Tex.App.—Houston [1st Dist.] 2001, pet. denied)(stock broker a link in the chain of the selling process under current version of art. 581–33A(2)). In *Brown v. Cole,* the high court affirming that the defendant in the underlying suit, Brown, who was not only not the primary wrongdoer, but was also unaware of the

---

the untruth or omission. The issuer of the security (other than a government issuer identified in Section 5M) is not entitled to the defense in clause (b) with respect to an untruth or omission (i) in a prospectus required in connection with a registration statement under 7A, 7B, or 7C, or (ii) in a writing prepared and delivered by the issuer in the sale of a security....

F. Liability of Control Persons and Aiders (1) A person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. (2) A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer....

**22.** Then Section 33a of Article 600a, Vernon's Texas Civil Statutes.

wrongdoing by the primary violators and had himself been scammed by those same individuals, to be liable as a seller under the TSA. It found "seller" liability because Brown had been "involved" (i.e., had discussed the proposal, written for information, called the sellers, suggested and paid for a trip to Mexico related to the sale of securities, and instructed on the manner of payment, and "but for Brown's activities and repeated efforts the respondents would not have participated in the transaction") in the negotiations leading up to the purchase by two others. *Id.*, 291 S.W.2d at 709; Bateman, *Securities Litigation: The 1977 Modernization of Section 33 of the Texas Securities Act*, 15 Houston L.Rev. at 852.

The 1956 decision in *Brown v. Cole* addresses the statutory language of the predecessor to article 581–33, before both the 1963 and, more importantly, the critical 1977 amendments. In response to the expansive potential for liability of defendants under the 1956 *Brown v. Cole* holding, "the 1977 Texas legislature substantially revised and modernized section 33 . . ." (1) to limit plaintiffs under 33A(2) to those who bought securities from the defendant they are suing (a privity requirement); (2) to add affirmative defenses under subdivision 33A(2) for a defendant/buyer, who may show (a) that the plaintiff actually knew of the alleged untruth or misrepresentation made by the sellers or (b) that the buyer used reasonable care and due diligence and did not know of the untruth or omission; and (3) to add subdivision F(1) and (2), broadening the statute's reach beyond sellers by imposing liability for control persons and aiders and abettors, balanced by limiting in part a defendant's vulnerability through new proof requirements or affirmative defenses, discussed subsequently in this memorandum and order. Bateman, *Securities Litigation: The 1977 Modernization of Section 33 of the Texas Securities Act*, 15 Houston L.Rev. at 847, 852.

These subsequent revisions made *Brown v. Cole's* broad definition of seller ("any link in the chain of the selling process") no longer necessary or appropriate. *Frank v. Bear*, 11 S.W.3d 380, 383 (Tex. App.-Houston [14th Dist.] 2000, review denied). To impose seller liability under the article 581–33(A)(2), a plaintiff must be in privity with the defendant, i.e., the plaintiff must have bought his securities from the defendant whom the plaintiff is suing. *Frank*, 11 S.W.3d at 383. The court in *Frank* noted, "The comments to the 1977 revisions to the [TSA] contain the notation that the section in question 'is a privity provision, allowing a buyer to recover from his offeror or seller . . .'" and that "'some nonprivity defendants may be reached' under other sections of the Act not applicable here." *Id.; see also* Comment—1977 Amendment to Tex. Civ.Rev.Stat. Ann. art. 581–33 A(2) at 82 (Vernon's Supp.2003)(applying to subdivision A(2) the comment regarding A(1), i.e., ". . . [S]ome nonprivity defendants may be reached under § . . . . 33F.").

Nevertheless, this Court notes that while the statute requires some kind of undefined privity relationship between the defendant and the purchaser in the process of offering to sell or in the sale of securities, the statutory definitions of "sale," "sell," and "offer for sale," Tex. Rev.Civ. Stat. Ann. art 581–4(E), still remain broad.[23] *See, e.g., Lutheran Broth.*

---

**23.** Tex.Rev.Civ. Stat. Ann. Article 581–4(E)(Vernon's 1964 and 2002 Supp.) provides in relevant part,

The terms "sale" or "offer for sale" or "sell" shall include every disposition, or attempt to dispose of a security for value.

The term "sale" means and includes contracts and agreements whereby securities are sold, traded, or exchanged for money, property or other things of value, or any transfer or agreement to transfer, in trust or otherwise.... The term "sell" means

v. *Kidder Peabody & Co., Inc.*, 829 S.W.2d 300, 306–07 (Tex.App.—Texarkana 1992)(placement agent who acted as seller's agent in making misrepresentations in a private placement memorandum and in the placement and offering of bonds, and who dealt directly with plaintiffs in doing so, was a "seller" within the meaning of the TSA; "one who 'offers or sells' a security is not limited to those who pass title" and "sell" is defined by the statute "as any act by which a sale is made, including a solicitation to sell, an offer to sell, or an attempt to sell"), *judgment set aside and case remanded for entry of judgment in accordance with settlement*, 840 S.W.2d 384 (Tex.1992); *Texas Capital Securities, Inc. v. Sandefer*, 58 S.W.3d 760, 775 (Tex.App.—Houston [1st Dist.] 2001, review denied)(brokerage firm liable for stock broker's untruth or omission to stock purchasers; TSA "applies to persons in corporations who offer or sell unregistered securities"). Furthermore, although the statute uses the language "attempt to sell" and "offer to sell" in its definition section, it is clear that article 581–33A(2) contemplates that the sale must have been effected because the buyer "may sue either at law or in equity for rescission, or for damages."

The Fifth Circuit, in *Huddleston v. Herman & MacLean*, 640 F.2d 534, 551 (5th Cir.1981), *aff'd in part and reversed in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), interpreted the statute and Texas case law regarding it as follows:

> The Texas courts have interpreted the term "seller" in the TSA to include those

who are not direct vendors and thus not in strict privity with the claimant. See Bordwine, Civil Liability Under the Texas Securities Act § 33 (1977) and Related Claims, 32 Sw. L.J. 867, 881 (1978)(pre–1977 decisions gave "seller" an astoundingly broad meaning.). However, in *Stone v. Enstam*, 541 S.W.2d 473 (Tex.Civ.App.1976), the Texas Court distinguished *Brown v. Cole* as a case involving an active negotiator whose efforts resulted in the sale and limited the term "seller" to the actual seller and one who acts as an agent for either the buyer or seller in carrying out the sale itself. 541 S.W.2d at 480. This decision limits the TSA to those who are actively engaged in the sale process and prevents it from reaching those who merely participate in preparing an offering. See Bromberg ... at 885–90 ....

640 F.2d at 551. The Fifth Circuit continued,

> We find further support for this construction of the Texas cases in the TSA's legislative history and analogy to the federal provisions on which the Texas statute was based. The comments to both the 1963 and 1977 amended versions of Section 33 of the TSA refer to Section 12 of the 1933 Act, 15 U.S.C. § 77*l*, which served as the basis for the drafting of the Uniform Securities Act, the model used in the 1963 and 1967 Texas enactments.... We have held that under Section 12 of the 1933 Act the term "seller" is limited "(i) to those in privity with the purchaser and (ii) to those whose participation in the buy-sell

---

> any act by which a sale is made, and the term "sale" or "offer for sale" shall include a subscription, an option for sale, a solicitation of sale, a solicitation of an offer to buy, an attempt to sell, or an offer to sell, directly or by an agent, by a circular, letter or advertisement, or otherwise, including the deposit in a United States Post Office or

> mail box or in any manner in the United States mails within this State of a letter, circular or other advertising matter. Nothing herein shall limit or diminish the meaning of the terms "sale," "sell" or "offer for sale" as used by or accepted in courts of law or equity....

transaction is a substantial factor in causing the transaction to take place. Mere participation in the events leading up to the transaction is not enough." *Pharo v. Smith,* 621 F.2d 656, 667 (5th Cir.1980). *See Lewis v. Walston & Co.,* 487 F.2d 617, 621 (5th Cir.1973). We have refused to extend Section 12 to include aiders, abettors and controlling persons as sellers. *Croy v. Campbell,* 624 F.2d 709, 713 n. 5 (5th Cir.1980). . . . [some citations omitted]

*Id.* at 551 n. 27.

In 1988 the Supreme Court issued a significant ruling about who could be sued as a statutory "seller" under § 12(1)("[a]ny person who . . . offers or sells a security" in violation of the 1933 Act's registration requirement "shall be liable to the person purchasing such security from him") and clearly rejected the Fifth Circuit's overly broad "substantial-factor" test for "seller" liability. *Pinter v. Dahl,* 486 U.S. 622, 653–54, 648–54, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988).[24] The First Circuit, in *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1214 (1st Cir.1996), relying on cases from the Seventh, Third, Ninth and Second Circuits, applied the rule in *Pinter* to § 12(2) because the two provisions share nearly identical language.[25] The Fifth Cir-

cuit in turn relied on the analysis in *Pinter* and *Shaw* in determining whether an issuer in a firm commitment offering can be a "seller" within the meaning of § 12(2). *Lone Star Ladies Inv. Club,* 238 F.3d at 369–70.

In *Pinter,* the Supreme Court held that even though the statutory language of § 12(1) suggests a "buyer-seller relationship not unlike traditional contractual privity," one need not have been the person who actually "transfers title to, or any other interest in, that property" to the purchaser to be liable as a "seller" under § 12. 486 U.S. at 642–43, 108 S.Ct. 2063. The high court examined the definition of "sale" and "sell", which includes " 'every contract of sale or disposition of a security or interest in a security for value,' " and of the language " 'offer to sell,' " " 'offer for sale' " or " 'offer,' " which encompasses "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value,' " in § 2(3), 15 U.S.C. § 77b(3). 486 U.S. at 643, 108 S.Ct. 2063. These words bring not only the person who passes title, but also the person who engages in solicitation within the "offer" or "sale" transactions that are covered by the statute, which is " 'expan-

**24.** *Inter alia,* the Supreme Court objected to the substantial-factor test because "it divorces the analysis of seller status from any reference to the applicable statutory language and from any examination of § 12 in the context of the total statutory scheme." 486 U.S. at 651, 108 S.Ct. 2063. The substantial-factor test "focuses on the defendant's degree of involvement in the securities transaction and its surrounding circumstances," and would expand "liability to participants only remotely related to the relevant aspect of the sales transaction," such as "securities professionals, such as accountants and lawyers, whose involvement is only the performance of their professional services" and from whom "[t]he buyer does not, in any meaningful sense, purchase . . . ." *Id.* In contrast the "purchase from" language of § 12(1) "focuses on the

defendant's relationship with the plaintiff-purchaser." *Id.* Furthermore, § 12(1) is a strict liability statute, while the substantial-factor test would inject issues of reliance and causation which are not suggested by the statute's language or legislative history. *Id* at 652, 108 S.Ct. 2063.

**25.** Section 12(2) provides, that a person who "offers or sells" a security may be liable to anyone "purchasing such security from him." In *Pinter* the Supreme Court noted, "The 'offers or sells' and the 'purchasing such security from him' language that governs § 12(1) also governs § 12(2)," but pronounced that "this case does not present, nor do we take a position, on the scope of a statutory seller for purposes of § 12(2)." 486 U.S. at 642 n. 20, 108 S.Ct. 2063.

sive enough to encompass the entire selling process, including the seller/agent transaction.'" *Id.*

With respect to the second clause of § 12(1), "purchasing such security from him," the Supreme Court concluded that the purchase requirement limits liability to situations where a sale has taken place. *Id.* at 644, 108 S.Ct. 2063. The high court stated that § 12(1) "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus a buyer cannot recover against his seller's seller." *Id.* at 644, 108 S.Ct. 2063 n. 21. As examples of persons other than securities' owners who might be liable as sellers under § 12, *Pinter* pointed to brokers or agents of vendors that solicited the purchase. *Id.* The Supreme Court noted that "solicitation is the stage at which an investor is most likely to be injured, that is, by being persuaded to purchase securities without full and fair information" and therefore imposition of liability on successful solicitors that do not own the securities serves the policy of adequate disclosure underlying the statute. *Id.* at 647, 108 S.Ct. 2063. The Supreme Court did place a restriction on such solicitor liability: "The language and purpose of § 12(1) suggest that liability extends only to the person who successfully solicits the purchase, motivated at least in part to serve his own financial interests or those of the securities owner." *Id.* Under such circumstances, "it is fair to say that the buyer 'purchased' the security from him and to align him with the owner in a rescission action." *Id.*

Applying the *Pinter* holding to § 12(2), the First Circuit held in *Shaw* that because "the issuer in a firm commitment underwriting does not pass title to the securities, [the issuer and its officers] cannot be held liable as 'sellers' under Section 12(2) unless they actively 'solicited' the plaintiffs' purchase of securities to further

their own financial motives." *Shaw*, 82 F.3d at 1214–15, *citing Ackerman v. Schwartz*, 947 F.2d 841, 844–45 (7th Cir. 1991); *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 635 (3d Cir.1989); *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 536 (9th Cir.1989); and *Wilson v. Saintine Exploration and Drilling Corp.*, 872 F.2d 1124, 1125–26 (2d Cir.1989).

The Fifth Circuit has embraced the holding in *Shaw* and applied the *Pinter* rule in a similar § 12(2) claim case. *Lone Star Ladies Inv. Club*, 238 F.3d at 369–70. It concluded that although ordinarily in a firm commitment underwriting, the issuer is immune because the investor is not buying from the issuer, where the issuer actively solicits the sale of the securities, and thus becomes an agent of the securities vendor, the issuer may be liable as a "seller" under the statute. *Id.; Shaw*, 82 F.3d at 1215 (to be liable as a seller one must "actively" solicit the purchase of securities by the plaintiff "to further [his] own financial motives, in the manner of a broker or vendor's agent").

It appears to this Court that, along with the holding of *Frank v. Bear*, the *Pinter* rule, embraced by the Fifth Circuit in *Lone Star Ladies Inv. Club*, applies to seller liability under article 581–33A(2), which is ultimately based on § 12(2) and embodies similar language and definitions.

As noted previously, under subdivision 33A(2), the purchaser need not show reliance on the seller's misrepresentation or omission, nor need he prove scienter. *See, e.g., Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 648–49 (Tex.App.—Houston [14th Dist.] 1995, writ dism'd w.o.j.)(no reliance required), *petition for mandamus denied*, 951 S.W.2d 394 (Tex.1997); *Summers v. WellTech, Inc.*, 935 S.W.2d 228, 234 (Tex.App.—Houston [1st Dist.] 1996, no writ)(same); *Wood v. Combustion Eng'g, Inc.*, 643 F.2d 339, 345 (5th Cir.

1981)(no scienter or reliance requirement under subdivision 33A).

Section 33F(1), which imposes joint and several liability for violations of section 33A between a person "who directly or indirectly controls a seller, buyer, or issuer of a security" and that seller, buyer, or issuer, parallels the federal provisions, section 15 under the 1933 Act and section 20(a) under the 1934 Act.

■■■■ A comment to Sections F(1) and (2) states that the sweeping *Brown v. Cole* definition of "seller" should no longer apply because subdivision F(1) and (2) "provides quite specifically who, besides a person who buys or sells, is liable, and the criteria for such liability." *Frank*, 11 S.W.3d at 383.[26] Section 33F(1) is interpreted in accordance with Fifth Circuit law relating to those statutes, which this Court has discussed previously. Tex.Rev.Civ. Stat. Ann. § 531–33 comment at 84 (Vernon's Supp.2003); *Busse v. Pacific Cattle Feeding Fund #1, Ltd.*, 896 S.W.2d 807, 814–15 (Tex.App.-Texarkana 1995, writ denied)(the term "control person" is "used in the same broad sense as in the federal statutes"); *Frank*, 11 S.W.3d at 384.[27] The test for control person liability under section 33F(1) was established in *Frank*, 11 S.W.3d at 384, based on the Fifth Circuit test in *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 620 (5th Cir.1993), *cert. denied sub nom. Turnbull v. Home Ins. Co.*, 510 U.S. 1177, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994): a plaintiff must show that the controlling person (1) exercised control over the operations of the corporation generally and (2) had the power to control the specific transaction or activity constituting the primary violation. *See also Barnes v. SWS Financial Services, Inc.*, 97 S.W.3d 759, 764 (Tex.App.—Dallas 2003). The language of section 33F(1) does not require that a plaintiff show scienter, i.e., that the controlling person knew of or recklessly disregarded the underlying primary violations, but it does provide an affirmative statutory defense to a defendant who pleads and proves that "he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Tex.Rev.Civ. Stat. Ann. § 531–33F(1). Moreover, a plaintiff does not have to sue the controlled person (here Enron Corporation) in order to sue a controlling person. *Summers v. WellTech*, 935 S.W.2d at 231. The comment to 33F(1) states, "The rationale for control person liability is that a control person is in a position to prevent the violation and may be able to compensate the injured investor when the primary violator (e.g., a corporate issuer which has gone bankrupt) is not." Art. 581–33, Comment at 84 (Vernon's Supp.2002). Furthermore, it states, "Depending on the circumstances, a control person might include an employer, an officer or director, a large shareholder, a · parent company, and a management company." *Id.*

---

**26.** See also Comment to 1977 Amendments to Art. 581–33F at 84 (Vernon's Supp.2003), in relevant part:

Old § 33A allowed recovery only from "any person who sells." Although the phrase would presumably be broadly construed, *see Brown v. Cole*, 155 Tex. 624, 291 S.W.2d 704 ... (1956), its scope was unclear, particularly since the 1963 language could be read as narrower than prior language interpreted in *Brown v. Cole*. In any event, *Brown v. Cole* should have no application to the new law, since § 33F provides quite specifically who, besides a person who buys or sells is liable, and the criteria for such liability.

**27.** Nevertheless, the *Busse* court stated that major shareholders and directors are control persons within the meaning of the statute. 896 S.W.2d at 815. This Court had indicated in its discussion of controlling person liability under the federal securities statutes that the Fifth Circuit requires more that mere recital of position or status.

Section 33F(2) imposes joint and several liability on anyone who "directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security." Subdivision 33F(2) has no parallel in the federal statutes and, in the wake of *Central Bank of Denver, N.A. v. First interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), reaches farther than they do because it authorizes such aiding and abetting liability. The test for aiding and abetting liability under subdivision 33F(2) was also established in *Frank*, 11 S.W.3d at 384: "a plaintiff must demonstrate 1) that a primary violation of the securities laws occurred; 2) that the alleged aider had 'general awareness' of its role in this violation; 3) that the actor rendered 'substantial assistance' in this violation; and 4) that the alleged aider either a) intended to deceive plaintiff or [b] ) acted with reckless disregard for the truth of the representations made by the primary violator." *See also Crescendo Investments, Inc. v. Brice*, 61 S.W.3d 465, 472 (Tex.App.-San Antonio 2001, review denied). Thus, unlike for control person liability, the plaintiff must show that the aider "had the requisite scienter, i.e., intent to deceive or defraud, or reckless disregard." Tex. Civ. Stat. Ann. art. 531–33F(2) comment at 84 (Vernon's Supp. 2003). In sum, under the statute as revised in 1977, the standard of pleading and proving culpability is more specific than the earlier versions of the statute permitting liability "only if the aider was a 'person who sells.'"

## PENDING MOTIONS

### I. Joint Motion of Certain Defendants to Strike Pulsifer Class Action Complaint (# 1042)

Because the motion to strike the Pulsifer class action complaint will affect the scope of Outside Directors' motions to dismiss, the Court addresses it first.

Member case H–02–3010, *Nathaniel Pulsifer, Trustee of the Shooters Hill Revocable Trust v. Kenneth L. Lay, et al.*, was filed in this court on August 9, 2002 by the firm of Milberg Weiss Bershad Hynes & Lerach, who also serve as Lead Counsel for Plaintiffs in *Newby*. *Pulsifer* was consolidated into *Newby* on August 22, 2002, months after Lead Plaintiff's consolidated complaint was filed. The *Pulsifer* complaint asserts a class action on behalf of purchasers of Enron 7% Exchangeable Notes due on July 31, 2002 and issued in a debt offering made pursuant to a July 23, 1999 Registration Statement and a Prospectus dated August 10, 1999, against Enron directors and officers, Enron's outside auditor Arthur Andersen LLP, which consented to the issuance of its audit report, and the underwriters of the offering for violations of the 1933 Act.

The 7% Notes at issue were previously the basis of a claim brought by *Newby* Plaintiff Murray van de Velde, the sole class representative for that claim, regarding whom Lead Plaintiff filed a Notice of Withdrawal on July 31, 2002 (# 979). The Notice of Withdrawal additionally stated that the "withdrawal will have no detrimental effect on the Class and will streamline the class certification discovery that is underway."

Defendants contend that the *Pulsifer* complaint is "an impermissible unauthorized amendment," filed without leave of Court, to Lead Plaintiff's consolidated *Newby* class action complaint and should be stricken. They argue that in effect, it "seeks to deconsolidate this case." *Pulsifer* was filed four months after the deadline for filing the consolidated complaint in *Newby* (April 8, 2002), three months after deadline for filing motions to dismiss (May 8, 2002), and six weeks after the deadline for Lead Plaintiff's reply briefs (June 24,

2002). Defendants emphasize that in their pleadings relating to their motions to dismiss, they repeatedly requested that the 7% Notes claim be dismissed with prejudice.[28] Furthermore, in its order of August 7, 2002 (# 983), this Court stayed all claims or complaints not encompassed within the consolidated complaint. Defendants insist that the proposed *Newby* Class, of which Nathaniel Pulsifer is a member, is bound by Lead Plaintiff's representations to this Court that it was dismissing that claim and by the established docket control schedule in *Newby*. In sum, they maintain that the *Pulsifer* complaint is "an unauthorized end run not only around the explicit schedules set by this Court, but consolidation as well."

In opposition, Plaintiffs answer that the *Pulsifer* complaint was filed to toll the statute of limitations and ensure that its valid § 11, 7%-Note claims were not time-barred. They explain that they would be willing to amend the consolidated complaint to add the *Pulsifer* claims, but have not so moved to avoid piecemeal amendments while the motions to dismiss were pending. Plaintiffs also note the Defendants would not be prejudiced if the Court permitted Lead Plaintiff to amend the consolidated complaint to add the *Pulsifer* claims because even if amendment is not allowed, the claims will be pending against Defendants anyway, but simply as part of a separate action. Plaintiffs emphasize that no additional parties are named, nor are any truly new claims [29] asserted. Furthermore none of the Court's orders barred the filing of claims or cases to keep the statute of limitations from running. In fact, the Court's order of August 5, 2002 clearly contemplated that claims outside those in the consolidated complaint would exist, with their claims stayed until closer to class certification stage and subject to the Court's rulings on the motions to dismiss.

Lead Plaintiff additionally clarifies that the first class action member suit that it filed on behalf of purchasers of the 7% notes was brought by Pulsifer & Associates, an investment advisor. Pulsifer & Associates then applied for appointment as Lead Plaintiff in *Newby* for a class composed of the 7% Note purchasers, but the Court decided to appoint one Lead Plaintiff to represent all Enron securities purchasers as a single class. Thereafter, the designated Lead Plaintiff incorporated into the consolidated complaint, (# 441) filed on April 8, 2002, the claims of the 7% Notes purchasers in *Pulsifer & Associates*, added additional Defendants to those sued by the 7% Note purchasers, and brought 7% Note claims under both § 11 and § 10(b).[30] The consolidated complaint's Count III named Murray van de Velde as Plaintiff and representative of the class for purposes of the § 11, 7%-Note claims to avoid a collateral dispute about whether Pulsifer & Associates was the beneficial purchaser or a nominee for purchasers of the 7% Notes. Subsequently Defendants moved to dismiss the § 11 claims on the grounds that van de Velde did not acquire his notes until November 2001, after Enron had

---

**28.** In its memorandum and order entered on December 20, 2002 (# 1194), this Court dismissed without prejudice van de Velde's § 11 claim on the 7% Notes, based on the withdrawal of van de Velde and Defendants' unchallenged representation that Lead Plaintiff no longer wished to pursue it.

**29.** In the consolidated complaint Lead Plaintiff did assert through van de Velde claims under § 11 and § 10(b) on behalf of the 7% Notes purchasers against the same Defendants as the *Pulsifer* complaint.

**30.** Count I of the consolidated complaint asserted § 10(b) claims on behalf of a class of purchasers of *all* Enron publicly traded securities, without specifying the 7% Notes.

filed a Form 10–K for 2000, and had failed to plead reliance of the allegedly materially false and misleading registration statement, as required by § 11(a)(5), 15 U.S.C. § 77k(a)(5)(providing that a person who has acquired a security "after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effect date of the registration statement" must prove actual reliance on the registration statement to recover). Thus, once van de Velde had withdrawn, to insure that Plaintiffs had a 7% Note class representative with standing, Lead Plaintiff decided to substitute Nathaniel Pulsifer, although he is also a principal in Pulsifer & Associates, to sue this time in his capacity as a trustee of a family trust that had purchased 1000 7% Notes for the trust on January 25, 2000, before "the issuer had made generally available to its security holders an earnings statement covering a period of at least twelve months beginning after the effective date of the registration statement." 15 U.S.C. § 77k(a)(5). Because Lead Counsel was concerned that the claims would be time-barred by § 13 of the 1933 Act if not filed prior to the three year-anniversary of the first sale of the 7% Notes pursuant to the registration statement on August 10, 1999, and because the Court's order of August 5, 2002 indicated that it expected other complaints would be filed with claims not embodied within the consolidated complaint and would stay those claims until it resolved the motions to dismiss the consolidated complaint, Lead Plaintiff filed the new suit on August 9, 1999 with a cover letter addressed to Defendants' counsel, stating, "In accordance with Judge Harmon's recent orders, our view is that this *Pulsifer* case will be stayed pending the Court's ruling on the motions to dismiss in *Regents v. Lay.*"

Lead Plaintiff emphasizes that it did not voluntarily "waive," i.e., intentionally relinquish or abandon, all the 7% Note purchasers' § 11 claims. In response to Defendants' motions to dismiss, it did state that "Plaintiffs are no longer pursuing their claim with respect to the 7% Exchangeable Notes" and voluntarily withdrew van de Velde as a plaintiff in the face of the challenge that he had failed to plead proof of reliance. Lead Plaintiff also stated in the notice that van de Velde's withdrawal "will have not detrimental effect on the Class." Lead Counsel then reinstituted the § 11, 7%-Note claims, a mere nine days later, by filing the *Pulsifer* action. It never withdrew the § 10(b) claims for these investors.

Finally, urges Lead Plaintiff, if the Court decides to strike the *Pulsifer* complaint, it should alternatively also grant leave to amend the consolidated complaint in compliance with the policy of liberal amendment underlying Fed.R.Civ.P. 15(a).

■ After reviewing the matter, the Court agrees with Lead Plaintiff for the reasons it has argued that the motion to strike should be denied, Defendants have had sufficient notice and suffer no prejudice, especially in light of the stay on discovery, from the nine-day gap between the withdrawal of van de Velde and the instituting of the *Pulsifer* action to assert the same § 11 claims by 7% Note purchasers. Furthermore, the *Pulsifer* action is not the only one asserting claims based on the 7% notes that has been consolidated into *Newby. See, e.g., Headwaters Capital LLC and JAS Securities LLC v. Kenneth Lay et al.*, Member No. H–03–0341, order of consolidation on February 5, 2003 (# 1244 in *Newby* ). Moreover, it also makes practical sense, with respect to efficient use of time throughout discovery and class certification, to permit Lead Plaintiff, when it amends or supplements its complaint to comply with the Court's determinations on the motions to dismiss, to include the claims in the *Pulsifer* action in the amended or supplemented consolidated

complaint. Thus the Court denies the motion to strike and grants Lead Plaintiff leave to supplement the consolidated complaint with the *Pulsifer* claims once the Court has finished reviewing the motions to dismiss and sets a deadline for such amendment.

## II. Certain Current and Former Directors' Motion to Dismiss Pursuant to Fed.R.Civ.P. 8(b) [and the PSLRA] (# 661)

 Directors argue in generalized fashion that the complaint as to them should be dismissed because it consists of impermissible puzzle pleading, group pleading, and imposition of liability based merely on their high positions in and daily management of Enron.

Although the complaint's pleading is flawed, the Court disagrees with Movants' contention that it is totally inadequate, and because the Court is fully capable of "separating the wheat from the chaff," as it has done in prior orders, the Court denies the motion.

## III. Outside Directors' Motions

### A. Outside Directors' Collective Motion to Dismiss (# 662)

The Outside Director Defendants sat on Enron's board of directors and served on one or more of Enron's Executive, Finance or Audit Committees. According to Lead Plaintiff, "dozens of fraudulent transactions the details of which were presented to the Board," as well as described in the complaint, constituted "major elements of Enron's business that were accomplished with the full knowledge of their risks and impropriety by the Board." Moreover, the complaint charges that the Outside Di-

rectors' knowing and reckless "approval of fraudulent transactions, conflicts of interest and deceptive accounting practices were at the center of the fraud ...." Plaintiffs' Memorandum of Law in Opposition, # 853 at 2, 1.

Having reviewed the briefing by all parties, the Court only summarizes the arguments made by the Outside Director Defendants in their motions and replies (# 909, 924) and then addresses them directly.

### 1. Fraud Claims under § 10(b)

In moving for dismissal with prejudice of the claims against them, the Outside Directors (Robert A. Belfer, Norman P. Blake, Jr., Ronnie C. Chan, John H. Duncan, Joe H. Foy, Wendy L. Gramm, Robert K. Jaedicke, Charles A. LeMaistre, John Mendelsohn, Jerome J. Meyer, Paulo V. Ferraz Pereira, Frank Savage, John Wakeham, Charles E. Walker, and Herbert S. Winokur), arguing that none of them is alleged to have made any misrepresentation that might make him or her liable under § 10(b) of the 1934 Act, complain that Lead Plaintiff has divided them into two groups: (1) nine of them who did not sell Enron stock during the Class Period, and who are not charged with fraud (Mendelsohn, Meyer, Pereira, Urquhart,[31] Wakeham, Walker, Winokur, and Savage are sued only under §§ 11 and 15 of the 1933, and the claims against whom are expressly not grounded in fraud, Complaint at ¶ 3 n. 1.); and (2) eight who did sell Enron stock during the Class Period and who are charged with fraud under § 10(b) and § 20A, as well as under §§ 11 and 15 (Belfer, Blake, Chan, Duncan, Foy, Gramm, Jaedicke, and LeMaistre).[32]

---

**31.** Fifteen out of seventeen of Enron's Outside Director Defendants have collectively filed # 662. Defendant Urquhart has filed a separate motion to dismiss (# 647). Lead Plaintiff filed a notice of dismissal of Bruce G. Willi-

son (# 499) on April 17, 2002, which the Court effected by order of April 22, 2002 (# 526).

**32.** Outside Directors make a weak argument that Lead Plaintiff's failure to sue them all for

Those Outside Directors charged with fraud challenge Lead Plaintiff's complaint on several grounds: (1) the complaint's reliance on impermissible group pleading for its fraud claims, without the specific factual particularity mandated by the PSLRA and Rule 9(b); (2) the complaint's pleading of scienter based on the trading of Enron stock, when most Outside Directors did not sell any stock, but increased their Enron securities holdings, and when those who did sell, sold only a small portion of their holdings at inauspicious times [33]; and (3) Lead Plaintiff's allegations that in doing what corporate directors routinely do (serve on committees, review financial information, approve transactions, and sign disclosure documents), they violated the law.

Outside Directors further argue that the complaint nowhere asserts facts giving rise to a strong inference of scienter for any of them, i.e., the complaint fails to establish what each individual director did wrong, what each knew and when, or that each acted with an intent to deceive. Instead, Defendants object, each director is identified only by the dates he or she served on Enron's board, by the committees he or she sat on, and by the SEC filings each signed. They also contend that Lead Plaintiff has failed to allege scienter with the requisite particularity, but instead provides only insufficient, conclusory statements based on their board or committee membership or sale of stocks during the Class Period. They maintain that Lead Plaintiff has failed to assert any facts that would give rise to a strong inference that any of them knew or recklessly disregarded matters that would or should have alerted them to suspect that the financial statements and registration statements that they signed were, as Plaintiff claims, false and misleading.

With supporting charts, Outside Director Defendants furthermore contend that Lead Plaintiff's allegations relating to their sales of Enron stock during the Class Period are insufficient to establish scienter because Lead Plaintiff fails to show that the stock sales were unusual, suspicious in amount or in timing [34] or

---

fraud, when they all attended committee and/or board meetings on which Lead Plaintiff relies to demonstrate that they had knowledge of fraudulent activity at Enron, demonstrates that nothing fraudulent or wrongful occurred at these meetings and therefore it does not have a fraud claim against them. Plaintiff is the master of its complaint and may assert or not assert claims against its defendants as it chooses, as long as the claims against each defendant satisfy the pleading standards of the relevant law and rules. The focus is on the adequacy of what Lead Plaintiff does allege, not on what it does not.

**33.** Defendants argue that the only basis for Plaintiff's pleading of scienter is the sale of stock, which by itself is insufficient to show fraudulent intent. *In re Waste Management, Inc. Sec. Litig.*, C.A. No. H–99–2183, sl. op. at 129 (S.D.Tex. Aug. 16, 2001), *citing In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir.1999).

**34.** Defendants emphasize that because stock and options are a common form of compensation for directors, selling is a normal and regular occurrence. So, too, is it rational and nonfraudulent to exercise options well before the expiration date if the price significantly exceeds that option's strike price, i.e., as Lead Plaintiff's own expert, Scott Hakala, asserted, when the market price hits at least three to four times the strike price.

Outside Directors argue that Lead Plaintiff's Class Period of thirty-seven months is an unusually long period for examination of stock sales for allegations of suspicious trading. *Cf. In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir.2002)(noting unusually long class period of fifteen months selected by Milberg Weiss and observing that "lengthening the class period ha[d] allowed the plaintiffs to sweep as many stock sales into their totals as possible"); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 985–86 and 987 (9th Cir.1999)(finding average sales of 10% of holdings in a class period lasting fifteen weeks insufficient); *Ronconi*, 253 F.3d at 435 (sales of 17% of holdings during a seven-month period "not suspicious in

inconsistent with prior trading patterns of each individual director, or that each sale was not explainable by other facts. Furthermore, argue Defendants, nine of the seventeen Outside Directors did not sell any stock, yet Lead Plaintiff does not meaningfully differentiate those who did not sell from those who did sell Enron stock, making any inference of scienter

amount"); *Waste Management*, 128 F.Supp.2d 401 (no strong inference of scienter when individuals sold 27.2 and 29.6% of holdings in a five-month period). Lead Plaintiff responds that "the length of the Class Period here is coextensive with the financial fraud as, it claims, was implicitly admitted by defendants when Enron restated its financials. [] In fact most of the Outside Directors' stock sales occurred late in the Class Period, between 3/00 and 9/01." # 853 at 68. Since the Court is reviewing a Rule 12(b)(6) motion, the Court views these matters in a light most favorable to the nonmovant. Nevertheless the unusually long Class Period is a factor to consider in evaluating the weight to be attributed to any inference of scienter arising from stock sales in context. Also Outside Directors point out that Lead Plaintiff compares the thirty-seven month Class Period to trading during a prior period of only twenty-seven months, a base period substantially shorter than the Class Period, also weakening any inference of scienter to be drawn.

Outside Directors maintain that the percentages of their holdings that were sold, in light of the length of the trading period, "were substantially below those that have been consistently ruled nonsuspicious as a matter of law" in the cited cases. # 662 at 20–21 & nn. 23–25. They also argue that Enron's stock was often trading at $70 or more, but only "a small fraction"(less than 5%) of their sales were at or above that level. *Id.* at 22 & nn. 26–27; 23. Furthermore each Outside Director selling stocks sold only a fraction of his holdings. *See Nathenson*, 267 F.3d at 420–21 (Outside director's sale of only "a fraction of his holdings" does not satisfy scienter requirement); *In re Waste Management, Inc. Sec. Litig.*, Civ. A. No. H-99-2183, S1. Op. at 131 (S.D.Tex. Aug. 16, 2001)("Retention of the vast majority of their stock negates any inference of scienter."). For the timing of a sale to be suspicious, a plaintiff must show it was "calculated to maximize benefit" to the seller, such as just before a

less plausible as to the those who did sell. *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 421 (5th Cir.2001)(" '[t]he fact that other defendants did not sell during the class period undermines plaintiffs' claims' "), *quoting Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir.1995). In fact, Defendants emphasize, the evidence properly before the Court [35] demonstrates that at

negative earnings disclosure or near a class period high. *In re: Apple Computer Litig.*, 886 F.2d 1109, 1117–18 (9th Cir.1989); *Nathenson*, 267 F.3d at 421.

Although they do not concede that Lead Plaintiff's statistical trading analysis is valid or the results accurate (and which the Court has already ruled would not be considered for purposes of pleading sufficiency), they argue that it demonstrates that their trading was neither unusual or suspicious. *Id.* at 23–28. In particular they point out that in Lead Plaintiff's statistical analysis of option exercises, Plaintiffs' expert stated that insiders acting without scienter had a rational motive to exercise options before their expiration date if the market price of the stock were significantly higher than the options' strike price. Moreover, exercises of stock options that are "deep-in-the-money," i.e., where "the market price is at least four times the strike price (complaint at ¶ 408)," "could be explained by wealth diversification and risk aversion," economic rather than fraudulent intent, as indicated in Plaintiffs' detailed expert report. Ex. B at 16 n. 21. They point out that Jaedicke, LeMaistre, and Black, all accused of fraud, sold only stock options received as compensation from Enron at prices at least three to four times the strike price. Outside Directors further argue that under Lead Plaintiff's own criteria, as reflected in a second statistical analysis by their expert, sales by Blake, Chan, Duncan, Foy, Gramm and Jaedicke cannot be attributed to improper motives because of their prior trading practices. Thus, insist Outside Directors, Lead Plaintiff's own statistical analyses exonerate Outside Director Defendants.

**35.** See Proxy Summary (Compiled from Proxy Statements, SEC Appendix (# 1200) Tabs 88 & 20–22), Ex. A of Outside Directors' Appendix (# 663), chart summarizing proxy statement holdings disclosures for Outside Directors 1998–2001.

least eight Outside Directors (Chan, Jaedicke, LeMaistre, Mendelsohn, Meyer, Pereira, Savage and Wakeham) actually increased their stock holdings from 1998–2001, even though three of those (Chan, Jaedicke, and LeMaistre) are accused of some impermissible sales. Thus at least twelve Outside Directors made either no sales, or increased their holdings, or both.[36] *See Allison v. Brooktree Corp.,* 999 F.Supp. 1342, 1353 (S.D.Cal.1998)(if others allegedly involved in misconduct were purchasing stock, that fact made it "particularly difficult" to establish scienter based on stock sales); *Ronconi v. Larkin,* 253 F.3d 423, 436 (9th Cir.2001)(sale of stock by some of a group of equally knowledgeable insiders does not give rise to a strong inference of scienter where the rest act inconsistently with such an inference). Nor, Outside Directors emphasize, were the bulk of the sales made at times when prices were at or near peak levels; less than 5% of the stock was sold at $70 or more per share. Directors insist that under the case law,

> [I]n assessing scienter, consideration must be given to, for example: (a) the proportion of the amount sold to the seller's total holdings; (b) factors personal to the seller, like a recent or impending retirement or an impending option expiration; (c) the effects of trading restrictions or the vesting and expiration of options; and potential negating of the inference by the lack of sales of others similarly situated.

Motion to Dismiss at 26. They maintain that Lead Plaintiff's computer statistics fail to take any of these into account and thus are flawed. Moreover rather than plead each defendant's entire prior selling history, Lead Plaintiff employs charts and figures that merely compare trading during the thirty-seven-month Class Period with each defendant's trading in the prior twenty-seven months, thus weakening any inference that may be drawn from it.

Outside Director Defendants examine the allegations of trading during the Class Period made against each of those accused of fraud, summarized *infra,* to argue that the allegations do not give rise to a strong inference of scienter. Four Outside Directors (Blake, Chan, Duncan and Gramm) each had only a single sale; Jaedicke had two sales; Foy and LeMaistre each had three sales; and Belfer had an unspecified number.

## A. Joe Foy

The complaint states that Foy retired from the board in early 2000. During the Class Period he allegedly sold 36.9% of his Enron holdings in 1999 and 11.6% in 2000. Outside Director Defendants highlight the point that "[i]t is not unusual for individuals leaving the company . . . to sell shares." *Greebel v. FTP Software,* 194 F.3d 185, 206 (1st Cir.1999). *See also In re First Union Corp. Sec. Litig.,* 128 F.Supp.2d 871, 898 (W.D.N.C.2001)(concurrent resignation rebuts inference that stock sale was suspicious); *Acito,* 47 F.3d at 54 (outside director's sale of 350,000 shares was not "unusual" and was insufficient to establish scienter where complaint acknowledges that he had retired around the same time). Outside Directors assert that even very substantial sales that would otherwise be suspicious can be explained by retirement, which negates any inference of scienter.

Moreover, Foy's sales were "inauspiciously timed": 29,040 out of 38,160 shares

36. The complaint states that Winokur, who was Enron's Finance Committee Chairman, sold no Enron stock and purchased over 25,-000 more shares during the Class Period, but had no increase in his holdings because of gifts of shares to charity. Ex. L (SEC Form 4 for Winokur) to Outside Directors' Appendix, # 663.

were sold in early 1999 at about $34 per share, more than a year before the stock peaked at $90 per share. The complaint also states that Foy had sold 9,920 shares of Enron stock at $23 per share prior to the Class Period,[37] more shares than he sold in 2000 (9,120) when prices were high. Because an inference of scienter requires that sales be "at times calculated to maximize personal benefit from undisclosed inside information," any inference of scienter has been negated by Lead Plaintiff's own allegations regarding Foy. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir.1989), *cert. denied*, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990).

Furthermore, note Outside Directors, Lead Plaintiff's expert's statistical analyses failed to "flag" any of Foy's trades.[38] Moreover, the majority of Foy's challenged sales (30,4000 of the 38,160 shares) were exercises of options when the market price was at least three to four times the strike price, a circumstance that the complaint has conceded to be a wholly rational economic decision in the absence of a showing of improper motivation.

### b. Dr. Wendy Gramm

Outside Directors emphasize that there is no inference of scienter regarding the single sale of Enron stock during the Class Period by Gramm. She allegedly sold 84% of her Enron holdings, about 10,000 shares, in the first month of the Class Period, November 1998, at $27 per share, which was essentially the same price since the Class Period began and less than a third of its peak price two years later, and before the alleged Ponzi scheme even came to fruition. Moreover there is a ready explanation for the sale: in late 1998, Gramm filed an opinion of counsel stating that as the wife of Senator Phil Gramm, she might have a material conflict of interest if she retained ownership of Enron stock. 1999 Proxy (SEC App. (# 1200) Tab 20) at 12. Furthermore the sale was consistent with her earlier sale of 8,000 shares in 1998 before the Class Period began. Outside Directors observe the neither of Lead Plaintiff's statistical analyses identified Gramm's trades as suspicious.

### c. Robert Jaedicke

Outside Directors note that both of Jaedicke's sales during the Class Period, 8.6% of his holdings in May 2000 and 12.8% of his holdings in May 2001, were exercises of options at levels nine times the strike price, which was approximately $7 per share. Thus the sales and the low percentages of his holdings were economically justified and, according to Outside Directors, "non-suspicious" as a matter of law. Moreover the options were about to expire. Ex. E to # 663. Furthermore, in spite of the two sales, Jaedicke increased his Enron holdings consistently from 1998–2001, from 45,356 shares in 1998 to 57,087 in the 2001 proxy. His sales were not out of line with his prior trading history: in 1993–94 he sold more shares (21,840, split adjusted, at around $15 per share) than he did during the entire Class Period.[39]

---

**37.** The pre-Class Period sale occurred in June 1996.

**38.** Although this Court has decided that Lead Plaintiff may not use its expert Hakala's report to satisfy pleading requirements for insider trading, the Court cannot help but note that Lead Plaintiff has not responded to the numerous instances where Outside Directors have pointed out that the expert's report or statistics of failure to "flag" challenged sales as suspicious imply a contrary result to that Lead Plaintiff attempts to plead.

**39.** Lead Plaintiff has also alleged that Vinson & Elkins' letter of October 15, 2001, reporting on its "white wash" investigation of Enron, was directed to Jaedicke as chairman of the Audit Committee and that at his request, the law firm gave a verbal summary of its review and conclusions to the Audit Committee. Such allegations near the close of the Class Period do not state a claim under § 10(b).

#### d. Charles LeMaistre

LeMaistre's three sales during the Class Period were also exercises of stock options each year of the three-year period at least five times the strike price and were spurred by the imminent expiration of those options (on 5/8/99, 5/14/00, and 5/13/01), thus negating any suspicious inferences. The sales were about one year apart in January 1999, December 1999, and May 2001, respectively, constituting approximately 3% (1,984 shares), 11% (7,360 shares), and 12% (8,000 shares) of his holdings at the times of sale, none a suspicious amount. The two 1999 sales were at prices of $29.72 and $42.62, far from the peak price a year later, and the 2001 sale was at $58.64. Furthermore, despite these sales LeMaistre retained ownership of nearly 75% of his stock. The sales also totaled less than he sold in his prior trading practice: in 1993 he sold 17,856 shares, more than during the entire three-year Class Period. Furthermore, like Jaedicke, from 1998 to 2001 LeMaistre increased his holdings from 46,940 shares to 56,287.

#### e. Ronnie Chan

Outside Director Defendants point out that Chan sold 29% of his stock in July 1999 at a price of $42.15, half of what it would be worth the following year ($90) and not, they insist, a suspicious percentage as a matter of law. Lead Plaintiff's statistical analyses did not flag Chan's single sale as suspicious. Chan retained 71% of his Enron stock and spent cash to purchase more, actually increasing his holdings during the Class Period.

#### f. John Duncan

Lead Plaintiff alleges that Duncan sold 20% of his holdings at $57.42 per share in May 2001, which Outside Director Defendants characterize as "nonsuspicious" in light of the length of the Class Period. Outside Directors also claim that Lead Plaintiff failed to acknowledge that Duncan made substantial purchases of stock, increasing his holdings each year of the Class Period (by 9,920 shares in 1999, by 7,360 shares in 2000, and by 8,000 shares in 2001). Ex. A, I to # 663. The 2001 proxy reflects that Duncan was 74 years old when he made the 2001 sale; a "corporate insider may sell his stock to . . . diversify his portfolio, or arrange his estate plan." *Ronconi*, 253 F.3d at 435. Moreover, when Enron stock had climbed above $70 for more than a year and then peaked at $90.00, Duncan sold no stock. Even after his May 2001 sale, he retained 80% of his holdings.

#### g. Norman Blake

Blake's only sale during the Class Period was an exercise of options at a price at least three to four times the strike price of approximately $15–$20 per share, and thus not suspicious according to Lead Plaintiff's own analysis. Although he sold 46% of his stock at a high price, $80.44 per share, Outside Directors argue that Enron stock traded at $75 or more for most of several months and "it is impossible to consider it suspicious that this one director happened to sell in that time frame." They insist the timing is not suspicious because it is normal for insiders to sell their stock after a substantial increase in the price and because the ratio to the high strike price made the sale appropriate and rational well into the Class Period. Furthermore the amount sold was not suspicious because it was his only sale in the three-year class period. In addition Blake made a cash purchase of 5,000 more shares of Enron stock during 2001. Finally, Outside Directors contend that the absence of suspicious sales by any of themselves negates any possible inference of scienter in Blake's sale.

### h. Robert Belfer

Belfer was one of Enron's largest shareholders, holding over 10 million shares during the Class Period, and the most victimized by Enron's collapse because he remained Enron's largest individual shareholder after losing a potential $700 million when he decided to hold and not sell 80% of his Enron stock when the price hit $90 per share, and making only $112 million on the stock that he did sell.[40] Moreover, Outside Directors insist that the amounts of his sales were not suspicious as a matter of law: in 1999 he sold only 5.2% of his holdings; in 2000, only 8.1%; and in 2001, only 7.2%. Belfer also sold his stock generally well below peak prices; only 6% of his sold shares, or approximately 1% of his available holdings, was sold at $70 per share or above. *Greebel,* 194 F.3d at 206 ("timing does not appear very suspicious" where the stock was not "sold at the high points of the stock price"); *Nathenson,* 267 F.3d at 416, 420 ("inauspiciously timed" sales well below "class period high" are not suspicious); *Ronconi,* 253 F.3d at 435 (sales not suspicious where insiders "miss the boat" of peak prices). Additionally, Belfer's alleged sales were not market sales, but "costless collar agreements or transfers to equity exchange funds or partnerships, commonly used for purposes of diversification to limit risk, as Lead Plaintiff's complaint states at ¶ 409." Thus they are not "securities of the same class" as those purchased by Plaintiffs, as expressly mandated by the contemporaneity requirement of § 20A. 15 U.S.C. § 78t–1(a). Outside Directors represent that the use of zero-cost collars results in significantly lower proceeds than would sales, thus further undermining any inference of scienter; his transactions in December 2000 netted him proceeds of just over $55 per share, when by selling them, he could have realized the current market price of $80 per share.

Outside Directors object that conclusory allegations against them are inadequate to establish a strong inference of scienter, as are assertions that they performed their routine roles on the board or on committees of Enron. Even where there is a restatement of financial results, Lead Plaintiff must allege scienter against each of them with particularity. *In re Sunbeam Sec. Litig.,* 89 F.Supp.2d 1326, 1341 (S.D.Fla.1999)(outside directors sitting on Sunbeam's Audit Committee were dismissed from suit because of a "complete lack of any particularized allegations of scienter on part of Audit Committee members"); *Jacobs v. Coopers & Lybrand,* No. 97 CV 3374(RPP), 1999 WL 101772, *17 (S.D.N.Y. Mar.1, 1999)(allegations that outside directors had general knowledge of company's finances because of their positions as directors, members of audit committee, and signatures on company's 10–Ks fail to meet pleading-with-particularity standard).

Outside Directors also highlight, as a critical pleading point demonstrating that they did not act with severe recklessness, that every year Arthur Andersen informed Enron's board that Enron's audits had been done in accordance with GAAS, that its financial statements had been prepared in accordance with GAAP, and that the accounting firm had "present[ed] fairly, in all material respects, the financial position of Enron Corp." Complaint at ¶ 903. Even a strong inference of negligence, which requires a much lower showing than severe recklessness, is negated by reliance on outside auditors' accounting. *In re McKesson HBOC, Inc. Sec. Litig.,* 126 F.Supp.2d 1248, 1267 n. 9 (N.D.Cal.2000). Defendants emphasize that Lead Plaintiff has not alleged any facts suggesting that

---

**40.** Outside Directors observe that Enron shares peaked at $90 per share during the Class Period and then fell to $4 per share by the end.

any director actually knew or had reason to suspect that the unqualified opinions issued by Arthur Andersen for its Enron audits were false or misleading when they were made.

### 2. Section 20A

Outside Directors also contend that Lead Plaintiff has failed to allege a proper claim for insider trading under § 20A of the 1934 Act, so its § 20A claims must be dismissed, because Lead Plaintiff (1) failed to plead the requisite independent, underlying violation of § 10(b); (2) failed to plead adequately contemporaneous trading by Plaintiffs and Defendants, individually; and (3) cannot plead sales by any Defendant on the same market with respect to Belfer, i.e., "costless collars" and transfers to private exchange funds or investment partnerships. *See, e.g., Copland v. Grumet,* 88 F.Supp.2d 326, 337–38 (D.N.J. 1999); *In re AST Research Sec. Litig.,* 887 F.Supp. 231, 234 (C.D.Cal.1995); *Colby v. Hologic, Inc.,* 817 F.Supp. 204, 216 (D.Mass.1993); *In re MicroStrategy Sec. Litig.,* 115 F.Supp.2d 620, 663–64 (E.D.Va. 2000). Not only has Lead Plaintiff made no contemporaneous trading allegations with respect to sales by Gramm or Chan, but for those Outside Directors about whom it has made such assertions, it has not pleaded that Plaintiffs' purchases were made on the same day as the accused sales by Defendants. Outside Director Defendants maintain that the allegations fail in

light of a growing trend to conclude that only same-day purchases and sales of widely traded stocks are considered to be contemporaneous trading. *Copland,* 88 F.Supp.2d at 338 (and cases cited therein); *AST Research,* 887 F.Supp. at 233–34 (and cases cited therein); *MicroStrategy,* 115 F.Supp.2d at 664. In particular, § 20A claims relating to Joe Foy's trades on March 18, 1999, Robert Belfer's trades on September 2, 1999, November 8, 9, & 11 1999, May 11 & 16, 1999, and Robert Jaedicke's trade on February 24, 2000 must be dismissed because they do not meet the same-day-trade requirement. Moreover, Outside Directors argue that many of Belfer's purported "sales"[41] are not market sales, but transfers of sales into an "Investment Partnership" and an "Exchange Fund."

Outside Directors further argue that because § 20A standing should be limited to those who at least "may have" traded with the insider, it should also be limited to those who purchased at the same price at which the insider sold. Here Plaintiffs' alleged trades, with one exception,[42] were at different prices than the prices of Outside Director Defendants' sales.

### 3. Section 11 Claims

The claims against Outside Directors under § 11 of the 1933 Act, based on four note purchases (three in public offerings and one in a private placement),[43] should

---

**41.** Outside Directors identify the disputed costless collars or transfers occurring on September 2, 1999, November 2, 2000, December 22, 2000, January 26, 2001, February 8, 2001, March 9, 2001, May 3, 2001, July 27, 2001, and September 21, 2001.

**42.** A January 6, 1999 purchase by the San Francisco City & County Employees' Retirement System is allegedly on the same day at the same price as a sale by Outside Director LeMaistre.

**43.** Initially Lead Plaintiff based his § 11 claims on four note purchases. Complaint at ¶ 1006.

The first § 11 claim is asserted against Belfer, Blake, Chan, Duncan, Foy, Gramm, Jaedicke, LeMaistre, Meyer, Wakeham, Walker, and Winokur based on a May 1999 offering of Enron Corporation 7.374% notes due May 15, 2019 ("the May 1999 offering").

A second § 11 claim originally targeted Belfer, Blake, Chan, Duncan, Foy, Gramm, Jaedicke, LeMaistre, Mendelsohn, Meyer, Wakeham, and Winokur and was based upon an

also be dismissed for the following reasons, insist Outside Directors.

First, there can be no § 11 liability in connection with a Rule 144A[44] private placement because a private placement is not made pursuant to a registration statement. Such was the case with the July 2001 Placement made "only to qualified institutional buyers (as defined under Rule 144A under the Securities Act)." SEC App. (# 1200), Tab 81, p. 1. *Gustafson v. Alloyd Co.*, 513 U.S. 561, 577–78, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)(the term, "registration statement," applies only to purchases in a public offering).[45]

Second, some of the claims are brought against Directors who were not on Enron's board at the time of the offering (i.e., Walker for offerings made May 19, 1999 and May 18, 2001[46]) or who did not sign the registration statements in dispute (Meyer and Winokur for the offering made in August 1999 of the 7% Exchangeable Notes,[47] which has yet to be re-alleged

---

August 1999 offering of Enron 7% notes due on July 31, 2002 ("the August 1999 offering"). Lead Plaintiff withdrew this claim when it filed a notice of Withdrawal for the sole class representative, van de Velde, of those 7% Notes; because the Court has decided to permit Lead Plaintiff to amend or supplement to add another class representative to assert a claim based on the 7% notes, for economy of time with respect to Outside Directors' motion to dismiss the Court will assume that such a claim is pending.

Lead Plaintiff sues Belfer, Blake, Chan, Duncan, Foy, Gramm, Jaedicke, LeMaistre, Meyer, Wakeham, Walker, and Winokur based on a May 18, 2000 offering of 8.735% due on May 23, 2005 and of 7.875% notes due on June 15, 2003 ("the May 2000 offering").

The fourth § 11 claim is solely for signatory liability and originally charged Belfer, Blake, Chan, Duncan, Foy, Gramm, Jaedicke, LeMaistre, Mendelsohn, Meyer, Pereira, Savage, Wakeham, and Winokur, based on a July 2001 private placement of Enron Corporation zero coupon convertible senior notes due 2021 ("the July 2001 Placement"). By Lead Plaintiff's Notice of Errata and motion for entry of order to replace pages in consolidated complaint (# 480), which the Court granted on May 13, 2002 (# 722), Lead Plaintiff deleted Meyer and Foy as defendants to the claim based on the July 2001 Placement. Thus Outside Directors' argument that Meyer and Foy should be dismissed from § 11 claims based on the July 2001 Placement because they were neither members of the board nor signatories on the registration statement is moot. Motion to dismiss (# 662) at 61–62.

**44.** Rule 144A is an express exemption from the requirement that a registration statement be filed in connection with an offering of securities so that the placement is "deemed not to have been offered to the public." 17 C.F.R. § 230.144A & § 230.144A(c). A registration statement is an essential element of a § 11 claim.

**45.** Outside Directors also argue that Lead Plaintiff fails to allege that Plaintiffs purchased their notes in the initial placement and therefore they lack standing under § 11, based on the holding in *Gustafson v. Alloyd Co., Inc.* 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), that standing to sue under § 12(2) of the 1933 Act, 15 U.S.C. § 771(a)(2), is restricted to persons who purchased securities in the initial public offering, and thus those who purchased their securities in private initial offerings or on the secondary market are deprived of the antifraud protection of § 12(2). Outside Directors contend that the rule also applies to claims under § 11, 15 U.S.C. § 77k(a). In its memorandum and order (# 1194) dealing with the secondary actors' motions to dismiss at 267–68 n. 126, this Court concluded that the *Gustafson* rule requiring privity, i.e., purchases in the initial public offering, for standing to sue under § 12(2), does not apply to § 11, which reaches aftermarket purchasers who can trace the securities they purchased to those sold in the offering covered by the allegedly false registration statement. Therefore the Court does not address the argument here.

**46.** *See* Enron's 1999 10–Q for the Second Quarter [Part II, Item 4]; SEC App. Tab 8 at 41 (noting at a May 4, 1999 meeting Walker was no longer on the Board).

**47.** *See* 8/10/1999 Prospectus Supplement, SEC App. Tab 79; 7/23/1999 Registration Statement, SEC App. Tab 51.

through addition of claims currently asserted in the *Pulsifer* complaint). 15 U.S.C. § 77k(b)(1)(an individual is not liable under § 11 if "before the effective date of the part of the registration statement ... he had resigned from ... office.").

Third, Lead Plaintiff has not identified any material misstatements or omissions in the registration statements of the four offerings nor shown why the statements are misleading, as required by the PSLRA to establish § 11 liability.

Fourth, Outside Directors maintain, where between the filing of the registration statement and a plaintiff's purchase the issuer files "a [Form 10–K] earnings statement covering a period of at least twelve months beginning after the date of the registration statement," the plaintiff must prove reliance on the alleged misrepresentation or omission in the registration statement. 15 U.S.C. § 77k(a). They argue that some Plaintiffs have not pleaded reliance for their § 11 claims where a Form 10–K earnings statement was filed after the registration statement at issue.[48]

Fifth, Lead Plaintiff's own pleadings conclusively establish an absolute defense to liability for Outside Directors because Lead Plaintiff has pleaded facts demonstrating that the Outside Directors signed the registration statements in reasonable reliance on opinions of legal and accounting experts (including Arthur Andersen and Vinson & Elkins) whose opinions[49] they had no reason to question and because Lead Plaintiff expressly disclaims any claim of fraud or bad faith against the seven directors (Mendelsohn, Meyer, Pereira, Wakeham, Walker, Winokur, and Savage) sued for violations of § 11. 15 U.S.C. § 77k(b)(3)(C) (providing safe harbor for directors who sign a registration statement in reliance upon expertised disclosures); *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir.1982)("[A] complaint that shows relief to be barred by an affirmative defense ... may be dismissed for failure to state a cause of action."), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*, 238 F.3d 363, 369 (5th Cir.2001)(quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)(noting it is a "hornbook principle[ ] of securities law" that "Defendants other than the issuer can avoid liability by demonstrating due diligence")); *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208 n. 26, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)("individuals who sign the registration statement ... are accorded a complete defense against civil liability based on the exercise of reasonable investigation and a reason-

---

**48.** Aside from van de Velde, who was voluntarily withdrawn, referring to the Certificates filed for the parties with the consolidated complaint Defendants point to an Amalgamated Bank purchase on June 29, 2001 after Enron filed its Form 10–K for 2000; to the Hawaii Laborers' purchase of notes and the Archdiocese of Milwaukee's purchase of securities, both offered pursuant to a February 5, 1999 registration statement in May, 2000, after Enron filed its Form 10–K for 1999.

**49.** According to the complaint, before every registration statement was issued, Arthur Andersen represented to the Outside Directors that "Enron's financial statements ... were presented in accordance with GAAP and that Andersen's audits of Enron's financial statements had been performed in accordance with ... GAAS," that it consented to the use of its name in each Prospectus as an expert, that it consented to the incorporation of its reports in each of the offerings alleged under § 11, that the accounting firm issued " 'clean' audit opinions" throughout the Class Period, that the 1997 and 1998 financials were "certified by Andersen and [had] an unqualified report thereon," that Andersen had issued a "clean opinion" as to the 1998, 1999, and 2000 financials, and that the report in early 2001 was "certified by Andersen." Complaint at ¶¶ 899, 926, 141, 221, 292, 931, 54.

able belief that the registration statement was not misleading").

Sixth, the § 11 claims sound in fraud[50] but have not been pleaded to satisfy Rule 9(b). The Outside Directors also argue that to the extent that Lead Plaintiff has alleged fraud in its § 11 claims, Lead Plaintiff's own pleadings raise the Outside Directors' due diligence defense while failing to state with particularity facts giving rise to a strong inference that Outside Directors acted not only with bad faith, but with severe recklessness or fraud in relying on the expert opinions. *Ernst & Ernst,* 425 U.S. at 208, 96 S.Ct. 1375; *Glassman v. Computervision Corp.,* 90 F.3d 617, 628 n. 12 (1st Cir.1996)(in § 11 context, "[d]ue diligence is equivalent to non-negligence").

As for Outside Directors against whom Lead Plaintiff has not pleaded fraud (Mendelsohn, Meyer, Pereira, Wakeham, Walker, Willison, Winokur, and Savage), Lead Plaintiff has not alleged that their reliance on the expertised opinions of Arthur Andersen and Vinson & Elkins was in bad faith, so the § 11 claims against them must be dismissed.

### 4. Sections 20(a) and 15 (Controlling Person Liability)

In addition, Outside Directors insist, Lead Plaintiff fails to plead a controlling person claim against them because it fails to allege (1) the requisite primary violation of the securities laws (federal or Texas) by Enron, (2) the exercise of actual control by Outside Directors over Enron, or (3) facts showing that they were culpable participants in the alleged fraudulent conduct by others. In its memorandum and recommendation regarding Individual Andersen Defendants (# 1241), this Court explained that under Fifth Circuit jurisprudence neither the second nor the third are required for controlling person liability under § 15 or § 20(a). # 1241 at 64–67, 71–73. The TSA does require a plaintiff to show that the defendant had actual power or influence over the controlled person and that the defendant induced or participated in the alleged violation. *Id.* at 10. Outside Directors appear to argue that Lead Plaintiff's controlling person claim rests only on their positions at Enron, which are insufficient to establish control, a view which the Fifth Circuit and the Texas courts have taken with regard to the federal and Texas statutes, respectively.

### 5. Texas Securities Act

Finally, Outside Director Defendants argue that the Washington State Investment Board's ("Washington Board's") sub-class action under the Texas Securities Act ("TSA"), Tex.Rev.Civ. Stat., Art. 581–33, against Belfer, Blake, Chan, Duncan, Foy, Gramm, Jaedicke, LeMaistre, Meyer, Wakeham, Walker, and Winokur, must be dismissed because (1) the Washington Board purchased its securities before the alleged misrepresentation was made; (2) none of the allegations or purchases underlying the Washington Board's claim occurred during the Class Period; (3) it does not satisfy Rule 9(b); (4) Lead Plaintiff fails to allege with particularity any untruths, omissions, or materiality in connection with the offering in which they actually bought; and (5) Lead Plaintiff does not plead that Outside Director Defendants were "sellers" under the TSA.

---

**50.** Outside Directors argue that despite Lead Plaintiff's disclaimer of claims of fraud, it incorporates numerous paragraphs of the complaint that clearly sound in fraud. If this Court chooses to disregard the allegations of fraud pursuant to *Lone Star,* they insist that all that remain are conclusory allegations that somewhere each of the contested offering documents misrepresents Enron's financial situation—a claim far too vague to provide them with fair notice under Rule 8.

Outside Directors note that to assert a claim under the TSA a plaintiff must prove either (1) that he was induced to buy a security from a seller "by means of" an untruth or material omission or (2) that he was induced to buy a security based upon a misleading registration statement. Tex. Rev.Civ. Stat. Ann. Art. 581–33A(1) and (2). Washington Board does not identify under which section it is asserting its claims, but its pleadings fail under either.

According to the complaint and its Certification, Sched. A, filed Dec. 20, 2001, the Washington Board purchased securities on July 7, 1998 in connection with two note offerings, Enron 6.95% Notes and Enron 6.4% Notes. Nevertheless, insist Outside Directors, the complaint does not identify any misrepresentation or omission in the July note offering documents, which were also dated July 1998,[51] but merely incorporates by reference more than 1000 paragraphs from other sections of the complaint that relate to offerings and events that occurred after October 1998. Thus the Washington Board could not have been induced to purchase the notes in July 1998 by statements not made until months later. Therefore the claims under the TSA must be dismissed, insist Outside Directors.

Moreover, urge Outside Director Defendants, the Washington Board's claims are outside the *Newby* Class Period, which did not begin until October 1998, more than three months after the Washington Board purchased the notes in dispute.

Outside Directors also note that Rule 9(b), requiring the pleading of fraud with particularity, applies to all averments of fraud, even to claims grounded in state law. *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir.1997); *Rubinstein v. Collins*, 20 F.3d 160, 165–66 (5th Cir.1994).

Furthermore, they argue, Lead Plaintiff also fails to allege that any misrepresentations or omissions in the offering documents were relevant to Plaintiffs' purchases, i.e., that they were material, argue Outside Directors.

Last of all, Outside Directors complain that Lead Plaintiff fails to allege that Outside Directors are "sellers" as required for seller liability under the TSA. To impose seller liability under the statute, a defendant must be in privity with a plaintiff. *Frank v. Bear Stearns & Co.*, 11 S.W.3d 380, 384 (Tex.App.—Houston [14th Dist.] 2000, pet. denied). Moreover, argue Outside Directors, the notes were sold on the basis of a firm commitment offering, so Enron, not the Outside Directors, passed title to these Notes to Plaintiffs. SEC App. (# 1200) Tab 82 at S–5 ("Enron has agreed to sell each of the Underwriters named below .... Under the terms and conditions of the Underwriting agreement, the Underwriters are committed to purchase all of the Notes, if any are purchased."); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1215 (1st Cir.1996)("the issuer in a firm commitment underwriter does not pass title to the securities")[52];

---

**51.** SEC App. (# 1200) Tab 82.

**52.** This Court has previously discussed the Fifth Circuit's construction of "seller" in art. 581–33A(2) of the TSA in 1982 in *Huddleston*, 640 F.2d 534, which in part was based on its interpretation of the term as used in § 12(2) of the 1933 Act, on which the Texas provision was modeled, and the impact of *Pinter* on that interpretation. *See* pages 44–49 of this memorandum and order. Neither the First Circuit in *Shaw* nor the Fifth Circuit in *Lone Star Inv.*

*Club* concludes there is a hard and fast rule that because an issuer in a firm commitment underwriting is a remote seller who sold all the shares of an offering to one or more underwriters from which the plaintiff investor directly purchased his securities, that the issuer cannot be liable as a seller under § 12(2) (or its analogue, article 581–33A(2) of the TSA). *Lone Star Ladies Inv. Club,* 238 F.3d at 369–70. Instead, although ordinarily in a firm commitment underwriting, the issuer is immune because the investor is not buying

*Dartley v. ErgoBilt*, 2001 WL 313964, *2 (N.D.Tex. Mar.29, 2001)("Where there is a firm commitment underwriting … the issuer sells the stock to be offered to the group of underwriters for the offering… Here Plaintiffs do not allege any facts to support the conclusion that [the defendants] were statutory sellers as to any of the Plaintiffs."). Outside Directors maintain that Plaintiffs concede that the only "sellers" they can identify are JP Morgan and Lehman Brothers, who "together offered for sale and sold" the securities purchased by the Washington Board. They have not and cannot allege that any Outside Director Defendants were sellers.

## B. John A. Urquhart's Motion to Dismiss

Urquhart was a director on Enron's Board when the Class Period began and retired on May 1, 2001. He is among those charged under the non-fraud provisions of the 1933 and 1934 Acts. No allegations are made against him relating to any insider trading activities or stock sales. Under the 1933 Act, Lead Plaintiff sues Urquhart under § 11 for signing Registration Statements during the Class Period for three note offerings (the May 19, 1999 offering of 7.375% Notes; the August 10, 1999 offering of 7% Exchangeable Notes; and the May 2000 offering of 8.735% notes due on May 23, 2005 and 7.875% notes due on June 15, 2003 two types of notes) and under § 15 for controlling person liability.

Urquhart basically reiterates arguments asserted in the Outsider Directors' collective motion where they are relevant to the specific allegations against him. He first maintains that Lead Plaintiff has failed to state a claim against him for signing the registration statements under § 11 because (1) the claims sound in fraud and are not pleaded with Rule 9(b) particularity; (2) because the complaint fails to allege any specific material misrepresentations or omissions in the registration statements and prospectuses or to show that such information was known by him at the time the purchases were made; and (3) the complaint establishes a complete defense for him, i.e., that the registration statements were expertised by Arthur Andersen and Enron's lawyers, on whose opinions he relied. He insists Lead Plaintiff has not adequately pleaded controlling person liability under § 15 because it has not pleaded actual power or influence nor inducing or participating in the alleged violation[53]; nor has it established the prerequisite violation under § 11. He also challenges the absence of pleadings showing that he possessed the power to direct or cause the direction of the management and policies of the primary violator by ownership of stock, contract or otherwise. In addition Urquhart maintains that he is not liable under the TSA because he does not meet the requirements for a statutory "seller," both because he merely participated in the offerings and was not in privity with any plaintiff and because the July 1998 offering was a firm commitment offering, so he could not have passed title to any plaintiff. Moreover, he maintains that Lead Plaintiff admits that Urquhart is not an "aider" under the Texas statute because he was not involved in any intentionally deceptive, fraudulent, or reckless conduct. Furthermore, Urquhart insists that Lead Plaintiff cannot show a causal connection

from the issuer, where the issuer actively solicits the sale of the securities, and thus in essence becomes an agent of the securities vendor, the issuer may be liable as a "seller" under the statute. *Id.; Shaw*, 82 F.3d at 1215 (to be liable as a seller one must "actively" solicit the purchase of securities by the plaintiff "to further [the solicitor/seller's] own financial motives, in the manner of a broker or vendor's agent").

**53.** As indicated, the Fifth Circuit does not require these allegations.

between the alleged misstatements and the purchase of the notes offered on July 7, 1998 and that claims based on this offering fall outside the Class Period, which begins in October 1998. Thus Urquhart maintains that Lead Plaintiff has failed to plead with particularity as required by Rule 9(b).

## C. Court's Decision

### 1. Fraud Claims Under § 10(b) Against Outside Directors Belfer, Blake, Chan, Duncan, Foy, Gramm, Jaedicke, and LeMaistre

The complaint alleges that Outside Directors, with scienter, participated in the purported Ponzi scheme by approving or implementing all of the very large sham transactions (manipulative and deceptive devices), which could not have occurred without Outside Directors' authorization and by means of which Enron hid its debt and falsified its profits, while Outside Directors ignored obvious signs of potential or actual fraud. Complaint at ¶ 395. Indeed Lead Plaintiff contends that the size, value, frequency, and timing of these deceptive transactions should have secured the attention of those sitting on the Enron Board's Executive, Finance and Audit Committees. Lead Plaintiff emphasizes that the Outside Directors waived Enron's established policy in approving blatant conflicts of interest, in particular the dual role of Fastow in Enron and LJM2. Subsequent knowing or reckless disregard of the entities LJM2 established and transactions among them, as well as approval of deceptive accounting practices, furthered the alleged Ponzi scheme. In its new memorandum in opposition (# 853), supported by a new Appendix (# 858) of documents,[54] Lead Plaintiff argues that its pleadings are sufficient to state a claim under § 10(b)

and Rule 10b–5 against Belfer, Blake, Chan, Foy, Gramm, Jaedicke and LeMaistre, based on (1) the newly submitted copies of minutes of related, key Enron board of directors or committee meetings to demonstrate the Outside Directors' knowing and reckless participation in the alleged Ponzi scheme, (2) alleged facts in the complaint regarding manipulative and deceptive devices, scheme, and course of business that the Outside Directors used to defraud Enron's investors, and (3) the complaint's particulars (who, what, when, where and why) of each registration statement signed by each Outside Director. For clarity, the Court henceforth identifies the Outside Directors charged with fraud under § 10(b) and 10b–5 with an asterisk (*) to make them and the allegations giving rise to a strong inference of scienter against each easier to follow.

Outside Directors in their reply vociferously object to "Plaintiffs' unauthorized effort to amend their Complaint, in their Response, by adding close to sixty pages of new allegations" and "nearly thirty new factual exhibits," # 909 at 2 n. 3 and at 7. The Court notes that Rule 15(a) states that leave to amend "shall be granted freely when justice so requires." Because the rule " 'evinces a bias in favor of granting leave to amend,' " a court should have a " 'substantial reason,' " such as " 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment,' " if it denies such a request. *Herrmann Holdings, Ltd. v. Lucent Technologies, Inc.*, 302 F.3d 552, 566 (5th Cir.2002), *quoting Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir.1981), and *Jacobsen*

---

**54.** Lead Plaintiff characterizes its documentary evidence as public filings, documents referred to or partially quoted in the complaint, and documents of public record (including Congressional testimony and Enron-related documents furnished to Congress), of which the Court may take judicial notice.

*v. Osborne,* 133 F.3d 315, 318 (5th Cir. 1998). Although Outside Directors complain that Lead Plaintiff has already had an opportunity to amend, the situation in a class action governed by the PSLRA is distinguishable from that in an ordinary single-suit action. Here Lead Plaintiff's first "amendment" involved writing essentially a new complaint, covering many actions, claims, and parties not originally asserted in its member case, within an expedited time period. Moreover, the Fifth Circuit has noted,

> The PSLRA was enacted, in part, to compensate for "the perceived inability of Rule 9(b) to prevent abusive frivolous strike suits." It was not enacted to raise the pleading burdens under Rule 9(b) and section 78u–4(b)(1) to such a level that facially valid claims, which are not brought for nuisance value or as leverage to obtain a favorable or inflated settlement, must be routinely dismissed on Rule 9(b) and 12(b)(6) motions [footnotes omitted].

*ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 354 (5th Cir.2002). From the totality of circumstances before it, this Court does not find, and would be greatly surprised if any reasonable person disagreed, that the *Newby* consolidated action is merely a strike suit filed solely for nuisance value or an inflated settlement. The Fifth Circuit has also stated that "a complaint can meet the new pleading requirement of [15 U.S.C. § 78u–4(b)(1) ] by providing documentary evidence and/or a sufficient general description of the per-

sonal sources of the plaintiffs' beliefs." *ABC Arbitrage,* 291 F.3d at 352. The Court has therefore reviewed the new allegations and the newly filed documents, in particular the minutes of committee and board meetings on identified dates attended by identified Outside Directors, at which a number of activities identified as part of the alleged Ponzi scheme were discussed, to determine whether permitting Lead Plaintiff to amend to include allegations of their content would suffice to state § 10(b) securities claims against the Outside Directors.

■ As noted, a corporate official who, on behalf of the corporation, signs a false financial statement that is filed with the SEC, "makes" a statement for potential liability under § 10(b), provided that Lead Plaintiff can also establish scienter. *Howard,* 228 F.3d at 1061. Taken altogether, numerous allegations support Lead Plaintiff's claim that Enron's financial statements during the Class Period were false and misleading. Among these are allegations relating to the extraordinary magnitude in amount and duration of Enron's final, pre-bankruptcy restatement in the fall of 2001, covering its financial statements for 1997 through the second quarter of 2001, revealing (1) that Chewco had never satisfied SPE accounting rules, (2) that Chewco and JEDI should have been consolidated since 1997, and (3) that Enron had overstated profits by more that $591,000,000 and understated debt by approximately $711,000,000 and shareholder's equity by $1,208,000,000.[55] Complaint

---

55. There is a diversity of opinion among courts about the significance of a restatement in pleading scienter. This Court agrees with those courts that have concluded that while a restatement of financials by itself is not sufficient to raise a strong inference of scienter, together with other allegations that take into account and measure the relative seriousness of the restatement, a restatement can satisfy the pleading requirement: allegations of "sig-

nificant overstatements of revenue 'tend to support the conclusions that the defendants acted with scienter'," *Chalverus v. Pegasystems, Inc.,* 59 F.Supp.2d 226, 234 (D.Mass. 1999); "the magnitude of the [restatement or of the violation of GAAP] error can play a role" in creating a strong inference of scienter, *In re Baan Co. Sec. Litig.,* 103 F.Supp.2d 1, 21 (D.D.C.2000); evidence of fraudulent intent or alleged "facts showing that defen-

at ¶¶ 61–63. The Court observes that facts supporting the first two matters were available at the time that Arthur Andersen prepared the earliest financial statements at issue. Furthermore, in its memorandum in opposition at 42–43, Lead Plaintiff provides a summary of all the allegations in the complaint, with references to relevant paragraphs, that demonstrate when and why Enron's financial statements were false and misleading, including such practices as violations of specific GAAP and GAAS, sham profits and concealment of debt through identified SPEs and transactions among them, false hedges, disguised loans, capitalization of expenses for failed bids rather than immediate write-offs, failure to write down impairment of long-term assets, abuse of mark-to-market accounting on identified projects and transactions, fictitious trades, and sham deals such as the one with Blockbuster. Moreover, Lead Plaintiff demonstrates that each of the Outside Directors signed at least one of the 10–Ks at issue, and most signed all four, as well as registration statements for new offerings.

Among others, the consolidated complaint identifies the following Form 10–Ks and registration statements as allegedly false statements, which Outside Director signed (i.e., "made"), and when they were issued. First, Enron's 1998 Report on Form 10–K, containing Enron's 1997 and 1998 annual financial statements, certified by Arthur Andersen with an "unqualified" audit report and signed by Outside Directors Foy,* Gramm,* Jaedicke,* LeMaistre,* Meyer, Urquhart, Wakeham, Walker, and Winokur, was filed on March 1999 with the SEC. Complaint at ¶¶ 136–41, 510. Moreover, in March 2000, Enron filed its 1999 Report on Form 10–K, containing Enron's 1998 and 1999 financial statements, also certified by Arthur Andersen with a "clean" audit opinion, and signed by Outside Directors Belfer,* Blake,* Chan,* Duncan,* Mendelsohn, Meyer, Pereira, Savage, Urquhart, Wakeham, and Winokur. Complaint at ¶ 221. In addition, in approximately March 2001, Enron filed with the SEC its 2000 Report on Form 10–K, containing Enron's 1999 and 2000 annual financial statements certi-

dants' acts were so highly unreasonable and amounted to such an extreme departure from the standard of ordinary care as to present a danger of misleading plaintiffs to the extent that the danger was known to defendants or was so obvious that the defendants must have been aware of it," *In re E.Spire Communications, Inc. Sec. Litig.*, 127 F.Supp.2d 734, 745, 749 (D.Md.2001) and *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir.2000), *cert. denied*, 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000); the improper accounting must constitute significant percentage (e.g., 20%) of the company's total assets, *In re Allied Products Corp., Inc. Sec. Litig.*, No. 99 C 3597, 2000 WL 1721042, *3–4 (N.D.Ill. Nov.15, 2000); ("the number, size, timing, frequency and context" of the restatement "may give rise to a stronger, or weaker, inference of scienter"), *In re MicroStrategy*, 115 F.Supp.2d 620, 635, 638–39 (E.D.Va.2000)("scienter requires more than a misapplication of accounting principles" but

can "take on significant inferential weight" through such factors). In *MicroStrategy*, the court found that "the magnitude and pervasiveness of MicroStrategy's financial restatements and the relative simplicity of the accounting principles violated ... lend further probative weight to Plaintiff's allegations that the GAAP violations in this case raise a strong inference of scienter." 115 F.Supp.2d at 651.

Nevertheless, with respect to a substantial restatement, this Court distinguishes between a corporation's inside directors, who normally participate in its operations and create its policies, and outside directors, who are supposedly independent and disinterested and who, without a showing that the situation is otherwise, rely on the insiders' disclosure of material information about the corporation's business. With respect to the latter group, the Court requires a Lead Plaintiff to establish scienter by more than the fact that a significant restatement has been made.

fied by Arthur Andersen and with a "clean" audit opinion, and signed by Outside Directors Belfer,* Blake,* Chan,* Duncan,* Gramm,* Jaedicke,* LeMaistre,* Mendelsohn, Meyer, Pereira, Savage, Urquhart, Wakeham, and Winokur. Complaint at ¶ 292. In its memorandum in opposition at 41–42, Lead Plaintiff provides a fuller list of financial statements and registration statements filed during the Class Period and the Outside Directors who signed them, with references to paragraphs in the complaint.[56]

In particular, the complaint asserts that the registration statements and prospectuses of the following Enron securities offerings were false and misleading and were signed by the identified Outside Directors: (1) the 7.375% Notes due May 15, 2019, signed by Belfer,* Blake,* Chan,* Duncan,* Foy,* Gramm,* Jaedicke,* LeMaistre,* Urquhart, Wakeham, Walker, and Winokur; (2) the 7% Exchangeable Notes due July 31, 2002, signed by Outside Directors Belfer,* Blake,* Chan,* Duncan,* Foy,* Gramm,* Jaedicke,* LeMaistre,* Mendelsohn, Meyer, Urquhart, Wakeham, and Winokur[57]; (3) the 8.375% Notes due May 23, 2005 and the 7.875% Notes due June 15, 2003, signed by Outside Directors Belfer,* Blake,* Chan,* Duncan,* Foy,* Gramm,* Jaedicke,* LeMaistre,* Meyer, Urquhart, Wakeham, Walker, and Winokur; and (4) Zero Coupon Convertible Senior Notes due in 2021, signed by Belfer,* Chan,* Duncan,* Gramm,* Jaedicke,* LeMaistre,* Mendel-

sohn, Pereira, Savage/Alliance, Wakeham, and Winokur. Complaint at ¶¶ 1006–07.

With respect to each Outside Director signatory to these SEC-filed documents whom Lead Plaintiff sues under § 10(b), i.e., Belfer,* Blake,* Chan,* Duncan,* Foy,* Gramm,* Jaedicke,* and LeMaistre,* Lead Plaintiff must allege facts sufficient to give rise to a strong inference of scienter. Lead Plaintiff attempts to demonstrate through minutes of meetings that the members of Enron's board and its key committees, which included Outside Directors, had if not actual knowledge of, at the very least access to full information about, and were severely reckless in disregarding, the activities that Lead Plaintiff contends constituted fraud and which were contrary to representations in the financial statements and registrations that they signed as fiduciaries of the corporation. Outside Directors complain that their status as members of the board and of key committees at Enron and their attendance at various meetings, which are minimally summarized in the minutes of those meetings, by themselves, cannot support a claim of fraud against any of them.

■■■ After careful review, this Court agrees with the Outside Directors and finds that both Lead Plaintiff's allegations and the contents of the minutes too brief, general, and imprecise to establish scienter, i.e., that any Outside Director attendees knew or recklessly disregarded fraudulent acts taking place and approved them to further the alleged Ponzi scheme. In-

**56.** Lead Plaintiff attempts to allege § 10(b) liability based on Outside Directors' conduct *in participating in a scheme to defraud or course of business that operated as a fraud and deceit on purchasers of Enron's publicly traded securities.* This Court has already ruled that conspiracy allegations do not state a claim under § 10(b) and that where defendants worked together, a plaintiff must allege that each defendant in the scheme committed

a prohibited manipulative or deceptive act in furtherance of the scheme to state a claim against that defendant. *Cooper v. Pickett,* 137 F.3d 616, 624 (9th Cir.1997).

**57.** Because the Court is granting Lead Plaintiff leave to amend or supplement the consolidated complaint to allege the *Pulsifer* claims based on these notes, it will at this time treat them as if they are pending.

stead the references in the minutes to various entities, transactions and problems are merely brief allusions or lists of topics touched on, presented and/or discussed during the meetings, but no particular facts or details about the presentation or discussion are recited that would indicate that the Outside Directors knew or recklessly disregarded that there was a Ponzi scheme afoot or that would suggest that their resolutions as members of the board or committees were intended to further fraud. At most they might suggest negligent failure to ask more questions or investigate the corporation's affairs in greater depth.

Moreover, to be discussed in further detail *infra* as an additional factor working against a strong inference of scienter, Lead Plaintiff has failed to plead facts showing that any of the Outside Directors personally benefitted from any nonpublic information to which he or she was given access by engaging in timely, highly unusual and suspicious insider trading of their Enron securities.

First, regarding knowledge or access to information about the formation and funding of Chewco when Enron was unable to find a legitimate buyer for the outside interest in JEDI in 1997, Lead Plaintiff points to the minutes of the November 5, 1997 Executive Committee Meeting, involving Outside Directors Duncan,* Belfer,* Foy,* LeMaistre,* and Winokur, to show that they *inter alia* knew the fraudulent details of the transaction and voted to approve it. Ex. 21, to # 858. This Court is not persuaded by Lead Plaintiff's argument. Exhibit 21 reflects that Skilling and Fastow represented to the Executive Committee that Chewco, which was acquiring a 50% interest in JEDI, was not affiliated with Enron; Exhibit 21 does not demon-

strate that Skilling and Fastow provided specific details about the purportedly illicit funding that would or should have alerted committee members to fraud. At most the minutes hint at some kind of financial relationship between Enron and Chewco: they state that Fastow revealed "that a corporate guarantee of $383 million bridge loan and a corporate guaranty of a $250 million loan to Chewco would be required. He reviewed the economics of the project, the financing arrangements and the corporate structure" of Chewco and "recommended that the Committee approve the corporate guaranties associated with the transaction." The Committee then resolved *inter alia* to approve "the financing of the purchase [by Chewco] of such interest [in JEDI] and any subsequent refinancings thereof." Such general statements are not sufficient to give rise to a strong inference of knowledge or reckless disregard of fraudulent activity on the part of Outside Director members. At most, they might be responsible for a negligent failure to ask more questions or subsequently monitor the Chewco transactions.

Exhibits 16 and 17 (copies of internal Arthur Andersen documents) and Exhibit 18 [58] reflect that Arthur Andersen alerted the Audit Committee during a presentation on February 7, 1999 to numerous areas in which it categorized much of its Enron financial reporting as high risk. The complaint at 89 identifies the following Outside Directors as sitting on the Audit Committee at that time: Chan,* Foy,* Gramm,* Jaedicke,* and Wakeham. Exhibit 18 purports to be what the minutes of that meeting, Ex. 22, describe as a "risk profile analysis of accounting judgments, disclosures judgments, and rule changes" that was presented by David Duncan of Arthur Andersen to the Enron Audit Com-

---

**58.** All three exhibits were provided to Lead Plaintiff by the U.S. Senate Permanent Subcommittee on Investigation.

mittee on February 7, 1999. Of the categories of financial reporting it rated ("SFAS 125" Securitizations, Fair Value Merchant Investments, Purchase Accounting, Off–Balance Sheet Equity Investments, Contingent Equity Funding Vehicles, Other Portfolio Monetizations, Other Structured Transactions, Pendency/Other Reserves, and Other), all but one category under the "scrutiny of judgment" risk profile and five out of eight under the "scrutiny of disclosure" risk profile were deemed by Arthur Andersen to be "high" risk. Ex. 17. Ex. 18, which is a list of the categories that Duncan discussed, is prefaced by the quoted statement, "Obviously, we are on board with all of these, but may push limits and have a high 'others could have a different view' risk profile." [59]

These documents need to be viewed in the context of Exhibit 22, the minutes of the Audit and Compliance Committee Meeting in London, England on February 7, 1999, which was attended by Outside Directors Jaedicke* (the Chairman), Chan,* Foy,* Gramm,* and Wakeham, as well as various representatives of Arthur Andersen. At that meeting Douglas King, a partner in charge of Arthur Andersen's London office, discussed the audits for 1998, stated that the accounting firm would issue an unqualified financial opinion based on its audit. King also indicated that "there would be no significant audit adjustments or new accounting policies or changes," and that the firm saw no need for modifications "in either management's judgments on accounting estimates or results of reviews of interim financial information." Ex. 22 at 1–2. Duncan then discussed Arthur Andersen's observations, "including [the] risk profile analysis of accounting judgments, disclosure judgments,

and rule changes," as well as "an assessment of the likelihood and significance of high risk in the Company's operations and strategies and pointed out key risk changes from prior years." *Id.* at 2. After "a thorough discussion" among those present, during which questions were answered by management, Arthur Andersen representatives pronounced that the firm "was comfortable with the 1998 Financial Statements." *Id.* The Committee then approved those statements for inclusion in the 1998 Annual Report to Shareholders and the 1998 Form 10–K. *Id.* The Court finds that the information presented to Outside Directors about business risks by itself and in context (involving significant discussion and assurances from Arthur Andersen and Enron management) also is not sufficient to give rise to a strong inference of scienter on the part of the Outsider Defendants. Enron was well known and often praised for its aggressive, "high flying" or "cutting edge" approach to business. Lead Plaintiff has not provided any particular facts that were presented to and that led or should have led an Outside Director to know or recklessly disregard that there was fraudulent accounting at Enron.

At a board of directors meeting on October 11–12, 1999, attended by Outside Directors Belfer,* Blake,* Duncan,* Foy,* Gramm,* Jaedicke,* LeMaistre,* Mendelsohn, Meyer, Urquhart, Wakeham, and Winokur, the formation of LJM2 was discussed and it was resolved that the directors should waive Enron's Business Conduct Policy to allow Chief Financial Officer Andrew Fastow to operate LJM2 despite a conflict of interest due to his position at Enron. Ex. 24 at 17–19 to # 858.[60] See also Ex. 23 at 2 (minutes of

---

**59.** Such information might raise issues relating to Defendants' defense to the § 11 claims that they reasonably relied on financial statements expertised by Arthur Andersen.

**60.** Lead Plaintiff's memorandum in opposition (# 853 at 3) submits a chart that reflects that the Board waived Fastow's conflict of interest three times: first for LJM1 in the spring of 1999, next for LJM2 in the fall of

the Finance Committee of an October 11, 1999 meeting attended by Outside Directors Winokur, the chairman, Belfer,* Blake,* Meyer, Urquhart, and LeMaistre*); Ex. 27 (minutes of an October 6, 2000 Finance Committee meeting attended by Winokur, Belfer,* Blake,* Meyer, Ferraz Pereira, Savage, Urquhart, Duncan,* Gramm,* LeMaistre,* and Mendelsohn, discussing in depth Fastow's role and the need for controls). The knowing waiver of Fastow's clear conflict of interest, for LJM2 and later for LJM3, is the closest that Lead Plaintiff comes to pleading scienter. The minutes demonstrate that the waiver was contrary to established Enron policy and created a possibility for fraud, but that the waiver was within the board's power. Moreover, it is also clear that the attendees were reassured that there would be identified checks on Fastow's power. Ex. 23 at 2 reflects that at a board meeting on October 11, 1999 Fastow discussed "the controls that would be put in place to manage any transactions between the Company and LJM2. ... He noted that the controls include review and approval of all transactions by the Chief Accounting Officer and the Chief Risk Officer of the Company. He stated that the Audit and Compliance Committee would, on an annual basis, review all transactions completed within the year and make any recommendations they deemed appropriate." See also Ex. 24 at 17 (reiterating these same safeguards because of Fastow's dual role as managing partner of LJM2 and CFO of Enron); Ex. 27 at 2. Moreover, the corporate secretary made two handwritten notes, apparently summarizing questions asked by Blake*, at the bottom of page 6 of Ex. 23, which reflect concerns raised and discussed: the first line states, "Blake–Has AA reviewed Causey yes, they're fine w/ it." The second entry reads, "Blake–Still concerned about 1999, and third for LJM3 in the fall of 2000

conflict of interest. Causey—Give LP enough authority to keep Andy from having too much power. LP can remove GP w/out cause." Lead Plaintiff has not pleaded the presentation to the Outside Directors of any specific facts, then or later, that would or should have alerted them to Fastow's alleged misconduct. At most the minutes give rise to an inference of negligence in Outside Directors' failure to monitor LJM2 and Fastow subsequently.

At a meeting of the board on May 1, 2000 (Ex. 26 to # 858), which included Outside Directors Winokur, Belfer,* Blake,* Savage, and Duncan, the board was informed of and approved numerous large securities offerings and loans necessary to raise fresh money for what Lead Plaintiff characterizes as a cash-starved Enron so that it could sustain the alleged Ponzi scheme. See also Complaint at ¶ 18. By itself, the need to raise money is a standard problem for corporations and their boards and would not raise a strong inference of scienter. Lead Plaintiff has not alleged specific facts made known to Outside Directors that would raise a strong inference that they knew or recklessly disregarded that the monies were being raised for anything but ordinary, legitimate corporate needs.

Lead Plaintiff maintains that the board members were routinely informed about and approved highly questionable transactions proposed by management without further inquiry or without putting controls in place, yet none of the minutes demonstrates that any facts making these transactions so highly questionable were presented to the members. See, e.g., Ex. 21 (LJM2); Ex. 24 (including mention of Enron's retail energy service business ("EES") and the Cuiaba energy project in Brazil); Ex. 25 (Minutes of the May 1, 2000 Audit and Compliance Committee, at-

(see Ex. 27 to # 853).

tended by Jaedicke,* Foy,* Gramm,* Mendelsohn, Wakeham, Duncan,* and Le-Maistre,* at which David Duncan of Arthur Andersen "discussed the financial reporting areas that AA had determined to be high priorities due to inherent risks," including "structured transactions, the merchant portfolio, commodity trading activities, project development activities, and intercompany and related party transactions." David Duncan also commented on specific areas where AA would be spending additional time including the following: 1) the formalization of accounting models, policies, and procedures relating to Enron Energy Services, LLC ("EES"), Enron Broadband Services, Inc, ("EBS"), Enron Network, and the Company's activities in Japan, 2) structured transactions related to securitizations and syndications and hedging vehicles, and 3) analysis of "the impact of rulemaking activity specifically as it relates to the Company."); Ex. 26 (May 1, 2000 Finance Committee meeting attended by Outside Directors Winokur, Belfer,* Blake,* Savage, and Duncan*)(Project Raptor presented by Ben Glisan, who had reviewed the structure of the non-affiliated entity Talon, functioning as a hedge for Enron; Richard Causey stated "that Arthur Andersen had spent considerable time analyzing the Talon structure and the governance structure of LJM2 and was comfortable with the proposed transaction. Mr. Glisan then discussed Project Raptor's risk and potential mitigants to those risks," followed by a discussion and a vote approving Raptor for recommendation to the Board.); and Ex. 27 at 4 (Oct. 6, 2000 meeting at which

*inter alia* by Richard Buy reviewed EES' problems as EES lagged behind original projections and Skilling answered questions about "EES's capital expenditures and the potential implication of the slowdown in project implementation on future earnings," and, more generally, the doubling of Value–at–Risk ("VAR") at Enron, which Buy recommended that the board make more discretionary so it could "be allocated by himself and Mr. Skilling to the business units/commodity groups"; at 2–3 also reflecting the increasing cost of obtaining capital to keep the business going and mention of a possible new private equity fund, LJM3.). *See also* Ex. 27 at 4 (Oct. 6, 2000 meeting dealing with EES' problems). These topics are vaguely and generally characterized by the minutes, were apparently discussed by the committee members with assurances of their propriety from Arthur Andersen and Enron inside management, and lacking identification of any specific facts that would support a strong inference of scienter on the part of the Outside Directors.

Lead Plaintiff asserts that in light of the "material size of [the LJM2 and associated illegitimate SPEs'] transactions and their vital importance to Enron's earnings and entire financial structure," as well as what he insists is the obvious fact that the SPEs were Enron controlled,[61] the board of directors must have had knowledge of and approved such transactions. As an example, Lead Plaintiff alleges that in the late part of 2000, two Enron's LJM2–financed Raptor SPEs were in danger of becoming unwound because they lacked sufficient credit capacity to support their obligations.

---

**61.** Lead Plaintiff cites Exhibit 23 and especially Exhibit 24 at 18 (Minutes for the Oct. 11–12, 1999 meeting of the board), at which an Enron executive (Fastow or Winokur) described LJM2, "as a potential ready purchaser of the Company's businesses and assets or as a potential contract counterparty, could provide liquidity, risk management, and other financial benefits to the Company." Such functions are not, by themselves, inherently fraudulent and do not give rise to a strong inference of scienter. Instead Lead Plaintiff would have to allege how Outside Directors were informed or learned particular facts about how LJM2 was used to defraud investors and the public.

Yet Plaintiff attempts to make the proverbial "mountain out of a mole hill" by pointing for support to the minutes of the Finance Committee for a meeting on October 6, 2000, Exhibit 27 at 3, which recite that Enron Treasurer Ben Glisan informed the Finance Committee of a "significant increase" in the "Company's guarantee portfolio." The attachments to the minutes of that meeting also make a brief reference to the structuring of one Raptor vehicle, Talon, for purported hedging. Although Lead Plaintiff argues it was not a true hedge since Enron provided the bulk of the funding consisting of its own stock, constituting merely another manipulative and deceptive device to misrepresent Enron's financial results, the minutes do not even hint at such an interpretation. No specific facts were recorded in the minutes that would raise a strong inference of scienter on the part of the Outside Directors regarding fraudulent hedging.

■ The complaint has also asserted that, following the resignation of Jeffrey Skilling, announced on August 18, 2001 only months after he had become CEO, two Enron management employees wrote letters to the Board about the possible revelation of an accounting scandal at Enron, yet the Board did not instigate an investigation nor disclose anything to the public. The Board did instigate an investigation, but by Vinson & Elkins, which Lead Plaintiff has alleged had a conflict of interest in performing it. Nevertheless, because Lead Plaintiff has not alleged facts giving rise to a strong inference of scienter on the part of the Outside Directors with respect to fraudulent activity at Enron or by Vinson & Elkins, any participation by them in the decision to assign the task to Vinson & Elkins has not been shown to be knowing or severely reckless. One of the reasons why a large corporation chooses a law firm with an outstanding reputation is confidence in the quality and integrity of its work.

■ Lead Plaintiff claims that Outside Directors breached their duty to disclose and § 10(b), in three ways: (1) trading their corporate securities without disclosure of material, nonpublic information, *O'Hagan*, 521 U.S. at 652, 117 S.Ct. 2199; *Texas Gulf Sulphur*, 401 F.2d at 848; (2) violating the SEC's Rule 10b–5, prohibiting employment of "any device scheme or artifice to defraud" and "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" and requiring complete and accurate information about publicly traded companies in all public statements on behalf of such corporations, and disregarding Item 303 of Regulation S–K, 17 C.F.R. § 229.303(a)(1)-(3) [62] ("the change in the relationship shall be disclosed.") [63] in annual and periodic reports and registration statements filed with the SEC; and (3) failure to correct prior or contemporaneous "inaccurate, incomplete, or misleading" disclosures, *Rubinstein*, 20 F.3d at 170. *See generally Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26–27 (1st Cir.1987).[64]

---

**62.** Item 303 of Regulation S–K states, "Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed."

**63.** The Court agrees with Outside Directors that a violation of Item 303 does not establish a duty to disclose that may give rise to liability under § 10(b). *See, e.g., Oran v. Stafford*, 226 F.3d 275, 287 (3d Cir.2000)(and cases cited therein).

**64.** The Court observes that while Defendants attack Lead Plaintiff's insider trading allega-

Lead Plaintiff maintains that it has demonstrated that the Outside Directors accused of fraud were present at key Enron Board and Committee meetings throughout the Class Period where nonpublic information was discussed and that they knew this information when they traded stock for personal gain. 17 C.F.R. § 240.10b5–1.

The Court has already implicitly indicated its ruling regarding these three grounds. All three grounds fail because Lead Plaintiff has failed to adequately allege facts showing that the Outside Directors had specific, nonpublic information about the alleged fraud at Enron and thus with scienter employed a device, scheme or artifice or practice or course of business to defraud or deceive any person in connection with the purchase or sale of securities. *Cooper v. Pickett,* 137 F.3d 616, 624 (9th Cir.1997). Lead Plaintiff cannot logically argue that any Outside Director failed to disclose information that Lead Plaintiff has not shown that the Outside Director had.

Insider trading allegations against the Outsider Directors also fail to establish scienter. Lead Plaintiff's memorandum in opposition, making no effort to distinguish or to focus on Enron's Outside Directors as opposed to Enron insiders, asserts, "Collectively, the Enron Defendants sold over 20 million shares of Enron stock during the Class Period for over $1.1 billion in illegal insider trading proceeds," # 853 at 65. Moreover, the complaint at 84 conclu-

sorily claims about the Enron Defendants (including insiders), "Because of their positions with the Company, each Enron Defendant had access to the adverse non-public information about the Company's business, finances, products, markets and present and future business prospects via access to internal corporate documents (including the Company's product sales, operating plan, budget and forecast and products sales reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith." Such vague generalities do not meet the heightened pleading standards laid out by this Court in prior orders for pleading scienter under § 10(b).

Other than graphs reflecting the Enron-security trading history of each Outside Director charged with fraud under § 10(b) and a chart (Ex. C to the Complaint) identifying the number of shares sold within various general price categories and what percentage the sale constituted of the holdings of each Director, the complaint does not address any specific facts about the trades by the Outside Directors.

 "Insider stock sales are not inherently suspicious; they become so only when the level of trading is 'dramatically out of line with prior trading practices at

tions as insufficient to raise a strong inference of scienter, Lead Plaintiff attempts to employ these insider trading claims for another purpose, i.e., to serve as direct violations of § 10(b) (i.e., as "deceptive devices" that violate the "relationship of trust and confidence between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position and have a resulting duty to disclose material information or refrain from trading," *O'Hagan,* 521 U.S. at 643, 652, 117 S.Ct. 2199, and a duty to correct prior statements on behalf of

the corporation, *Rubinstein,* 20 F.3d at 170). The problem is that Lead Plaintiff fails to allege facts that demonstrate that Outside Directors actually learned material confidential inside information that they had a duty to disclose but that was not disclosed. Lead Plaintiff relies on other matters aside from insider trading to satisfy its burden of pleading scienter, specifically the minutes of board and committee meetings, but these, too, as discussed, are too minimal and nonspecific to raise a strong inference of scienter.

times calculated to maximize the personal benefit from undisclosed inside information.'" *In re Vantive Corporation Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir.2002), *quoting Ronconi*, 253 F.3d at 435. Moreover, as discussed under Supplemental Applicable Law, at pages 20–22 of this memorandum and order, each sale must be viewed in context

In its memorandum in opposition, Lead Plaintiff argues generally that a comparison of the Outsider Directors' trades before the Class Period and during the Class Period, which is demonstrated in the complaint's chart for each, "clearly illustrates a substantial increase in insider trading during the Class Period" from that prior to the Class Period. # 853 at 70. It further claims that pre-Class Period sales by Belfer, Foy and Gramm "were dwarfed by their Class Period sales, evidencing that the Class Period Sales were highly unusual and suspicious in timing and amount." *Id.* Lead Plaintiff also globally observes that the Outsider Directors sold between 20–100% of their Enron holdings during the Class Period for a total of over $1 billion, with proceeds about 100 times those in prior periods. Finally it maintains that the fact that the Outside Directors did not sell all of their shares at the highest price during the Class period "does not undercut the strong inference of scienter."

Besides such generalizations, Lead Plaintiff fails to respond adequately to the Outside Directors' specific, detailed, "context" challenges to Lead Plaintiff's allegations of illicit insider trading against each to give rise to a strong inference of scienter.

Foy's only pre-Class Period trading during Lead Plaintiff's shorter base period was near the close of 1996, when he sold almost 9,920 shares of Enron stock at approximately $23 per share. Foy's two spring sales in 1999 (15,360 shares on February 25 1999 and 13,680 shares on March

18, 1999, for a total of 29,040 shares constituting 36.9% of his holdings), occurred more than a year before Foy retired in approximately June 2000, and therefore are not "readily explained" by his leaving the company, as Outside Directors have urged. Nevertheless these shares were sold at only $34 per share, far from the peak of approximately $90 only a year later and not at a time "calculated to maximize personal benefit from undisclosed inside information," and thus insufficient to give rise to a strong inference of scienter. Nor are Lead Plaintiff's claims persuasive in light of the documents it has submitted. Lead Plaintiff emphasizes that the February 25, 1999 sale "came just 18 days after [Foy] received undisclosed information at an Audit Committee meeting that Enron's accounting for structured transactions and its use of mark-to-market accounting were highly risky," while the March 18, 1999 sale took place "only two weeks after Enron's 98 10–K which Foy signed and which contained admittedly false financial information-was signed." # 853 at 72. As indicated, Lead Plaintiff has not shown through the minutes of the Audit Committee meeting on February 7, 1999 that Foy or any other Outside Director attendee (Exhibits 18 and 22 to # 858) was given access to any particular information that would have revealed the allegedly fraud in transactions and accounting going on at Enron. Moreover, hindsight provides twenty-twenty vision; Lead Plaintiff's claim that Enron's restatement in the fall of 2001 is an "admission" of fraud by Outside Director Foy in particular, without identification of any participation by Foy in the alleged fraud or that restatement, or any exposure to particular information that revealed the purported scheme, is not supportable and constitutes impermissible hindsight.

Foy's final sale about a year later in 2000 of 9,120 shares did occur shortly be-

fore he left Enron and thus is readily explainable by his retirement. Furthermore, it constituted only 11.6% of his holdings and was so small a percentage of his holdings that it is insufficient to raise a strong inference of scienter. Moreover even though the shares were sold at a higher price, approximately $72 per share, that price was still appreciably below the $90 high later that year. When viewed in the context of his prior trading history as presented by Lead Plaintiff, the number of shares sold in 1999 were fewer than he sold in his only pre-Class Period sale of 9,920 shares (for $23 a share) in 1996. Moreover, while Lead Plaintiff has limited its discussion of prior trading to twenty-seven months before the Class Period, Outside Directors note that SEC filings reflect that Foy sold a nearly identical number of shares (9,920), in February 1995, when the price was also very low. Ex. F (Foy's Form 4) to # 663.

Finally, Lead Plaintiff has not responded to the Outside Directors' argument that 30,400 shares of Foy's sale of 38,160 shares were exercises of his stock options at a time when the market price was at least three to four times the strike price. Ex. E to # 663.

Viewing the allegations as whole, the Court finds that Lead Plaintiff's pleadings fail to give rise to a strong inference of scienter on Foy's part.

Outside Directors' arguments as to why Wendy Gramm's single sale of her Enron stock in the first month of the Class Period, November 1998, at a mere $27 per share, does not raise a strong inference of scienter are completely persuasive. The sale is not dramatically out of line with her prior trading history, the timing and the price of the sole sale within the Class Period were inauspicious and clearly not designed to maximize her personal gain, and the sales are readily explainable by the conflict of interest created by her hus-band's Senate position and her retention of the stock. Although Lead Plaintiff alleges that Gramm was on the Audit Committee at the time and knew about the formation of and accounting for Chewco, this Court has indicated that Lead Plaintiff has not alleged specific facts demonstrating access to information of the purported fraud nor shown such by way of the meetings' minutes. Moreover, Gramm's stock sale did not occur until more than a year after that meeting approving the establishment of Chewco, a delay further undermining the argument that she may have learned something material that would motivate her to "unload" her Enron holdings.

Of Jaedicke's two sales during the Class Period, Lead Plaintiff asserts that he sold 5,630 shares on February 24, 2000, three months after one of the waivers of Fastow's conflict of interest and the formation of LJM2 in October 1999, and a second sale on May 2, 2001, of 8,000 shares, three months after the Audit Committee's February 2001 meeting, where the committee was informed that Enron "continued to utilize highly structured transactions, such as securitization and syndications, in which there was significant judgment required in the application of GAAP." As highlighted by Outside Directors, the first sale constituted only 8.6% of his holdings, the second only 12.9%. Both were exercises of stock options at nine times the strike price, thus economically justified even by Plaintiff's own expert's test. Such low percentages are "not suspicious in amount." *Ronconi*, 253 F.3d at 435. Moreover, the options involved in both sales were to expire within ninety days of the sales. Ex. E to # 663. Finally, as reflected in proxy statements (Ex. A to # 663; # 1200, SEC App. Tabs 88 & 20–22) Jaedicke's total holdings *of Enron stock during the Class Period* increased from 45,356 in 1998 to 57,087 in 2001, in spite of the sales. Clearly Lead

Plaintiff has failed to establish a strong inference of scienter as to Jaedicke.

Lead Plaintiff charges that Charles Le-Maistre sold 7,360 shares on December 28, 1999, two months after approval of Fastow's conflict of interest and the creations of LJM2 to boost Enron's earnings for the year, and 8,000 shares on May 10, 2001 after the Audit Committee's February 2001 meeting where Enron's high risk accounting was discussed. Outside Directors demonstrate that LeMaistre's three sales of 1,984 shares in January 1999, 7,360 shares in December 1999, and 8,000 shares in May 2001, also were all exercises of options with impending expiration dates of May 8, 1999, May 14, 2000, and May 13, 2001 (Ex. E to # 663) at a market price at least five times the strike price of the options, and thus economically justifiable. They respectively represented 3%, 11% and 12% of LeMaistre's total holdings, not unusual or suspicious in amount. Like Jaedicke, despite the three sales, LeMaistre increased his total holdings of Enron stock during the Class Period from 46,940 to 56,287 shares in 2001. Ex. A to # 663. Again, in view of all the facts, Lead Plaintiff fails to establish a strong inference of scienter as to LeMaistre.

In the same vein, Ronnie Chan's sole sale of stock in July 1999, at $42.15 per share, long before the price peaked at $90 per share, was inauspicious in timing and price. Although he sold 29% of his holdings at that time, he purchased additional shares with cash and his holdings increased during the class period. These circumstances as a whole fail to support a strong inference of scienter as to Chan.

John Duncan's single sale of 35,000 shares of stock, constituting only 20% of his Enron holdings, in May 2001 at $57.42, when, as reflected in the complaint's chart at 79, Enron's stock had generally been over $70 per share for over a year and had reached a high of $90 per share, is not suspicious in timing or amount. Outside Directors have demonstrated from proxy statements that Duncan's sale occurred when he was 74 years old (# 1200, SEC App. Tab 22 at 2), and that he, too, increased his total holdings of Enron stock each year, buying 9,920 shares in 1999, 7,360 shares in 2000, and 8,000 shares in 2001. Ex. A and I (Duncan's Form 4) to # 663. Again these facts viewed as a whole do not give rise to a strong inference of scienter as to Duncan.

The closest Lead Plaintiff comes to pleading scienter is with Blake and Belfer. In reviewing the allegations and facts available about their trading, however, the fact that Lead Plaintiff has failed to raise a strong inference of scienter about the other Outside Directors weakens any inference of scienter about Blake and Belfer. *Ronconi*, 253 F.3d at 436 ("One insider's well timed sales do not support the 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference . . . .").

Lead Plaintiff claims that Blake's single sale of 21,200 shares, or 46% of his holdings, from stock options at $80.44 per share on October 31, 2000 was "suspiciously timed three weeks after Blake attended a meeting of the Finance Committee in which he learned that Enron's weighted cost of capital was 17.17%, that there was a 'significant increase' in Enron's guarantee portfolio (due to guarantees of SPE obligations and stock hitting triggers), and that EES was 'lagging behind projections,' had substantial capital expenditures and that EES's earnings would be negatively affected." # 853 at 74, *citing* Ex. 27 to # 858 (minutes of the Finance Committee meeting on October 6, 2000.) Lead Plaintiff has taken a "kitchen sink" approach to the minutes, selecting remarks by different, unidentified individuals out of context

and mixing them together, with the effect of obfuscating rather than clarifying the facts. *See Greebel*, 194 F.3d at 206 (context is significant in determining the weight to give to the timing of insider stock sales). Despite Lead Plaintiff's obfuscation, a review of the minutes on which it relies undermines an inference of scienter. The minutes do not present a picture of imminent decline of Enron, no less cause for alarm, but, as will be shown by the Court, a discussion of numerous, ordinary topics of an ongoing business.

With respect to the cost of capital targeted by Lead Plaintiff, the minutes reflect that Fastow explained to the committee that Enron had recently changed its method of calculating the cost of capital, now "utilizing the current estimate of the equity cost component rather than the previous method, which utilized a historical calculation for the equity component," and that this new method "would impact the pricing used by the Risk Assessment Control ('RAC') group when determining the required rate of return on potential projects." Ex. 27 at 3. Then, although Lead Plaintiff presented the 17.17% cost of capital as an established fact, in context and according to the minutes Fastow "stated that *if* a project's expected returns were lower than the Company's weighted average cost of capital of 17.17%, then additional syndication or leverage would be necessary [emphasis added]."

Among other matters discussed by Fastow at that meeting was the proposed new private equity fund, LJM3, concerns about Fastow's conflict of interest, and safeguards that might be implemented to prevent problems. Moreover, both Causey

and Skilling at this meeting "discussed the benefits to the Company of having the ability to transact with the LJM funds . . . ." *Id.* These matters hardly present a picture of a corporation in deep trouble.

There is no indication in the minutes that treasurer Ben Glisan, who reviewed the company's liquidity report, including the guarantee portfolio, said that the increase in the guarantees was due "to guarantees of SPE obligations and stock hitting triggers," [65] or, more specifically, that Blake knew of or was given access to specific information about any fraudulent use of these arrangements alleged by the complaint. Instead Glisan pictured Enron as healthy, his explanations of Enron's available capital were rational and not alarming, and significantly he noted that the credit agencies had not lowered Enron's ratings:

> Mr. Glisan reviewed the liquidity report as of September 20, 2000, noted that the Company's total liquidity was currently over $7 billion, and stated that a transaction recently completed would bring the total to approximately $8 billion. He reviewed year-to-date investments and proceeds on sales of assets and noted that during the year there had been fewer asset sales and more capital invested than originally planned. He commented on the financing activity that occurred since June of 2000 and the financings still to be completed before year end. He noted that certain turbine purchases, previously approved by the Board, were requiring a significant amount of capital investment during the year. He then reviewed the Company's

**65.** As Outside Directors have complained, such general references during committee meetings to structured transactions, nonconsolidation, SPE obligations, triggers requiring Enron to issue more stock, or problems with business units such as EES were generally disclosed to the public in various documents and therefore, without more specificity or identification of patterns of conduct demonstrating fraud, do not sufficiently identify nonpublic or confidential information for purposes of stating a claim against Outside Directors for insider trading or demonstrating their alleged scienter by insider trading.

outstanding letters of credit and noted that there was no significant change since the last Committee meeting. He discussed the Company's guarantee portfolio and stated that the significant increase in the volumes transacted by the Company had led to related increases in required guarantees. He then stated that there had not been any change in the Company's ratings by the rating agencies.

Ex. 27 at 3.

Finally, Lead Plaintiff has distorted the information presented by Richard Buy in a status report about EES. While acknowledging that "actual project implementation was lagging behind the original projections," Buy also "stated that improvements have been made in developing projects." Ex. 27 at 4. He and Skilling answered questions from the attendees about "EES's capital expenditures and the *potential* implication of the slowdown in project implementation on future earnings [emphasis added]." *Id.* Their presentation was conjectural or hypothetical, and the minutes do not identify any degree of impact the slowdown might have, no less a severe one. The presentations at the meeting, as reflected in the minutes, are not sufficient to raise a strong inference of scienter on the part of Blake that would motivate him to rush out and sell a substantial portion of his stock because he knew the company was in trouble.

Outside Directors also demonstrate that Blake purchased with cash 5,000 new shares during 2001, a purchase inconsistent with the alleged scienter. Ex. J (Blake's Form 5) to # 663.

As for Belfer, Outside Directors emphasize that he not only was a major Enron shareholder before Enron's collapse, but he held onto 80% of his stock and remained Enron's biggest individual shareholder at the end of the Class Period, when the peak price of the stock at $90 per share plummeted to $4 and he lost $700 million that he could have recouped had he sold the stock at $90 per share. Outside Directors point to the substantial size of Belfer's holdings, over ten million shares during the Class Period, which explains the number of transactions and large dollar amounts involved when Belfer did sell. Nevertheless, when viewed as percentages of his total holdings, his 1999 sales constituted only 5.2%, his 2000 sales only 8.1%, and his 2001 sales only 7.2%, not suspicious amounts. In addition, as reflected in the chart in the complaint at 76, except for the sale toward the end of 2000, the timing and price at which he sold were not suspicious. When Enron's stock was over $70 for approximately fourteen months, only about 6% of Belfer's shares (approximately 1% of his available holdings) were sold at $70 or more, the rest below, and in most cases substantially below the market price. Although Lead Plaintiff asserts that Belfer held on to 214,580 shares of Enron stock because they were convertible preferred shares that would pay him enormous dividends and superior rights to common stock holders in Enron's bankruptcy, these allegations do not support a claim of illegitimate insider trading. Reviewing the facts as a whole, and keeping in mind Lead Plaintiff's failure to plead facts to raise a strong inference of scienter about any of the other Outside Directors, the Court finds that Lead Plaintiff has also failed with respect to Belfer.

In sum, Lead Plaintiff's allegations, individually and together, fail to raise a strong inference of scienter with respect to any of the Outside Directors, nor has Lead Plaintiff adequately pleaded their insider trading as a primary violation of the statute, and therefore it fails to state a § 10(b) claim against any of them.

Because Lead Plaintiff has not adequately alleged a claim for insider trading,

any § 20A claims against Outsider Defendants fails also.[66]

**2. Sections 11 and 15 Claims Against Outside Directors Belfer, Blake, Chan, Duncan, Foy, Gramm, LeMaistre, Mendelsohn, Meyer, Pereira, Urquhart, Wakeham, Walker, Winokur, and Savage**

 Because Lead Plaintiff's complaint expressly states that the claims against Outside Directors Mendelsohn, Meyer, Pereira, Urquhart, Wakeham, Walker, Winokur, and Savage are not grounded in fraud, and because the claims can be viewed as grounded in strict liability or negligence, heightened pleading standards and scienter are not applicable. *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir.2001). Similarly, although Plaintiff has failed to state a fraud claim under § 10(b) against Outside Directors Belfer, Blake, Chan, Duncan, Foy, Gramm, LeMaistre, the claims against them can also be viewed as grounded in strict liability or negligence. Because, as noted *supra*, Lead Plaintiff alleges that each of these directors signed one or more registration statements containing a materially false or misleading statement, a claim has been stated against each under § 11.

Outside Directors have asserted that an affirmative defense of reasonable reliance on Arthur Andersen's clean opinions and certifications and maintain that they had no reason to question its expertised documents. They have further asserted that as a matter of law they are entitled to it based on Lead Plaintiff's own pleadings demonstrating that reliance.

Under the statute, the Outside Directors have two defenses available to the § 11 claims, i.e., (1) that they conducted a "reasonable investigation" under § 11(b)(3)(A)(the "due diligence" defense), which they have not claimed here, and which has relevance to the second defense, (2) that they reasonably relied on the opinion of an expert under § 11(b)(3)(B). Lead Plaintiff does not have the burden of pleading and proving Defendants' affirmative defenses of due diligence and/or reliance on an expert's opinion under § 11(b)(3), which expressly places the burden on Defendants. Nor is the fact-specific determination of "the reasonableness" of a defendant's investigation or of his reliance on the opinion of an expert "a question properly resolved on a motion to dismiss." *Griffin v. PaineWebber Inc.*, 84 F.Supp.2d 508, 513 (S.D.N.Y.2000). The Court observes that in the cases cited by Outside Directors for their contention that they have an absolute defense as a matter of law to the § 11 claims, all had reached summary judgment or trial stage before a determination regarding the affirmative defense was made.

There is good reason why such a decision should not be made on a motion to dismiss pursuant to Rule 12(b)(6). "Reasonableness" with respect to these defenses is not subject to a heightened pleading standard, and there are factual issues in determining what was reasonable under the circumstances alleged by Lead Plaintiff in this action.

Lead Plaintiff has charged that Arthur Andersen was "a repeat offender with a history of failed audits, conflicts of interest and document destruction in some of the

---

66. Moreover, even if a predicate § 10(b) violation of the Exchange Act had been stated, the Court agrees with Outside Directors that Belfer's "costless collar" transactions, i.e., transfers of Enron Cumulative Second Preferred Stock to investment partnerships and exchange funds, were not "securities of the same class," 15 U.S.C. § 78t–1(a), as Plaintiffs' common stock and therefore fail to satisfy the contemporaneity requirement for the § 20A claim against him.

most egregious cases of accounting fraud in history." Complaint at 455. The complaint alleges in some detail Arthur Andersen's improper conduct, materially similar to that alleged at Enron, in providing accounting services to Waste Management, Sunbeam Corporation, Baptist Foundation of Arizona, Colonial Realty Company, and Lincoln Savings, all of which had received substantial negative coverage by the media and in all probability would have been known to the educated individuals who constituted the Outside Directors. As noted earlier, Exhibits 16, 17, and 18 reflect that Arthur Andersen alerted the Audit Committee during a presentation on February 7, 1999 to numerous areas in which it categorized much of its Enron financial reporting as "high risk." *See, e.g.,* Exhibit 18 (demonstrating that of the categories of financial reporting ("SFAS 125" Securitizations, Fair Value Merchant Investments, Purchase Accounting, Off–Balance Sheet Equity Investments, Contingent Equity Funding Vehicles, Other Portfolio Monetizations, Other Structured Transactions, Pendency/Other Reserves, and Other) Arthur Andersen rated all but one category under the "scrutiny of judgment" risk profile and five out of eight under the "scrutiny of disclosure" risk profile as "high" risk). Ex. 18 is prefaced by the quoted statement by David Duncan, "Obviously, we are on board with all of these, but may push limits and have a high 'others could have a different view' risk profile." The exhibits also reflect that some Outside Directors were concerned about the Fastow's conflict of interest in controlling LJM2 and the waiver of that conflict by the board. In the attachment to minutes of the Finance Committee meeting on October 11, 1999, Ex. 23 in # 858, the corporate secretary's handwritten notes reflect that Blake specifically questioned whether Andersen had reviewed the LJM2 proposal, and even after assurances that the proposal had been approved by the accounting firm, his

concerns persisted. *See* Ex. 23 at 6 (first entry states, "Blake–Has AA reviewed Causey yes, they're fine w/it"; the second entry reads, "Blake–Still concerned about conflict of interest. Causey—Give LP enough authority to keep Andy from having too much power. LP can remove GP w/out cause.").

██ Outside Director Defendants identify the following aftermarket purchasers as having to demonstrate reliance under § 11(a), 15 U.S.C. § 77k(a), because a Form 10–K earnings statement, covering a twelve-month period was filed after the effective date of the registration statement on which that party bases its Section 11 claim and before that plaintiff purchased the securities: (1) Van de Velde, who claimed that he purchased notes in November 2001 pursuant to a July 23, 1999 registration statement, after issuance of Enron's 10–K for 1999 in March 2000, and who has since withdrawn, mooting the challenge, and who will be replaced by Nathaniel Pulsifer, who claims that he made a timely purchase and is not required to show reliance: (2) Amalgamated Bank for a purchase made on June 29, 2001 after Enron filed its Form 10–K for 2000; (3) the Hawaii Laborers who claim to have purchased pursuant to a registration statement filed on February 5, 1999, but did not buy their notes until an offering in May 2000, after Enron filed its 1999 Form 10–K; and (4) the Archdiocese of Milwaukee, which in May 2000, after Enron filed its Form 10–K for 1999, bought securities in an aftermarket offering also initially offered pursuant to the February 5, 1999 registration statement.

Lead Plaintiff responds that Hawaii Laborers, the Archdiocese and Amalgamated Bank need not show reliance because their purchases satisfy the "effective date" requirement as defined in 17 C.F.R. § 230.158, i.e., as ("the *latest* to occur of

(1) the effective date of the registration statement; (2) the effective date of the *last post-effective amendment* to the registration statement, *next preceding a particular sale by the registrant of registered securities to the public filed* .... [emphasis added]") (see pages 23–24 of this memorandum and order). Lead Plaintiff maintains that the Outside Directors incorrectly calculated the "effective date" from the original date of the Registration Statement and Enron's filing of its Form 10–K in 2000. Lead Plaintiff claims that Enron filed a post-effective Registration Statement on 3/1/00 and the Registration Statement for the 7.85% notes incorporated by reference Enron's first quarter 2000 Form 10–Q, filed on 5/15/00, determining the "effective date" for purposes of § 77k(a)(5). Thus according to Lead Plaintiff Hawaii Laborers purchased its notes the day before and the Archdiocese purchased its notes three days after the Prospectus issued on 6/20/00, while Amalgamated purchased on 6/29/00, and therefore none has to plead reliance.

Outside Directors object that the shelf registration pursuant to which these three entities purchased was not amended on 3/1/00 and that Lead Plaintiff has provided no support for that contention. The complaint, itself, at ¶ 612, asserts that the effective date of the registration statement was February 5, 1999, the 1999 Form 10–K was filed in March 2000 before Hawaii Laborers and the Archdiocese purchased in May 2000, while the 2000 10–K was filed in March 2001, before Amalgamated Bank made a purchase on June 29, 2001. Outside Directors point out that a Form 10–Q, unlike a Form 10–K, is not "an earning statement covering a period of at least twelve months" and thus does not satisfy the § 77k(a). They insist that because

Lead Plaintiff has failed to plead reliance by any of these parties, these claims under § 11 must be dismissed. This Court concurs with the Outside Directors and accordingly dismisses those claims.

Outside Directors have argued that the § 11 claims against Walker for offerings made on May 19, 1999 and May 18, 2001 should be dismissed under 15 U.S.C. § 77k(b)(1) [67] because he was not a director at that time. They note that the complaint at ¶ 86 states that Walker was not a member of the Board on May 19, 1999 and they have submitted a document required to be filed with the SEC reflecting that at the May 4, 1999 Annual Meeting Walker was no longer on the Board of Directors. # 1200, SEC App. Tab 8 at 41. Lead Plaintiff has responded that regardless of whether Walker was a director at the time that the May 10, 1999 and July 18, 2001 offerings became effective, he did sign those statements and is therefore liable under § 11. Lead Plaintiff also asserts that Walker has not met his burden of proof and therefore the claim should not be dismissed under Rule 12(b)(6).

▬▬ In reviewing a Rule 12(b)(6) motion to dismiss a claim for securities fraud on the pleadings, the district court may take judicial notice of and consider the contents of relevant public disclosure documents that are required by law to be filed with the Securities Exchange Commission ("the SEC") and are actually filed with the SEC, with the restriction that these documents may be considered only for the purpose of determining what statements they contain and not for proving the truth of their contents. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017–18 (5th Cir.1996), *citing and adopting rule of Kramer v. Time Warner, Inc.*, 937 F.2d

**67.** Section 77k(b)(1) provides that an individual is not liable under § 11 if "before the effective date of the part of the registration statement with respect to which his liability is asserted (A) he had resigned from ... office."

767, 774 (2d Cir.1991). Thus the Court cannot view the document submitted by Outside Directors to prove that Walker had resigned before the two offerings.

Furthermore clear language of the relevant statute shows that the burden of proof is broader than merely showing that Walker was no longer on the board. Section 77k(b), by its terms, deals with "Persons exempt from liability *upon proof of issues* [emphasis added]." Section 77(b)(1) states,

> Notwithstanding the provisions of subsection (a) of this section, no person, other than the issuer, shall be liable as provided therein *who shall sustain the burden of proof*—
> (1) that before the effective date of the part of the registration statement with respect to which his liability is asserted (A) he had resigned from or had taken such steps as are permitted by law to resign from, or ceased or refused to act in, every office, capacity or relationship in which he was described in the registration statement as acting or agreeing to act, and (B) he had advised the Commission and the issuer in writing that he had taken such action and that he would not be responsible for such part of the registration statement .... [emphasis added]

15 U.S.C. § 77k(b). Therefore the Court will not dismiss the claims against Walker at this juncture.

Outside Directors have argued that Lead Plaintiff's § 11 claims based on the July 2001 private placement should be dismissed because private placement offerings are not covered by the statute. The Court agrees that § 11 does not apply to private placement offerings, but Lead Plaintiff has argued that Enron filed a registration statement for the resale of these zero-coupon notes to the public, effective on July 18, 2001. Complaint at ¶ 336. Outside Directors have not re-

sponded to this contention. Because under 12(b)(6), the Court views the alleged facts in favor of Plaintiff, the Court allows the zero coupon claims to go forward.

### 3. Controlling Person Liability

■ Because the Court has found that Lead Plaintiff has failed to plead predicate violations of § 10(b), its claims for controlling person liability under § 20(a) of the Exchange Act also fail.

■ The Court has found that Lead Plaintiff has pleaded predicate violations of § 11 by Outside Directors as a prerequisite for alleging controlling person liability under § 15 of the 1933 Act. The controlled person is Enron Corporation.

The Court has already held that under Fifth Circuit case law, a plaintiff may assert controlling person liability by alleging that the controlling person had the power to control the controlled person or to influence corporate policy, but that actual exercise of that control need not be alleged. *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 957–58 (5th Cir.1981); *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619–20 (5th Cir.1993), *cert. denied sub nom. Turnbull v. Home Ins. Co.*, 510 U.S. 1177, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). Nor does the Fifth Circuit require allegations of culpable participation in the alleged fraud. *Abbott*, 2 F.3d at 620.

Furthermore, while a director's status alone would not subject him to liability under § 15, influence over the direction of Enron would. *Dennis v. General Imaging, Inc.*, 918 F.2d 496, 509–10 (5th Cir. 1990). Outside Directors' votes relating to corporate business are evidence of their control over Enron.

### 4. Texas Securities Act Claims

Lead Plaintiff has sued Outside Directors Belfer, Blake, Chan, Duncan, Foy,

Gramm, Jaedicke, LeMaistre, Meyer, Urquhart, Wakeham, Walker, and Winokur [68] under the TSA in connection with the sale to the Washington Board of $250 million of 6.95% Notes due July 15, 2028 and $250 million of 6.40% Notes due July 15, 2006.

Although Outside Directors first argue that the Washington Board's claims under the TSA fail because it purchased its securities before the alleged misrepresentation was made and because none of the allegations against them took place during the Class Period, Lead Plaintiff's response and the complaint demonstrates that this challenge lacks merit. Lead Plaintiff has alleged events occurring prior to October 19, 1998, when the federal Class Period commences,[69] including the formation and use of the JEDI/Chewco SPEs to hide debt and recognize sham revenue, and Enron International's practice of snowballing, i.e., deferring start-up and proposal costs even after the project proposals failed, which made Enron's 1997 financial statements false or misleading. The attendant accounting manipulations asserted by the complaint were included in Enron's allegedly false 1997 Form 10–K, filed in March 1998 and incorporated into the Registration Statement used to sell the notes purchased by the Washington Board in July 1998. Lead Plaintiff further claims that the July 7, 1998 Prospectus incorporated Enron's third quarter 1997 Form 10–Q, which misrepresented accounting for contracts involving EES and thus also served to induce the Board's purchase. Thus the allegedly false financial statements and representations of Enron's debt and earnings, manipulated in part by the use of

SPEs and partnerships, along with such practices of abuse of mark-to-market accounting, hidden loans and sham hedging, described in detail in the complaint, were incorporated into Enron's offering documents. Under the TSA an issuer of securities is strictly liable for untrue statements of material fact in a prospectus accompanying a public offering. Tex.Rev. Civ. Stat. Ann. art. 581–33C(2)(Vernon 2001).

Outside Directors contend that Lead Plaintiff fails to plead that they are "sellers" under article 581–33 subdivision A of the TSA. They argue that since the complaint alleges that the sales were pursuant to a commitment order, Outside Directors could not have passed title to Plaintiffs. Lead Plaintiff, noting that the vast majority of public offerings are firm commitment offerings by which the issuer does not sell directly to purchasers, responds that the Outside Directors' argument would render the language of the TSA meaningless and be contrary to the legislature's intent. To counter Outside Directors' interpretation, Lead Plaintiff quotes from *Anheuser– Busch Cos. v. Summit Coffee Co.*, 934 S.W.2d 705, 707–08 (Tex.App.-Dallas 1996, writ dism'd)(citing Tex.Rev.Civ. Stat. Ann. art. 581–4(E)(Vernon Supp.1996)): "The term 'sell' means 'any act by which a sale is made,' and the term 'sale' or 'offer for sale' shall include ... an offer to sell, directly or indirectly, by an agent or salesman....'" This Court has indicated that Lead Plaintiff may be able to state a claim against Defendants in a firm commitment offering if it can meet the requirements of

---

**68.** Outside Director Bruce Willison was also sued under the Texas statute but has since been dismissed from this action.

**69.** The duration of the asserted federal Class Period was determined by the three-year statute of repose. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350,

111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). The TSA, in contrast has a three-year statute of limitations and a five-year statute of repose. Tex.Rev.Civ. Stat. Ann. art. 581–33H(2). Therefore the TSA reaches claims based on misrepresentations prior to the commencement of the federal Class Period on October 19, 1998.

*Pinter, Shaw* and *Lone Star Ladies Inv. Club* and allege that they were actively involved in the solicitation of the sale of the Enron securities to the Washington Board. Moreover, Lead Plaintiff insists it has not only stated a claim against Outside Directors as "sellers" under subdivision A(2), but also as control persons and/or aiders and abettors under subdivision F(1) and (2).

Not only has Lead Plaintiff failed to identify the relevant provisions of the TSA for claims against every defendant that Led Plaintiff has sued thereunder, but this Court finds that Lead Plaintiff has not stated a claim for seller liability under article 581-33A(2) for reasons indicated in its Supplemental Applicable Law, pages 44–49 of this memorandum and order, i.e., Lead Plaintiff has not alleged facts demonstrating privity between Outside Directors and the Washington Board and has not shown that Outside Directors sold or actively solicited the sale of securities to the Washington Board. Nor has Lead Plaintiff alleged the elements of a claim for control person liability under subdivision F(1) for aiding and abetting under subdivision F(2) of the statute. Although the complaint does not allege, with any speci-ficity, claims linked explicitly to one or more of the three provisions, in its memorandum in opposition to Outside Directors' motion to dismiss Lead Plaintiff has argued that it has. Defendants' objections to the impropriety of amending a complaint through responses to motions are justified. Nevertheless, to insure that justice is done, the Court concludes that it will deny the motion to dismiss and permit

Lead Plaintiff, if it can, to replead to state a claim against Outside Directors, as well as against the Enron insider officers, Arthur Andersen LLP, JP Morgan, and Lehman Brothers, for seller liability under subdivision A(2), control person liability under section 33F(1), and/or aiding and abetting liability under 33F(2).[70] The amended pleading must be clear with respect to the appropriate provisions and the elements of the claims or the claims will be dismissed.

## IV. Alliance's Motion to Dismiss

Lead Plaintiff alleges that Defendant Frank Savage was a director of Enron Corporation ("Enron") from 1999 through 2001, and that during that period he served on Enron's Finance Committee. Savage signed an allegedly false and misleading Enron Registration Statement, filed with the SEC, effective on June 1, 2001, which was used to sell $1.9 billion of Zero Coupon Convertible Senior Notes Due 1021 (the "0% Notes") on July 18, 2001. The Court has found that Lead Plaintiff has stated a claim against Savage under § 11 of the Securities Act of 1933 based on the 0% Notes, a prerequisite for pleading a controlling person claim against Alliance under § 15.

According to the complaint, during the Class Period Savage was concurrently Chairman of Alliance Capital Management International, a division of Defendant Alliance, and a director of Alliance, and also a director on the Board of Enron Corporation. The complaint further states that Alliance is a large financial services com-

---

**70.** In light of this Court's refined analysis of the TSA, the Court is uncertain whether Lead Plaintiff can allege that the Outside Directors or Arthur Andersen are liable as "sellers" in privity with the Washington Board under subdivision A(2), but it will give Lead Plaintiff an opportunity to plead such a claim if it can. With respect to the secondary actors, it ap-

pears that the underwriters may be suable under art. 581–33A(2) because Lead Plaintiff may be able to allege that they were in privity with and actively solicited the sale of securities to the Washington Board. Lead Plaintiff may also be able to and wish to state a claim against these defendants under 33F(1) and (2).

pany that offers a wide variety of financial and investment management services and owns, operates, and markets a group of Alliance Mutual Funds. Furthermore from 2000–2001, Alliance was the largest institutional shareholder of Enron, owning more that 43 million shares of Enron stock in the Alliance Mutual Funds. In addition, Alliance purchased millions of shares of Enron stock for several large institutional investor clients.

The complaint asserts that because, as a member of Enron's board of directors, Savage signed the 0% Notes Registration Statement (which incorporated Enron's allegedly false 1998, 1999, and 2000 10–K statements,[71] as well as false interim financial 10–Q report for first quarter of 2001), Savage is *prima facie* liable for their false statements or omissions under § 11 of the 1933 Act, subject to the statutory defense that he did not know or with the exercise of due care or diligence could not have

known of the falsity of the Registration Statement.[72] The complaint further alleges that Alliance was a controlling person of Savage, a corporate employer controlling its employee under simple agency theory, and is therefore liable under §§ 11 and 15 of the 1933 Act.[73] Lead Plaintiff claims that Savage sat on Enron's board of directors in 2000–2001 in order to protect Alliance's interests as the single largest outside shareholder and to insure that Alliance would benefit from information that Savage obtained as a director of Enron and a member of the Finance Committee in 2000–2001.[74] *See Feder v. Martin Marietta Corp.,* 406 F.2d 260, 265 (2d Cir.1969)(alleged facts supported inference that a defendant corporation had "deputized" its own president/CEO to represent its interests during the president/CEO's service on another public company's board of directors), *cert. denied,* 396 U.S. 1036, 90 S.Ct. 678, 24 L.Ed.2d 681 (1970).[75]

**71.** After Enron's collapse, these 10–Ks were all restated, indicating, according to Lead Plaintiff's complaint, that they were materially false when made. See footnote 55 of this memorandum and order.

**72.** In addition to financial misstatements, Lead Plaintiff notes that other assertions, such as that any transactions entered into by Enron with its "unconsolidated equity affiliates" were on terms that were reasonable if compared to terms that could have been obtained from independent third parties, were also materially misleading. Lead Plaintiff points to statements about Enron's EBS business, including the Enron Intelligence Network ("EIN")(¶¶ 636–39); about EES (¶¶ 640–41, 418–611); about Enron's capitalization (¶¶ 618–20); about Enron's financial risk management (¶¶ 625–27); about Enron's credit risk management activities and financial instruments (¶¶ 629–30). It further argues that in light of the duration of the false financial results, involving financial results over three years and the amount of money (billions of dollars), the burden here is very heavy to satisfy the statutory defense requirements.

**73.** Alliance contends, and the Court agrees, that because Alliance is not in one of those categories of persons designated as defendants for a primary violation of § 11, Alliance can only be liable as a controlling person under § 15. Thus Lead Plaintiff errs in citing both statutes with respect to its claims against Alliance.

**74.** The complaint also asserts that Savage was a member of Enron's Compensation & Management Development Committee as of March 2000.

**75.** This Court notes that in *U.S. v. Cleveland Trust Co.,* 392 F.Supp. 699, 711 (N.D.Ohio 1974), the court pointed out that in both *Feder* and in *Marquette Cement Mfg. Co. v. Andreas,* 239 F.Supp. 962 (S.D.N.Y.1965), which also recognized that "a corporation may be deemed to sit on the Board of Directors of another corporation through a 'deputy,'" the courts recognized that "'the issue of deputization is a question of fact to be settled case by case ....'". *Cleveland Trust,* 392 F.Supp. at 711, *citing Feder,* 406 F.2d at 263, and *Marquette,* 239 F.Supp. at 967.

In addition, because its § 11 claim against Savage is a "non-fraud" claim, according to explicit statements by Lead Plaintiff in the complaint, and is thus a strict liability or negligence claim, Lead Plaintiff insists that its claim against Savage and its derivative controlling person claim against Alliance need only comply with the liberal, notice pleading under Fed. R. Civ. 8 ("a short and plain statement of the claim, showing that the pleader is entitled to relief"), and that the heightened pleading standard of Rule 9(b) does not apply. *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*, 238 F.3d at 368. The Court agrees.

As a matter of law Alliance challenges Lead Plaintiff's contention that because Savage was a director and an employee of Alliance and an officer of an Alliance affiliate, Alliance is liable as a controlling person under § 15 for actions that Savage performed independently in his capacity as an outside director for an unaffiliated corporation, i.e., for Enron, from 1999–2001. Alliance further insists that Lead Plaintiff has not adequately pleaded that Alliance had the power to control Savage in connection with his decision as an outside director of Enron to sign the registration statement; indeed such a rule would provide a powerful incentive to corporations to bar their executives from serving as independent directors of other companies. Alliance quotes *Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111, 1115 (5th Cir.1980): "Congress's specific purpose in enacting § 15 was to impose liability upon persons who controlled corporations committing violations of the Securities Act but who might attempt to evade liability under common law principles by utilizing 'dummies' that would act in their place and under their control," such as a CEO who directs another person to sign a false and misleading registration statement in the CEO's place.[76] *See also* Senate Report No. 47, 73rd Cong., 1st Sess. at 5 (1933)("In order to aid in preventing directors from evading the liabilities incident to signing the registration statement, there are provisions governing 'dummy' directors."); *SEC v. Mgt. Dynamics, Inc.*, 515 F.2d 801, 812 (2d Cir. 1975)(same; "The legislative history of § 20(a) ... [and] § 15 gives no indication that Congress intended them to govern employer liability"). Instead § 15 claims are asserted against officers with the power to direct activities or statements made by the corporation. *G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 958 (5th Cir.1981)(finding officer was a control person because he was not only a "24% stockholder and an officer and director, but was ... involved in the day-to-day coordination of loan gathering."). Because a corporation can only act through or at the direction of its officers or directors, generally it is those officers who are controlling persons, directing the activities of or the making of statements by the corporation and liable for the conduct of that corporation. *See, e.g., In re Paracelsus Corp. Sec. Litig.*, 6 F.Supp.2d 626 (S.D.Tex.1998). Alliance insists that Lead Plaintiff has not pleaded facts demonstrating that Alliance had the power to control Savage's actions in his capacity as a fiduciary of Enron, i.e., to make him sign the registration statement at issue. Alliance asserts, but cannot at this stage prove, that the section 11 claim against Savage, is not based on any act that Savage performed as an Alliance employee or in his service on Alliance's board of directors, but is based exclusively on Savage's activities as outside director on Enron's board. Alliance maintains that it has found no

---

**76.** The Court notes that Lead Plaintiff's complaint encompasses the possible scenario that Alliance may be using Savage as a dummy to accomplish what it wants done at Enron.

authority that would impose controlling person liability on that basis alone, which would be contrary to the intent and purpose of § 15.

Moreover, Alliance contends that the good faith defense provided by the statute (if the "controlling person had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist," 15 U.S.C. § 77o), "made explicit Congress's intention of imposing liability under the controlling person provisions only on the basis of a failure to exercise due care." *Paul F. Newton & Co.* 630 F.2d at 1115. Alliance observes that while an entity employer may have a duty of care to supervise its employees within the scope of their employment, it does not have such a duty, statutory or otherwise, with respect to the employee's activities outside the scope of the employment, i.e., while serving as an outside director on the board of a separate, unaffiliated corporation. *See generally Sennott v. Rodman & Renshaw,* 474 F.2d 32, 40 (7th Cir.1973)(a company's "duty to control its partners and agents, as well as its past employees ... extends only to transactions with or by these parties where [the company] itself [is] involved.... To extend it further would be to impose liability upon [a company] for virtually any act of its past or present employees and partners regardless of how remote and unrelated that act might be to [that company].")*, cert. denied,* 414 U.S. 926, 94 S.Ct. 224, 38 L.Ed.2d 160 (1973).

Furthermore in the Fifth Circuit, Alliance urges, to establish a controlling person claim "a plaintiff must show that the defendant at least had power to control the 'controlled person' in the specific transaction that is alleged as a violation." *Paracelsus,* 6 F.Supp.2d at 633. Alliance emphasizes that Lead Plaintiff has not alleged any facts showing that Alliance had

the power to make Savage sign the registration statement at issue. Furthermore, although Lead Plaintiff has asserted that Alliance (and therefore Savage) "had a huge motive to keep Enron stock trading at very high levels," the test for a "controlling person" rests not on motive, but on having the power to control. *Abbott v. Equity Group, Inc.,* 2 F.3d at 620.

In addition, insists Alliance, while there is authority for the proposition that as a director of Alliance, Savage was a controlling person of that corporation, there is none for the contention that the director is a controlled person of the corporation merely by virtue of his position.

Lead Plaintiff has also alleged that Savage sat on Enron's board to protect Alliance's interest in Enron and so that Alliance could receive the benefits of information acquired by Savage as an Enron director and member of Enron's Finance Committee. Alliance emphasizes that Lead Plaintiff has not alleged any specific manner by which Savage protected Alliance's interest, any benefits that Alliance received from Savage's membership on the board. The Court notes that heightened pleading is not required for a § 15 claim, and that these matters can not be determined prior to an opportunity for discovery.

Finally Alliance argues that imposing controlling person liability on it in this case in light of the law and the circumstances would be contrary to public policy because such a rule would mean that any company that owned stock in another company would be deemed to have a motive to control that other company and therefore the power to control any officer or employee sitting on the other company's board. Facing open-ended and potentially enormous liability and litigations costs, a company would have a strong incentive to bar its employees from serving as independent

directors of other companies, or the executives would be deterred from accepting such positions because of the risks of exposing their own employers to such financial costs. Thus the public would suffer from the loss of highly qualified outside directors, who play an important role as independent watch dogs checking on management. *Burks v. Lasker*, 441 U.S. 471, 484, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979).[77]

In response Lead Plaintiff objects that Alliance is blending theories, i.e., respondeat superior, which would require a determination of Savage's scope of employment, and alternatively, the much broader controlling person liability under § 15, which also provides Alliance with a possible statutory good faith defense. The Court agrees and further notes that these are matters warranting discovery.

■■■ After reviewing the briefing and the applicable law, this Court concludes that Lead Plaintiff has stated a claim against Alliance under § 15.

First it has pleaded a claim for § 11 claim against Savage as a prerequisite for a § 15 claim against Alliance.

As indicated in the Court's summary of controlling person law in # 1241, for both § 15 and § 20(a) the Fifth Circuit requires more than a mere identification of a person's status or position in the corporate hierarchy: at minimum a plaintiff must allege some facts demonstrating that the defendant "had the requisite power to directly or indirectly control or influence" the primary violator's actions or "day-to-day control" or "knowledge" of the underlying violation. Furthermore, this Court has decided that the Fifth Circuit would not apply the pleading-with-particularity requirement of Rule 9 to controlling person liability. Under Rule 8, " '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002), *citing Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

While many of Lead Plaintiff's allegations appear somewhat speculative, this Court cannot find that there is no set of facts that might be consistent with Lead Plaintiff's controlling person allegations. As noted in its memorandum and order regarding the motions to dismiss of Individual Anderson Defendants, the SEC has defined "control" to mean "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12(b)—2(f). Lead Plaintiff has pleaded that from 2000–01, during the time

---

**77.** In a footnote Alliance observes that since Plaintiff Staro Asset Management ("Staro") is the only plaintiff that has asserted that it purchased the 0% Notes, but does not state that it did so in the offering, it may lack standing to sue Savage under § 11. If so, or if for any other reasons the § 11 claim against Savage is dismissed, the derivative controlling person claim against Alliance under § 15 would also fail. *Dennis v. General Imaging, Inc.*, 918 F.2d at 509.

Although the Fifth Circuit has not addressed the question, this Court has done so several times in the past and has agreed with the two federal appellate courts that have ruled on the issue based on the statute's language and legislative history. The Court holds that after-market securities purchasers who can trace the purchase of their stock to a misleading registration statement (i.e., make a *prima facie* showing that their stock was issued under that defective registration statement) have standing to sue under § 11 even if they did not purchase their shares in the initial or secondary offering. *See, e.g., Lee v. Ernst & Young, L.L.P.*, 294 F.3d 969, 977 (8th Cir.2002); *Joseph v. Wiles*, 223 F.3d 1155 (10th Cir.2000); *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 (9th Cir.1999).

that Savage allegedly signed a false and misleading registration statement with the SEC on June 1, 2001, Alliance was the largest institutional shareholder of Enron, clearly a basis for power to control Enron and impliedly a major reason for Savage's appointment to the Enron board. Although Alliance argues that the complaint fails to allege that Alliance owned any shares when Savage first became an Enron director in 1999, that omission by itself will not support dismissal. Alliance does not deny that it owned substantial Enron securities in 1999, as it certainly could have. Consistent with Rule 8, this Court must find that such possible ownership would be consistent with Lead Plaintiff's controlling person allegations. Moreover, it cannot be ignored that Alliance was Savage's employer, and, even more significantly, as Alliance's chairman, Savage additionally had a duty of loyalty to Alliance. According to the complaint, Alliance's enormous investments in Enron stock (over 43 million shares in Alliance mutual funds) purportedly motivated it and Savage to put Savage on the Enron Board to keep the value of Enron stock high and to protect Alliance's interests. For these reasons the Court finds that Lead Plaintiff has stated a § 15 controlling person claim against Alliance and denies Alliance's motion to dismiss. Alliance's objections may more appropriately be raised on summary judgment after discovery.

Accordingly for the reasons stated *supra*, the Court

ORDERS the following:

(1) Certain Defendants' motion to strike the *Pulsifer* complaint (# 1042) is DENIED and Lead Plaintiff is granted leave to amend or supplement to add the *Pulsifer* action's claims to those in the consolidated complaint when a deadline for such amendment is set by the Court;

(2) Certain Current and Former Directors' Motion to Dismiss Pursuant to Fed. R. of Civ. P. 8 (# 661) is DENIED;

(3) [Present and Former Outside Directors] Robert A. Belfer, Norman P. Blake, Jr., Ronnie C. Chan, John H. Duncan, Joe H. Foy, Wendy L. Gramm, Robert K. Jaedicke, Charles A. LeMaistre, John Mendelsohn, Jerome J. Meyer, Paulo V. Ferraz Pereira, Frank Savage, John Wakeham, Charles E. Walker, and Herbert S. Winokur's motion to dismiss (# 662) is GRANTED as to Lead Plaintiff's claims under § 10(b); under § 20A; under § 20(a); and under § 11 for failure to plead reliance for purchases of notes issued pursuant to a registration statement filed on February 5, 1999, against Amalgamated Bank for a purchase made on June 29, 2001 after Enron filed its Form 10–K for 2000 in March 2001, and against Hawaii Laborers and the Archdiocese of Milwaukee for their purchases of notes in May 2000 after Enron filed its Form 10–K for 1999 in March 2000;

(4) Outside Directors' motion to dismiss (# 662) is DENIED as to the remaining claims under § 11;

(5) John A. Urquhart's motion to dismiss (# 647) is DENIED as to claims under § 11 and 15 of the 1933 Act;

(6) Outside Directors' and Urquhart's motions to dismiss (# 662 and 647) are currently DENIED as to claims under the TSA, provided that Lead Plaintiff, if it can, repleads all of its claims under the art. 531–33A(2), F(1), and F(2) with the requisite identification of the proper provision and pleading of the appropriate elements with respect to each defendant after the Court has finished reviewing the remaining motions to dismiss Lead Plaintiff's complaint in *Newby* and sets a deadline for amendment/supplementation; Defendants in turn may file

timely supplemental motions to dismiss such claims, if appropriate;

(7) Alliance Capital Management L.P.'s ("Alliance's") motion to dismiss (# 618) is DENIED; and

(8) Because in reviewing of all motions to dismiss, the Court has been and will continue to weigh whether to permit amendment according to whether Lead Plaintiff has demonstrated in pleadings that it may have a viable claim, Lead Plaintiff's motion for leave to amend (# 839) is MOOT.